ORANGE COUNTY COASTKEEPER
INLAND EMPIRE WATERKEEPER
Colin Kelly (Bar No. 266956)
        Email:  colin@coastkeeper.org
Sarah Spinuzzi (Bar No. 305658)
        Email:  sarah@coastkeeper.org
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone:  (714) 850-1965

*Attorneys for Plaintiffs Inland Empire Waterkeeper*
*& Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

INLAND EMPIRE WATERKEEPER, a project of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California non-profit corporation;

                    Plaintiffs,

        v.

CORONA CLAY CO., a California Corporation;

                    Defendant.

Civil Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)**

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeeper" or "Plaintiff"), by and through counsel, hereby allege:

## I.      JURISDICTION AND VENUE

2.      1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).On December 13, 2017, Plaintiff issued a 60-day notice letter ("Notice Letter") to Corona Clay Co. ("Corona Clay" or "Defendant"), which is

attached hereto as Exhibit A and incorporated by reference herein. The Notice Letter informed Corona Clay of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*) (hereinafter "Storm Water Permit") and the Clean Water Act at the industrial facility located at 10600 Dawson Road, Corona, California 92883 ("Corona Clay Facility" or "Facility"). The Notice Letter informed Corona Clay of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.     The Notice Letter was also sent to the registered agent for Defendant, the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

5.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at

the Facility.

## II.      INTRODUCTION

7.      This complaint seeks relief for the Defendant's unlawful discharges of pollutants into waters of the United States from their industrial operations at 10600 Dawson Canyon Road, Corona, California 92883 (the "Facility"). Specifically, Defendant's discharge of pollutants from the Facility to Temescal Creek, the Santa Ana River, and the Pacific Ocean (collectively referred to as the "Receiving Waters") in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations are ongoing and continuous.

## III.      PARTIES

### A. Inland Empire Waterkeeper and Orange County Coastkeeper.

1.      Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

2.      Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

3.      Together with Orange County Coastkeeper, Waterkeeper has approximately over 6,000 members who live and/or recreate in and around the Santa Ana River watershed. Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself, its members, and others.

4.      Waterkeeper's members use and enjoy the Santa Ana River watershed and its tributaries for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing, kayaking, hiking, engaging in scientific study, including monitoring and research activities, and/or for aesthetic enjoyment.

Complaint                                    3

5.    Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Santa Ana River watershed, and impair Waterkeeper's members' use and enjoyment of those waters.

6.    The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Corona Clay's failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Waterkeeper caused by Corona Clay's activities.

7.    Continuing commission of the acts and omissions alleged herein will irreparably harm Waterkeeper's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owner and/or Operator of the Facility.**

8.    Plaintiff is informed and believes, and thereon alleges, that Corona Clay Co. is an owner of the Facility.

9.    Plaintiff is informed and believes, and thereon alleges, that Corona Clay Co. has owned the Corona Clay Facility since at least 1995.

10.    Plaintiff is informed and believes, and thereon alleges, that Corona Clay Co. is an operator of the Facility.

11.    Plaintiff is informed and believes, and thereon alleges, that Corona Clay Co. is an active California Corporation.

12.    Plaintiff is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Corona Clay Co. is Craig Deleo, 22097 Knabe Road, Corona, CA 92883.

13.    Plaintiff refers to Corona Clay Co. herein as the "Facility Owner and/or Operator."

IV.     **LEGAL BACKGROUND**

    A.     **The Clean Water Act.**

    14.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

    15.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

    16.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

    17.     The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

    18.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

    19.     The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

    20.     The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal.*

Complaint                                     5

*River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

21.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

22.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

23.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

24.     Corona Clay Co. is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

25.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

26.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day, pursuant to Sections 309(d) and 505 of the CWA occurring after January 12, 2009 and $51,570 per day per violation for all violations that occurred after November 2, 2015, and were assessed before January 15, 2017, and $52,414 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after January 15, 2017. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

27.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B.    California's Storm Water Permit.**

28.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

29.    Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

30.    California is a state authorized by EPA to issue NPDES permits.

31.    In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

32.    The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

33.    Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Plaintiffs refer to as the "1997 Permit."

34.    On July 1, 2015, pursuant to Order No. 2014-0057-DWQ the Storm Water Permit was reissued, which Plaintiff refers to as the "2015 Permit."

35.    The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. *See* 2015 Permit, Finding 6.

36.    In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. 1997 Permit, Finding #2; 2015 Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of

Complaint                               7

Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Finding #3; *see also* 2015 Permit, Finding 17.

37.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* 1997 Permit, Section C(1) (Standard Provisions); *see also* 2015 Permit, Section XXI(A) (Duty to Comply).

C.     **The Storm Water Permit Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.**

38.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* 1997 Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III(B).

39.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), and pH. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section V(A).

40.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A).

41.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm

Complaint                                          8

water discharges ("EPA Benchmarks").

42.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

43.     The EPA Benchmarks for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); TSS – 100 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facilities.

44.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility. *Id.*

45.     The Storm Water Permit Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* 1997 Permit, Receiving Water Limitation C(1); *see also* 2015 Permit, Section VI(B).

46.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the 1997 Permit and Section VI(B) of the 2015 Permit.

47.     The Storm Water Permit Receiving Water Limitations also prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan." *See* 1997 Permit, Receiving Water Limitation C(2); *see also* 2015 Permit, Receiving Water Limitation VI(A).

48.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

49.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan that contains WQS for water bodies within its geographical area.

50.     The Water Quality Control Plan for the Santa Ana River Basin, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Santa Ana Basin Plan") identifies the "Beneficial Uses" of water bodies in the Santa Ana region.

51.     The existing and/or potential Beneficial Uses for Temescal Wash downstream of the point at which it receives storm water discharges from the Corona Clay Facility identified in the Santa Ana Basin Plan include: Agricultural Supply, Industrial Service Supply, Ground Water Recharge, Water Contact Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Rare, Threatened, or Endangered Species Habitat. *See* Santa Ana Basin Plan at Table 3-1.

52.     The existing and/or potential Beneficial Uses of the Santa Ana River downstream of the point at which it receives storm water discharges from the Corona Clay Facility identified in the Santa Ana Basin Plan include: Agricultural Supply, Ground Water Recharge, Water Contact Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Rare, Threatened, or Endangered Species Habitat, and Spawning, Reproduction and Development. *See* Santa Ana Basin Plan at Table 3-1.

53.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

54.     According to the 2014/2016 303(d) List of Impaired Water Bodies, Santa Ana River, Reach 3 is impaired for copper and lead, and Prado Flood Control Basin is impaired for pH.

55.     Polluted discharges from industrial sites, such as the Corona Clay Facility, contribute to the degradation of these already impaired surface waters and aquatic-

dependent wildlife.

56.    Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

57.    WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

58.    The Santa Ana Basin Plan sets forth, among other things, narrative WQS for inland surface waters for floating material, oil and grease, pH, settleable matter, suspended materials, and toxic substances.

59.    The Santa Ana Basin Plan provides that "[w]aste discharged shall not result in coloration of the receiving waters which causes a nuisance or adversely affects beneficial uses" *See* Santa Ana Basin Plan, 4-10.

60.    The Santa Ana Basin Plan provides that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affects beneficial uses." *See* Santa Ana Basin Plan, 4-11.

61.    The Santa Ana Basin Plan prohibits discharges from contributing discharges "contain[ing] suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors" *See* Santa Ana Basin Plan, 4-16.

62.    The Santa Ana Basin Plan provides that "inland surface waters of the region shall be free of changes in turbidity which adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-18.

63.    The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." See Santa Ana Basin Plan, 4-18.

64.    The Santa Ana Basin Plan provides that "[w]aste discharges shall not result in increases in COD levels in inland surface waters which exceed the values shown in Table 4-1 or which adversely affect beneficial uses." See Santa Ana Basin Plan, 4-9.

1     65.    The Santa Ana Basin Plan includes a toxicity standard which states that

2 "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not

3 adversely affect beneficial uses." See Santa Ana Basin Plan, 4-20.

4     66.    WQS applicable to dischargers covered by the Storm Water Permit include,

5 but are not limited to, those set out in the Santa Ana Basin Plan and in the Criteria for

6 Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

7     67.    The CTR includes numeric criteria set to protect human health and the

8 environment in the State of California. Water Quality Standards; Establishment of

9 Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-

10 823-00-008 (April 2000), available at:

11 http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

12     68.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan

13 standards, and/or other applicable WQS are violations of Receiving Water Limitation

14 C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

15    **D.**    **The Storm Water Permit Storm Water Pollution Prevention Plan**

16         **Requirements.**

17     69.    Dischargers must develop and implement a Storm Water Pollution

18 Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section

19 A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must

20 identify and evaluate sources of pollutants associated with industrial activities that may

21 affect the quality of storm water and authorized non-storm water discharges from the

22 facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must

23 identify and implement site-specific BMPs to reduce or prevent pollutants associated

24 with industrial activities in storm water and authorized non-storm water discharges. 1997

25 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that

26 achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order

27 Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

70.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

71.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

72.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections

A(9)(a)-(c); 2015 Permit, Section XV.

73.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. 1997 Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

74.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.     The Storm Water Permit Monitoring and Reporting Requirements.**

75.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The 2015 Permit requires implementation of an M&RP. 2015 Permit, Sections X(I) and XI.

76.     The M&RP must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *See* 1997 Permit, Section B(2).  The M&RP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

77.     The 2015 Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the 2015 Permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

Complaint                                                14

78.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Sections X(I) and XI.

79.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

80.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of storm water discharges.

81.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit require dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3).

82.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

83.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

84.     Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm

events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

85. Section B(5)(b) of the 1997 Permit required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

86. Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

87. Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

88. Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

89. Section B(5)(c)(i) of the 1997 Permit required dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for O&G instead of TOC.

90. Section B(5)(c)(ii) of the 1997 Permit required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

91. Section B(5)(c)(iii) and Table D of the 1997 Permit and Table 1 of the 2015 Permit require facilities classified as Standard Industrial Classification ("SIC") code 3295 (Minerals and Earths), such as this Facility, to also analyze storm water samples for iron, as well as other parameters required by the Regional Board.

92. Section XI(B)(6)(a)-(b) of the 2015 Permit requires dischargers to analyze samples for TSS, O&G, and pH.

93.     Section XI(B)(6)(c) of the 2015 Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

94.     Section XI(B)(6) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

95.     Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

96.     Section XVI of the 2015 requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**F.     The 2015 Permit Exceedance Response Actions Requirements.**

97.     When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." See 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a Numeric Action Level ("NAL") exceedance for that same parameter. *See* 2015 Permit, Section XII(C).

98.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practioner ("QISP"),

1    of the industrial pollutant sources at the facility that are or may be related to the NAL

2    exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and

3    any additional BMPs and SWPPP revisions necessary to prevent future NAL

4    exceedances and to comply with the requirements of Storm Water Permit. *See* 2015

5    Permit, Section XII(C)(1)(a)-(c).

6        99.    Although the evaluation may focus on the drainage areas where the NAL

7    exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section

8    XII(C)(1)(c).

9        100.    Based upon this Level 1 status evaluation, the permittee is required to, as

10    soon as practicable but no later than January 1 following commencement of Level 1

11    status, revise the SWPPP as necessary and implement any additional BMPs identified in

12    the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action

13    ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA

14    Evaluation and a detailed description of the SWPPP revisions and any additional BMPs

15    for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii).

16        101.    The permittee in Level 1 status must also certify and submit via SMARTS

17    the QISP's identification number, name, and contact information (telephone number, e-

18    mail address) no later than January 1 following commencement of Level 1 status. *See*

19    2015 Permit, Section XII(C)(2)(a)(iii).

20        102.    A permittee's Level 1 status for a parameter will return to Baseline status

21    once a Level 1 ERA Report has been completed, all identified additional BMPs have

22    been implemented, and results from four (4) consecutive qualified storm events that were

23    sampled subsequent to BMP implementation indicate no additional NAL exceedances for

24    that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

25        103.    A permittee's Level 1 status for any given parameter shall change to Level 2

26    status if sampling results indicate an NAL exceedance for that same parameter while the

27    Discharger is in Level 1. Level 2 status commences on July 1 following the reporting

28    year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII(D).

Complaint          18

# V.        FACTUAL BACKGROUND

## A.    The Facility's Storm Water Permit Coverage.

104.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator obtained Storm Water Permit coverage for the Corona Clay Facility on October 27, 2014 by submitting a Notice of Intent ("2014 NOI") to the State Board.

105.   Plaintiff is informed and believes, and thereon alleges, that the Corona Clay Facility was in operation, but unpermitted prior to October 27, 2014.

106.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator submitted an NOI to continue coverage for the Facility under the 2015 Permit on July 7, 2015 ("2015 NOI")

107.   Plaintiff is informed and believes, and thereon alleges, that in the 2015 NOI, the Facility Owner and/or Operator identified the owner/operator of the Corona Clay Facility as "Corona Clay Recycling Plant" and the facility name and location as "Corona Clay Recycling Plant, 10600 Dawson Canyon Road, Corona, CA 92883."

108.   The 2015 NOI lists the Corona Clay Facility as 20.3 acres in size.

109.   The 2015 NOI fails to list the imperviousness of the Corona Clay Facility.

110.   The State Board's electronic SMARTS database, lists the current Corona Clay Facility Waste Discharge Identification ("WDID") number as 8 33I025117.

111.   SMARTS lists the Corona Clay Facility's coverage under the Storm Water Permit as "Active."

112.   The 2015 NOI lists the SIC code for the Corona Clay Facility as 3295 (Minerals and Earths).

113.   Plaintiff is informed and believes, and thereon alleges, that SIC code 4231 (terminal and joint terminal maintenance facilities for motor freight transportation) applies to the Corona Clay Facility.

114.   Plaintiff is informed and believes, and thereon alleges, that SIC code 4212 (local trucking without storage) applies to the Corona Clay Facility.

115.   Plaintiff is informed and believes, and thereon alleges, that SIC code 5032 (brick, stone and related construction materials) applies to the Corona Clay Facility.

**B.   Description of Industrial Activities at the Facilities.**

116.   Plaintiff is informed and believes, and thereon alleges, that the Facility is a clay manufacturing facility.

117.   Plaintiff is informed and believes, and thereon alleges, that the Facility crushes clay tile and used brick to create a clay-like substance.

118.   Plaintiff is informed and believes, and thereon alleges, that raw materials, including clay are delivered and stored at the Facility.

119.   Plaintiff is informed and believes, and thereon alleges, that the Facility contains a personal collection of antique and historical mining equipment.

120.   Plaintiff is informed and believes, and thereon alleges, that the personal collection of antique and historical mining equipment in the Facility is uncovered.

121.   Plaintiff is informed and believes, and thereon alleges, that the owner and/or operator Corona Clay intends to develop the personal collection in the Facility into a museum of construction, mining equipment, and other historical artifacts.

122.   Plaintiff is informed and believes, and thereon alleges, that the Facility is partially leased to Masonry Works, a brick cutting operation.

123.   Plaintiff is informed and believes, and thereon alleges, that used brick is imported to the Masonry Works and then cut.

124.   Plaintiff is informed and believes, and thereon alleges, that the broken or rejected pieces of brick to Masonry Works are deposited into the existing machine and conveyed to the Facility equipment via an underground conveyor.

125.   Plaintiff is informed and believes, and thereon alleges, that the clay manufacturing process at the Facility also includes onsite vehicle and mobile equipment operating, parking, fueling, and maintenance.

126.   Plaintiff is informed and believes, and thereon alleges, that the Facility includes maintaining clay transport vehicles.

127.   Plaintiff is informed and believes, and thereon alleges, that the Facility include hazardous materials storage areas such as diesel fuel, new vehicle fluids, and hazardous waste vehicle fluids.

128.   Plaintiff is informed and believes, and thereon alleges, that the Facility includes clay truck parking.

129.   Plaintiff is informed and believes, and thereon alleges, that the Facility includes unloading of clay.

130.   Plaintiff is informed and believes, and thereon alleges, that the Facility includes storage of clay.

131.   Plaintiff is informed and believes, and thereon alleges, that the Facility includes storage of chemical additives.

132.   Plaintiff is informed and believes, and thereon alleges, that the activities and/or areas listed in paragraphs 116-131 are industrial activities and/or areas of industrial activity at the Facilities.

**C.     Defendant's SWPPP and M&RP for the Facility.**

133.   The SWPPP and M&RP publicly available for the Corona Clay Facility via the SMARTS database is dated June 23, 2015, revised October 24, 2016.

134.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP and M&RP referenced in paragraphs 133 are the current SWPPPs and M&RPs for the Facility.

**D.     Industrial Activities, Pollutant Sources, Pollutants, and BMPs at the Facility.**

135.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas of industrial activity are pollutant sources at the Facility.

136.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to the activities described in paragraphs 116-132.

137.   Sections 1 and 2.1, Table 1 and 2, of the SWPPP for the Facility provide brief descriptions of the areas where industrial activities are conducted at the Facilities.

138.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility does not include all areas of industrial activity at the Facilities.

139.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility does not adequately describe all industrial processes at the Facility.

140.   Plaintiff is informed and believes, and thereon alleges, that a site map dated October 24, 2016 ("October 24 map"), was uploaded to SMARTS on May 09, 2017, and that the October 24 map is a map of the Corona Clay Facility submitted pursuant to Section II(B)(3)(a) of the 2015 Permit.

141.   Plaintiff is informed and believes, and thereon alleges, that the October 24 map does not identify all areas of industrial activity at the Corona Clay Facility.

142.   Plaintiff is informed and believes, and thereon alleges, that the October 24 map does not identify all discharge locations at the Corona Clay Facility.

143.   Plaintiff is informed and believes, and thereon alleges, that the October 24 map does not include locations and descriptions of structural control measures that affect industrial storm water discharges at the Corona Clay Facility.

144.   Plaintiff is informed and believes, and thereon alleges, that the October 24 map does not identify locations where materials are directly exposed to precipitation at the Corona Clay Facility.

145.   Plaintiff is informed and believes, and thereon alleges, that the October 24 map does not include notes, legends, and other data appropriate to ensure the site map is clear, legible, and understandable.

146.   Plaintiffs is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without adequate cover to prevent storm water exposure to pollutant sources.

147.   Plaintiff is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility outdoors without secondary containment or other

adequate treatment measures to prevent polluted storm water from discharging from the Facility.

148.   Plaintiff is informed and believes, and thereon alleges, that because the Facility's SWPPP fails to describe all of the industrial activities, the Facility's SWPPP also fails to describe all of the significant materials and processes that are related to the industrial activities at the Facility.

149.   Plaintiff is informed and believes, and thereon alleges, that because all significant materials have not been identified, the Facility's SWPPP fails to describe the locations where the materials are stored, received, shipped, and handled, or the typical quantities and frequency of significant materials at the Facility.

150.   Section 2.1, Table 1 and 2, of the Facility's SWPPP identifies potential pollutants associated with the industrial activities at the Facility

151.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe all of the pollutants associated with the industrial activities at the Facilities.

152.   Plaintiff is informed and believes, and thereon alleges, that the Owner and/or Operator of the Facility have failed and continue to fail to adequately assess pollutants associated with potential pollutant sources at the Facility.

153.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP does not include an adequate assessment of pollutants associated with potential pollutant sources at the Facility.

154.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with industrial activities and areas the Facilities include, but are not limited to: pH affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); BOD; TSS; N+N; SC; benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; total kjehldahl nitrogen ("TKN"); trash; and O&G.

155.   Section 3 of the Facility's SWPPP identifies the BMPs for the areas of industrial activity at the Facility.

156.   Section 3 of the Facility's SWPPP lists the BMPs at the Facility.

157.   Section 2 of the Facility's SWPPP includes an Assessment of "Potential Pollutant Sources" at the Facility.

158.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP fails to describe adequate BMPs to reduce or prevent pollutants in the discharges from the Facility.

159.   Plaintiff is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

160.   Plaintiff is informed and believes, and thereon alleges, that without properly identifying all industrial activities at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not implemented all appropriate BMPs.

161.   Plaintiff is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not developed all appropriate BMPs.

162.   Plaintiff is informed and believes, and thereon alleges, that without properly identifying all significant materials at the Facility in the SWPPP, the Facility Owner and/or Operator cannot and has not implemented all appropriate BMPs.

163.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP does not include an adequate assessment of potential pollutant sources at the Facility.

164.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to assess the BMPs at the Facility corresponding to potential pollutant sources and associated pollutants.

165.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP does not include an adequate assessment of the BMPs at the Facility

corresponding to potential pollutant sources and associated pollutants.

166.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to assess potential pollutant sources at the Facility.

167.   Plaintiff is informed and believes, and thereon alleges, that the Facility SWPPP does not include an adequate description of the BMPs at the Facility.

168.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to analyze the effectiveness of the BMPs at the Facility.

169.   Plaintiff is informed and believes, and thereon alleges, that the Facility's SWPPP do not include an adequate analysis of the effectiveness of the BMPs at the Facility.

170.   Plaintiff is informed and believes, and thereon alleges, that storm water sampling at the Facility demonstrates that the Facility's storm water discharges from the Facility contain concentrations of pollutants above EPA Benchmarks, including, but not limited to: aluminum, iron, pH, N+N, and TSS.

171.   Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or Operator failed and continue to fail to develop BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

172.   Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedance of EPA Benchmarks demonstrate that the Facility Owner and/or Operator failed and continue to fail to implement BMPs to prevent the exposure of pollutants to storm water, and to prevent discharges of polluted storm water from the Facility.

173.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continue to fail to adequately revise the Facility's

SWPPP.

### E.   Discharge Locations at the Facility.

####    a.  Discharge Locations at the Corona Clay Facility.

174.   The Facility Owner and/or Operator states that the Corona Clay Facility is considered a single drainage area ("DA 1") and identify two discharge points at the Facility: Discharge Point #1 ("DP #1") and Discharge Point #2 ("DP #2").

175.   The attachment to Corona Clay Facility's SWPPP is a map of the entrance, as well as hand-drawn pictures of the storm water being directed towards a silt basin downstream. *See* SWPPP, Map 3 and 4.

176.   The Facility Owner and/or Operator states Corona Clay Facility SWPPP that there is one discharge location at the Corona Clay Facility: Access driveway catch basin on Dawson Canyon Road.

177.   Plaintiff is informed and believes, and thereon alleges, that the Facility is simply an open lot with storage of clay materials, the storm water runs in all general directions off of the property.

178.   Plaintiff is informed and believes, and thereon alleges, that there is more than one discharge location at the Corona Clay Facility.

### F.   The Discharges from the Facility to the Receiving Waters.

179.   Plaintiff is informed and believes, and thereon alleges, that the storm water discharging from the Facility flows into County of Riverside and City of Corona storm drains (collectively, "municipal storm sewer system").

180.   Plaintiff is informed and believes, and thereon alleges, that the polluted storm water from the Corona Clay Facility discharges from the municipal storm sewer system to Temescal Creek and Reach 3 of the Santa Ana River.

181.   Plaintiff is informed and believes, and thereon alleges, that the polluted storm water from the Corona Clay Facility discharges from the Santa Ana River to the Pacific Ocean at Huntington Beach State Park.

182.   Plaintiff is informed and believes, and thereon alleges, that each of the receiving waters described in paragraphs 187 and 189 is a water of the United States.

**G.   Non-Storm Water Discharges.**

183.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

184.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occurred at the Corona Clay Facility from the December 14, 2012 until the Facility obtained permit coverage under the 1997 permit or on or about October 27, 2014.

185.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges are ongoing and will continue until the Facility Owner and/or Operator develop and implement BMP's that prevent prohibited on-storm water discharges or obtain separate NPDES permit coverage.

186.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur as a result of dust control and/or washing and cleaning activities at the Corona Clay Facility.

187.   The Facility Owner and/or Operator conducts the activities described at above without BMPs to prevent related non-storm water discharges.

188.   Non-storm water discharges resulting from the activities described at above are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the Storm Water Permit.

**H.   Defendant's Sampling, Monitoring, and Reporting.**

189.   Section 4 of the Facility's SWPPP include the "Storm Water Monitoring Implementation Plan (MIP)" for the Facility.

190.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator did not conduct any of the necessary visual observations of storm water discharges before the Facility obtained permit coverage under the 1997 Permit on

1    or about October 27, 2014.

2         191.   Plaintiff is informed and believes, and thereon alleges, that the Facility

3    Owner and/or Operator has failed and continues to fail to conduct all required quarterly

4    and/or monthly visual observations of unauthorized discharges at the Facility.

5         192.   Plaintiff is informed and believes, and thereon alleges, that the Facility

6    Owner and/or Operator has failed to conduct, and/or provide the records required by the

7    Storm Water Permit for, monthly visual observations of storm water discharges at the

8    Facilities.

9         193.   Section 4 of the Facility's SWPPP constitutes the "Sampling Program" for

10   the Facilities.

11        194.   Table 4.2 of the Facility's SWPPP identifies O&G, TSS, and pH as the

12   sampling requirements at the Facility.

13        195.   Plaintiff is informed and believe, and thereon allege, that the Facility is

14   classified under SIC 3295 and thus must analyze iron, which is not included in the

15   Facility's SWPPP.

16        196.   Plaintiffs is informed and believes, and thereon alleges, that the Facility's

17   SWPPP fails to require that the Facility Owner and/or Operator analyze storm water

18   discharges from the Facility for all required parameters by failing to specify that storm

19   water discharges will be analyzed for iron.

20        197.   Plaintiff is informed and believes, and thereon alleges, that the M&RPs for

21   the Facility fail to that require the Facility Owner and/or Operator collect storm water

22   samples from all discharge locations at the Facility from all storm water discharges

23   occurring during qualifying storm events.

24        198.   Via the SMARTs, database, Plaintiffs obtained an Annual Report for the

25   Corona Clay Facility dated February 23, 2016.

26        199.   Plaintiff is informed and believes, and thereon alleges, that the Annual

27   Report dated February 23, 2016, obtained from the Regional Board is the 2014/2015

28   Annual Report for the Corona Clay Facility.

Complaint                                          28

200.   Via the SMARTS database, Plaintiff obtained an Annual Report for the Corona Clay Facility dated September 26, 2016.

201.   Plaintiff is informed and believes, and thereon alleges, that the Annual Report dated September 26, 2016, obtained from the Regional Board is the 2015/2016 Annual Report for the Corona Clay Facility.

202.   Via the SMARTS database, Plaintiff obtained an Annual Report for the Corona Clay Facility dated July 17, 2017.

203.   Plaintiff is informed and believes, and thereon alleges, that the Annual Report dated July 17, 2017, obtained from the Regional Board is the 2016/2017 Annual Report for the Corona Clay Facility.

2014/2015 Annual Report

204.   Plaintiff is informed and believes, and thereon alleges, that the presence of high concentrations of pollutants above EPA benchmarks during the 2014/2015 reporting year demonstrate that the Facility's BMPs did not and continue to not adequately address existing potential pollutant sources.

205.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facilities storm water discharges in significant quantities, such as aluminum and iron during the 2014/2015 reporting year.

206.   Plaintiff is informed and believes, and there on alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2014/2015 Annual Report.

207.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certification of compliance in the 2014/2015 Annual Report was false because it failed to comply with each of the requirements of Section B(14) of the 1997 Permit.

208.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2014/2015 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility's SWPPP to achieve compliance with the Storm Water Permit.

209.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2014/2015 Annual Report.

210.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2014/2015 Annual Report.

2015/2016 Annual Report

211.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all required parameters, including pollutants likely to be present in the Facilities storm water discharges in significant quantities, such as aluminum and iron during the 2015/2016 reporting year.

212.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2015/2016 Annual Report.

213.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2015/2016 Annual Report.

214.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which drainage areas were observed in the 2015/2016 Annual Report.

215.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2015/2016 Annual Report.

216.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2015/2016 Annual Report.

217.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2015/2016 Annual Report.

218.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2015/2016 Annual Report.

219.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2015/2016 Annual Report.

220.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2015/2016 Annual Report.

221.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2015/2016 Annual Report.

222.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2015/2016 Annual Report was false because it failed to comply with each of the requirements of Section XI of the 2015 Permit.

223.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2015/2016 Annual Report for the Facility was false because the Facility Owner and/or Operator had not revised the Facility's SWPPP to achieve compliance with the Storm Water Permit.

224.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2015/2016 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

225.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2015/2016 Annual Report.

226.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2015/2016 Annual Report.

2016/2017 Reporting Year

227.   Plaintiff is  informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the sampling results of the one (1) storm water sample collected in their 2016/2017 Annual Report.

228.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to collect at storm water samples from all discharge locations at the Corona Clay Facility from storm water discharges occurring during up to twenty-four qualified storm events opportunities during the 2016/2017 reporting year.

229.   Plaintiffs is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to analyze all storm water samples collected for all

required parameters, including pollutants likely to be present in the Facility's storm water discharges in significant quantities such as aluminum and iron during the 2016/2017 reporting year.

230.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2016/2017 Annual Report.

231.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its quarterly visual observations of unauthorized non-storm water discharges for each of its drainage areas in the 2016/2017 Annual Report.

232.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to indicate the location of non-storm water visual observations to document which drainage areas were observed in the 2016/2017 Annual Report.

233.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of its monthly visual observations of storm water discharges for each of its discharge points in the 2016/2017 Annual Report.

234.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of its monthly visual observations of storm water discharges for each of its discharge points in the 2016/2017 Annual Report.

235.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2016/2017 Annual Report.

236.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required summary of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2016/2017 Annual Report.

237.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at observed discharge points in the 2016/2017 Annual Report.

238.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include the required evaluation of the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and source of pollutants at unobserved discharge points in the 2016/2017 Annual Report.

239.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator certified that the Facility was in compliance with the Storm Water Permit in its 2016/2017 Annual Report.

240.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2016/2017 Annual Report was false because it failed to comply with each of the requirements of Section XI of the 2015 Permit.

241.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2016/2017 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility's SWPPP to achieve compliance with the Storm Water Permit.

242.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's certification of compliance in the 2016/2017 Annual Report was false because the Facility Owner and/or Operator had not revised the Facility M&RP to achieve compliance with the Storm Water Permit.

243.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to describe instances of noncompliance with the Storm Water Permit at the Facility in its 2016/2017 Annual Report.

244.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to include descriptions of steps taken to prevent recurrence of its noncompliance with the Storm Water Permit in its 2016/2017 Annual Report.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

245.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

246.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

247.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility.

248.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

249.   The Facility Owner and/or Operator violates and will continue to violate the Storm Water Permit Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

250.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

251.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

252.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

253.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

254.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Violation of the Clean Water Act by Discharging Polluted Storm Water in Violation of the Storm Water Permit's Discharge Prohibitions.**

**33 U.S.C. §§ 1311(a), 1342, 1362(a) & 1365(f)**

255.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

256.   Plaintiff is informed and believes, and thereon alleges, that the Facility has discharged, and continues to discharge, prohibited storm water discharges that result in coloration of the receiving waters; contain floating materials, including soils and liquids; suspended or settleable solids; and increase turbidity which causes a nuisance or adversely affect beneficial uses in violation of discharge prohibitions contained in the

Complaint                                    36

Basin Plan.

257.   Plaintiff is informed and believes, and thereon alleges, that the Facility discharged, and continues to discharge, storm water in violation of the Storm Water Permit's Discharge Prohibition each time the Facility Owners and/or Operators fail to prevent storm water containing color, floating materials, suspended or settleable solids, or increased turbidity from travelling off-site.

258.   Plaintiff is informed and believes, and thereon alleged, that the Facility Owner's and/or Operator's violations of the Storm Water Permit's Discharge Prohibitions are ongoing and continuous.

259.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

260.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

261.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

262.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

///

///

///

///

///

### THIRD CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

263.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

264.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

265.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge each time storm water discharges from the Facility.

266.   The Facility Owner and/or Operator violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

267.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

268.   Each and every violation of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

269.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

270.   An action for injunctive relief under the Clean Water Act is authorized by

Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

271.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## **FOURTH CAUSE OF ACTION**

### **Defendant's Discharges of Non-Storm Water in Violation of the Storm Water Permit and the Clean Water Act.**

### **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

272.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

273.   Plaintiff is informed and believes, and thereon alleges, that prohibited non-storm water discharges have discharged and continue to discharge from the Facility, in violation of the Storm Water Permit and/or CWA Section 301(a). 33 U.S.C. § 1311(a).

274.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator's violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

275.   Each and every violation of the Storm Water Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

276.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

277.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm

1   Plaintiff has no plain, speedy, or adequate remedy at law.

2   278.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

3   an actual controversy exists as to the rights and other legal relations of the Parties.

4   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth

5   hereafter.

6   ## FIFTH CAUSE OF ACTION

7   **Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollution Prevention Plan in Violation of the**
8   **Storm Water Permit and the Clean Water Act.**

9   ### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

10   279.   Plaintiff is incorporates the allegations contained in the above paragraphs as

11   though fully set forth herein.

12   280.   Plaintiff is informed and believes, and thereon alleges, that the Facility

13   Owner and/or Operator has failed and continues to fail to develop an adequate SWPPP

14   for the Facility, in violation of the Storm Water Permit.

15   281.   Plaintiff is informed and believes, and thereon alleges, that the Facility

16   Owner and/or Operator has failed and continues to fail to adequately implement the

17   SWPPP for the Facility, in violation of the Storm Water Permit.

18   282.   Plaintiff is informed and believes, and thereon alleges, that Facility Owner

19   and/or Operator has failed and continues to fail to adequately revise the SWPPP for the

20   Facility, in violation of the Storm Water Permit.

21   283.   The Facility Owner and/or Operator have been in violation of the Storm

22   Water Permit at the Facility every day from December 14, 2012, to the present.

23   284.   The Facility Owner and/or Operator's violations of the Storm Water Permit

24   and the CWA at the Facility are ongoing and continuous.

25   285.   The Facility Owner and/or Operator will continue to be in violation of the

26   Storm Water Permit and the CWA each and every day the Facility Owner and/or

27   Operator fails to adequately develop, implement, and/or revise the SWPPPs for the

28   Facilities.

286. Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

287. By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

288. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

289. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

290. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

291. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to develop an adequate M&RP for the Facility, in violation of the Storm Water Permit.

292. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately implement the M&RP for the Facility, in violation of the Storm Water Permit.

293.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately revise the M&RP for the Facility, in violation of the Storm Water Permit.

294.   The Facility Owner and/or Operator have been in violation of the Storm Water Permit monitoring requirements at the Facility every day from December 14, 2012, to the present.

295.   The Facility Owner and/or Operator's violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

296.   The Facility Owner and/or Operator will continue to be in violation of Section B and Provision E(3) of the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day it fails to adequately develop, implement, and/or revise M&RP for the Facility.

297.   Each and every violation of the Storm Water Permit M&RP requirements at the Facility is a separate and distinct violation of the CWA.

298.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

299.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

300.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendant as set forth hereafter.

1

## SEVENTH CAUSE OF ACTION

2

### Defendant's Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.

3

4

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

5

6       301.   Plaintiff incorporates the allegations contained in the above paragraphs as

7   though fully set forth herein.

8       302.   Plaintiff is informed and believes, and thereon alleges, that the Facility

9   Owner and/or Operator has failed and continues to fail to submit accurate Annual Reports

10  to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997

11  Permit.

12      303.   Plaintiff is informed and believes, and thereon alleges, that the Facility

13  Owner and/or Operator's Annual Report failed to meet the monitoring and reporting

14  requirements of the Storm Water Permit, in violation of Section B(14) of the 1997

15  Permit.

16      304.   Plaintiff is informed and believes, and thereon alleges, that the Facility

17  Owner and/or Operator's 2015/2016 Annual Report fails to meet the requirements of

18  Section XVI(B) of the 2015 Permit.

19      305.   Plaintiff is informed and believes, and thereon alleges, that the Facility

20  Owner and/or Operator's 2016/2017 Annual Report fails to meet the requirements of

21  Section XVI(B) of the 2015 Permit.

22      306.   The Facilities Owner and/or Operator(s) has been in violation of Section

23  B(14) of the 1997 Permit and the CWA every day since at least December 14, 2012.

24      307.   The Facility Owner and/or Operator have been in violation of Section XVI

25  of the 2015 Permit and the CWA every day since at least December 14, 2012.

26      308.   The Facility Owner and/or Operator's violations of the reporting

27  requirements of the Storm Water Permit and the CWA are ongoing and continuous.

28

309.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from December 14, 2012, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

310.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

311.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendant as set forth hereafter.

## VII.   RELIEF REQUESTED

312.   Plaintiff respectfully requests that this Court grant the following relief:

a.   A Court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facilities in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit.

b.   A Court order enjoining Defendant from discharging pollutants without an NPDES permit;

c.   A Court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.   A Court order assessing civil monetary penalties for each violation of the CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009,

and $51,570.00 per day per violation for violations that occurred after November 2, 2015, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

      e.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

      f.    Any other relief as this Court may deem appropriate.

Dated: February 27, 2018             Respectfully submitted,

                    By ___/s/Colin Kelly_____
                        Colin Kelly
                        Attorney for Plaintiffs
                        Inland Empire Waterkeeper
                        Orange County Coastkeeper