Inland Empire Waterkeeper
*Advocacy • Education • Restoration • Enforcement*

6876 Indiana Avenue, Suite D
Riverside, CA 92506
Phone (714) 850-1965
Fax (714) 850-1592
Website www.iewaterkeeper.org

December 13, 2017

**<u>VIA CERTIFIED MAIL</u>**

Corona Clay Co.                                  Craig Deleo
Attn: Managing Agent                     Registered Agent for:
10600 Dawson Canyon Road           Corona Clay Co.
Corona, CA 92883                            22097 Knabe Road
                                                          Corona, CA 92883

**Re:      Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

        I am writing on behalf of Inland Empire Waterkeeper ("Waterkeeper") regarding violations of the Clean Water Act[1] and California's Industrial Storm Water Permit[2] ("Storm Water Permit") occurring at: 10600 Dawson Canyon Road, Corona, California 92883 ("Corona Clay Facility" or "Facility"). The purpose of this letter is to put Corona Clay Co. ("Corona Clay"), as the owner and operator of the Corona Clay Facility, on notice of the violations of the Storm Water Permit occurring at the Corona Clay Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, Corona Clay Co. is liable for violations of the Storm Water Permit and the Clean Water Act.

        Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This letter is being sent to you as the responsible owner and operator of the Corona Clay Facility or as the registered agent for this entity. This notice letter ("Notice Letter") is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform Corona Clay that Waterkeeper intends to file a federal enforcement action against Corona Clay for violations of the Storm Water Permit and the Clean Water Act sixty (60) days from the date of this Notice Letter.

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES) General Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ.

Notice of Violation and Intent to File Suit
December 13, 2017
Page 2 of 19

## 1. BACKGROUND

### 1.1. Inland Empire Waterkeeper

Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Founded in 1999, Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around the Santa Ana River watershed.

Inland Empire Waterkeeper ("Waterkeeper") is dedicated to the preservation, protection, and defense of the environment, wildlife, and the natural resources of the Inland Empire's watersheds. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of themselves and their members.

Waterkeeper's members enjoy the waters that storm water from the Facility discharges into including, Temescal Creek (also known as Temescal Wash) and the Santa Ana River. Waterkeeper's members use these waterways to swim, boat, kayak, bird watch, view wildlife, hike, bike, walk, and/or run. Additionally, Waterkeeper's members use the waters to engage in scientific study through pollution, habitat monitoring, and restoration activities. The discharge of pollutants from the Facility impairs each of these uses. Further, discharges of polluted storm water and non-storm water from the Facility are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by Corona Clay's failure to comply with the Clean Water Act and the Storm Water Permit.

### 1.2. The Owners and/or Operators of the Corona Clay Facility

Information available to Waterkeeper indicates that Corona Clay Co. has been an owner and/or operator of the Facility since at least 1995. Information available to Waterkeeper indicates that Corona Clay Co. is an active California corporation and its registered agent is: Craig Deleo, 22097 Knabe Road, Corona, CA 92883.

The Facility Owner and/or Operator has violated and continues to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Corona Clay Facility into local surface waters. As explained herein, the Facility Owners and/or Operators are liable for violations of the Storm Water Permit and the Clean Water Act.

### 1.3. The Corona Clay Facility's Storm Water Permit Coverage

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. *See* Storm Water Permit, Finding #12. The Corona Clay Facility first obtained Storm Water Permit coverage on July 07, 2015. On October 27, 2014, the Facility Owners and/or Operators submitted an NOI to obtain coverage for the Corona Clay Facility under the 2014 version of the Permit ("2014 NOI"). The 2014 NOI identifies the

Notice of Violation and Intent to File Suit
December 13, 2017
Page 3 of 19

owner/operator of the Corona Clay Facility as "Corona Clay Recycling Plant," and the Facility name and location as "Corona Clay Recycling Plant, 10600 Dawson Canyon Road, Corona, CA 92883." The 2014 NOI states that the facility is 20.3 acres in size and zero percent impervious.

The NOI lists the Standard Industrial Classification ("SIC") code for the Corona Clay Facility as 3295 (Minerals and Earths). SIC code 3295 facilities must obtain Storm Water Permit coverage for the entire facility. *See* Storm Water Permit, Attachment A, ¶ 2. Information available to Waterkeeper, including the Facility SWPPP describing vehicle and equipment maintenance and storage at the Facility, indicates that SIC code 4231 (terminal and joint terminal facilities for motor freight transportation) and or 4212 (local trucking without storage) also apply to the Facility. Additionally, information available to Waterkeeper also indicates SIC code 5032 (brick, stone and related construction materials) applies to the Facility.

### 1.4.    Storm Water Pollution and the Waters Receiving Facility's Discharges

With every significant rainfall event millions of gallons of polluted storm water originating from industrial operations such as the Corona Clay Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contributes to the impairment of downstream waters and aquatic dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from recycling plants such as the Corona Clay Facility contain pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); total suspended solids ("TSS"); nitrite plus nitrate ("N+N"); benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; total kjeldahl nitrogen ("TKN"); trash; and oil and grease ("O&G"). Many of these pollutants are on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm. Health & Saf. Code §§ 25249.5 – 25249.1. Discharges of polluted storm water pose carcinogenic and reproductive toxicity threats to the public and adversely affects the aquatic environment.

The Facility discharges into the Temescal Wash, which connects to the Santa Ana River and ultimately the Pacific Ocean ("Receiving Waters"). The Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitats for dozens of fish and bird species as well as invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters.

The California Regional Water Quality Control Board, Santa Ana Region ("Regional Board") issued the Basin Plan for the Santa Ana Watershed ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for Temescal Wash downstream of the point at which it receives storm water discharges from the Facility include: Agricultural Supply, Industrial Service Supply, Ground Water Recharge, Water Contact Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Rare, Threatened, or Endangered Species Habitat. *See* Basin Plan at Table 3-

Notice of Violation and Intent to File Suit
December 13, 2017
Page 4 of 19

1.[3] The Beneficial Uses for Santa Ana River downstream of the point at which it receives storm water discharges from the Facility include: Agricultural Supply, Ground Water Recharge, Water Contact Recreation, Non-Contact Water Recreation, Warm Freshwater Habitat, Wildlife Habitat, and Rare, Threatened, or Endangered Species Habitat, and Spawning, Reproduction and Development. *See* Basin Plan at Table 3-1.

The Basin Plan also established water quality standards for the Santa Ana River, and its tributaries, including Temescal Creek. It provides, "[w]aste discharged shall not result in coloration of the receiving waters which causes a nuisance or adversely affects beneficial uses." Basin Plan at 4-10. The Basin Plan also prohibits the discharge of floatables, stating that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affects beneficial uses." Basin Plan at 4-11. The Basin Plan also prohibits discharges from contributing discharges "contain[ing] suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors. Basin Plan at 4-16. Additionally, the Basin Plan states "inland surface waters of the region shall be free of changes in turbidity which adversely affect beneficial uses." Basin Plan at 4-18.

According to the 2014/2016 California Integrated Report 303(d) List of Impaired Water Bodies, Santa Ana River, Reach 3 is impaired for copper and lead, and Prado Flood Control Basin is impaired for pH.[4] Polluted discharges from industrial sites, such as the Corona Clay Facility contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## 2. THE CORONA CLAY FACILITY AND RELATED DISCHARGES OF POLLUTANTS

### 2.1. The Corona Clay Facility Site Description and Industrial Activities

The Corona Clay Facility is a clay manufacturing facility that provides raw material to licensed contractors specializing in the installation of baseball fields and running tracks. This facility crushes clay tile and used brick to create a clay-like substance that can be used for a variety of products. For example, Corona Clay's infield mix consists of fired clay which absorbs water and requires less water for maintenance.[5] In addition, the site contains a personal collection of antique and historical mining equipment. This area is currently uncovered, and it is the owner's intention to develop this area into a museum of construction, mining equipment, and other historical artifacts. Information available to Waterkeeper indicates that the Facility spans 20.3 acres and located at 10600 Dawson Canyon Road, Corona, California 92883. Information available to Waterkeeper also indicates the facility is located on APN 283-190-021, measuring 20.26 acres.

---

[3] Water Quality Control Plan for the Santa Ana River Basin (Region 8) – Chapter 3: Beneficial Uses, *available at https://www.waterboards.ca.gov/santaana/water_issues/programs/basin_plan/docs/2016/Chapter_3_Feb_2016.pdf* (last accessed on December 8, 2017).
[4] 2014/2016 Integrated Report – All Assessed Waters, *available at https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml* (last accessed on December 8, 2017).
[5] Storm Water Pollution Prevention Plan (SWPPP) Corona Clay Recycling Plant, at Sec. 1.4 (Rev. Oct. 24, 2016).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 5 of 19

This same information indicates that Corona Clay also leases a portion of its land to Masonry Works, a brick cutting operation. According to the SWPPP, used brick is imported to the site and then cut to be sold for use as brick pavers and brick facing. The broken and rejected pieces of brick are deposited into the existing machine and conveyed to the Corona Clay equipment via an underground conveyor.

A majority of the Facility is dedicated to raw material storage or stockpiling, with the rest of the property dedicated to office space, employee parking, loading/unloading of clay, and storage of trucks and other equipment. The Corona Facility's industrial activities include, but are not limited to: maintaining clay transport vehicles and other Facility vehicles and equipment, storage of hazardous materials, such as diesel fuel, new vehicle fluids, and hazardous waste vehicle fluids; clay truck parking; unloading of clay; storage of clay, storage of chemical additives; storage of process water; and storage of vehicle wash-water.

## 2.2.  Pollutants and Pollutant Sources Related to Corona's Industrial Facility

The areas of industrial activity at the Facility are sources of pollution. The pollutants associated with industrial activities at the Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic materials, such as lead, zinc cadmium, chromium, and arsenic; COD; BOD; TSS; N+N; benzene; gasoline and diesel fuels; fuel additives; coolants; antifreeze; TKN; trash; and O&G. Information available to Waterkeeper indicates iron is an additional pollutant associated with facilities classified under SIC code 3295 and required to be analyzed as an additional parameter under the Storm Water Permit.

Information available to Waterkeeper indicates that Facility Owners and/or Operators have not properly developed and/or implemented the required best management practices ("BMPs") to address pollutant sources and contaminated discharges. BMPs are necessary at the Corona Clay Facility to prevent the exposure of pollutants to precipitation and subsequent discharge of polluted storm water from the Facility during rain events. Consequently, during rain events, storm water carries pollutants from the Facility's stockpile or material storage area(s), truck parking area(s), maintenance area(s), crushing area(s), washing area(s), and other areas into the storm sewer system which flows into the Receiving Waters, in violation of the Storm Water Permit.

Information available to Waterkeeper also indicates that clay, particulates of brick and clay tile, have been and continue to be tracked from vehicle maintenance and equipment washing areas throughout the Facility. These pollutants accumulate at the storage areas and stockpiles, the loading and unloading areas, and the driveway leading onto the property. As a result, trucks and vehicles leaving the Facility via the only driveway are pollutant sources tracking sediment, dirt, oil and gas, metal particles, and other pollutants off site.

The Corona Clay Facility regularly stores raw materials outside, as well as weighing/mixing activities that occur outside without adequate cover or containment resulting in discharges of polluted storm water. Additionally, common pollutants that are generally associated with the operation of heavy machinery and trucks (i.e. metal parts and hazardous materials) are located outside without secondary containment or other measures to prevent polluted storm water and prohibited non-storm water discharges from escaping the Corona Clay Facility. The presence of these common pollutants was made clear in an August 24, 2017

Notice of Violation and Intent to File Suit
December 13, 2017
Page 6 of 19

inspection of the facility by Regional Board representative Michael Roth.[6] This inspection indicated the following: A drilling rig actively leaking, a trail of spilled fluid, an uncontained pile of clay, torn bulk storage bags, and several other materials on the facility that do not have secondary containment or other measures to prevent the discharge of non-storm water materials from the facility. These activities are all significant pollutant sources at the Facility. The Facility Owner and/or Operator's failure to develop and/or implement required BMPs also results in prohibited discharges of non-storm water in violation of the Storm Water Permit and the Clean Water Act.

These illegal discharges of polluted storm and non-storm water negatively impact Waterkeeper's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

### 2.3.   Corona Clay Facility Storm Water Flow and Discharge Locations

In the Facility's SWPPP, the Facility Owners and/or Operators state the Facility is considered a single drainage area ("DA 1") and identify one discharge point at the Facility – Sample Point 1 ("SP1"). Attached to the Facility's SWPPP is a map of the entrance, as well as hand-drawn pictures of the storm water being directed towards a silt basin downstream.

Information available to Waterkeeper, including direct observations, indicates that there are potentially other discharge locations at the Facility. Since the facility is simply an open lot with storage of clay materials, the storm water runs in all general directions off of the property.

Storm water discharging from the Facility flows into County of Riverside and City of Corona storm drains. After the storm water enters the storm drains it is carried to the Receiving Waters.

## 3.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

The Clean Water Act requires that any person discharging pollutants to a water of the United States from a point source[7] obtain coverage under an NPDES permit. *See* 33 U.S.C. §§ 1311(a), 1342; 40 CFR § 122.117(c)(1). CWA § 402 further requires each discharger to meet minimum technology-based treatment requirements. Discharges of toxic pollutants must be treated pursuant to the best available technology ("BAT"), 33 U.S.C. § 1311 (b)(2)(A), and other pollutant discharges must comply with best conventional technology ("BCT"). 33 U.S.C. § 1311(b)(2)(E).

In addition to implementing technology-based controls, each point source discharger must achieve "any more stringent limitation necessary to meet water quality standards[.]" 33 U.S.C. § 1311(b)(1)(C). Water quality standards establish the water quality goals for a water body. 40 C.F.R. § 131.2. They serve as the regulatory basis for the establishment of water quality-based controls over point sources, as required under §

---

[6] The record of the August 24, 2017 inspection can be found on the State Water Resources Control Board's SMARTs database for the Corona Clay Facility.

[7] A point source is defined as any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

Notice of Violation and Intent to File Suit
December 13, 2017
Page 7 of 19

301 and § 306 of the CWA. Once water quality standards are established for a particular water body, any NPDES permit authorizing discharges of pollutants into that water body must ensure that the applicable water quality standard will be met. 33 U.S.C. § 1311 (b)(l)(C); 40 C.F.R. §§ 122.4(d), 122.4(i), 122.44(d).

Between 1997 and June 30, 2015, the Storm Water Permit in effect was Order No. 97-03-DWQ, which Waterkeeper refers to as the "1997 Permit." The 1997 Permit requires that dischargers meet all applicable provisions of Sections 301 and 402 of the CWA. Rather than requiring specific application of BAT and BCT techniques to each storm water discharge, compliance with the terms and conditions of the 1997 Permit served as a proxy for meeting the BAT/BCT mandate. *See* 1997 Permit, Finding 10. Conversely, failure to comply with the terms and conditions of the 1997 Permit constitutes failure to subject discharges to BAT/BCT, and is a violation of the CWA.

On July 1, 2015, pursuant to Order No. 2015-0057-DWQ the Storm Water Permit was reissued, and includes the same fundamental terms as the prior permit. For purposes of this Notice Letter, Waterkeeper refers to the reissued permit as the "2015 Permit." The 2015 Permit retains this core statutory requirement to meet BAT/BCT standards. Just like the 1997 Permit, the 2015 Permit requires all facility operators to develop and implement SWPPP that includes BMPs, although the 2015 Permit now requires operators to implement certain minimum BMPs, as well as advanced BMPs as necessary, to achieve compliance with the effluent and receiving water limitations of the 2015 Permit. In addition, the 2015 Permit requires all facility operators to sample storm water discharges more frequently than the 1997 Permit, and to compare sample and analytical results with numeric action levels ("NALs"). All facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances.

Both the 1997 Permit and the 2015 Permit generally require facility operators to: (1) submit a Notice of Intent ("NOI") that certifies the type of activity or activities undertaken at the facility and committing the operator to comply with the terms and conditions of the permit; (2) eliminate unauthorized non-storm water discharges; (3) develop and implement a SWPPP; (3) perform monitoring of storm water discharges and authorized non-storm water discharges; and (4) file an Annual Report that summarizes the year's industrial activities and compliance with the Storm Water Permit.

### 3.1. Unauthorized Non-Storm Water Discharges from the Corona Clay Facility in Violation of Storm Water Permit Discharge Prohibitions

Except as authorized by Special Conditions D(1) of the 1997 Permit, Discharge Prohibition A(1) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. The 2015 Permit includes the same discharge prohibition. *See* 2015 Permit, Discharge Prohibition III.B. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* 1997 Permit, Discharge Prohibition A(1); *see also* 2015 Permit, Discharge Prohibition III.B.

Information available to Waterkeeper indicates that unauthorized storm water and non-stormwater discharges occurred at the Facility from December 13, 2012 until the Facility obtained permit coverage under the 1997 Permit on or about October 27, 2014.

Information available to Waterkeeper indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these

Notice of Violation and Intent to File Suit
December 13, 2017
Page 8 of 19

discharges. The Facility Owners and/or Operators conduct these activities without BMPs to prevent related non-storm water discharges. Non-storm water discharges resulting from dust control and/or washing and cleaning are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the Storm Water Permit.

Waterkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Discharge Prohibitions are violated each time non-storm water is discharged from the Corona Clay Facility. *See* 1997 Permit, Discharge Prohibition D(1); *see also* 2015 Permit, Discharge Prohibition III.B. These discharge violations are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition A(1) of the 1997 Permit and Discharge Prohibition III.B. of the 2015 Permit is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Waterkeeper will update the number and dates of violation when additional information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

### 3.2    Discharges of Polluted Storm Water from the Corona Clay Facility in Violation of Storm Water Permit Effluent Limitations

Effluent Limitation B(3) of the 1997 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic[8] and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[9] The 2015 Permit includes the same effluent limitation. *See* 2015 Permit, Effluent Limitation V.A.

Information available to Waterkeeper, including its review of publicly available information and observations, indicates that Corona Clay has not implemented certain BMPs that achieve BAT/BCT at the Facility. Consistent with Waterkeeper's review of available information and direct observations, the analytical results of storm water sampling at the Facility demonstrate that the Facility Owners and/or Operators have failed and continue to fail to implement BAT/BCT, as required. Specifically, Facility dischargers have exceeded EPA Benchmarks for numerous pollutants. EPA Benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V.A. of the 2015 Permit.[10] The table in Exhibit A sets forth the results of sampling at the Facility conducted by Waterkeeper as well as the Facility Owners and/or Operators. For example, the EPA Benchmark for total suspended solids is 100 mg/L. A storm water sample collected by Waterkeeper at the Corona Clay Facility

---

[8] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, benzene, arsenic, lead, and zinc, among others.

[9] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, oil and grease, pH, and fecal coliform.

[10] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009 ("Multi-Sector Permit"), Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 9 of 19

on January 20, 2017 measured 2,400 mg/L, or 24 times the EPA Benchmark level. The repeated and significant exceedances of EPA Benchmarks as set forth in Exhibit A, demonstrates that the Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

Waterkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See, e.g.*, Exhibit B (setting forth dates of rain events resulting in a discharge at the Facility). These discharge violations are ongoing and will continue every time the Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Waterkeeper will update the dates of violations when additional information and data becomes available. Each time the Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation V.A. is also a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

### 3.3.   Discharges of Polluted Storm Water from the Facility in Violation of Storm Water Permit Receiving Water Limitations

Receiving Water Limitation C(2) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[11] The 2015 Permit includes the same receiving water limitation. *See* 2015 Permit, Receiving Water Limitation VI.A. Discharges that contain pollutants in excess of applicable WQS violate the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(2); 2015 Permit, Receiving Water Limitation VI.A.

Receiving Water Limitation C(1) of the 1997 Permit prohibits storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment. The 2015 Permit includes the same receiving water limitation. *See* 2015 Permit, Receiving Water Limitation VI.B. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of the Storm Water Permit Receiving Water Limitations. *See* 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Receiving Water Limitation VI.B.

Storm water sampling at the Facility demonstrates that discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS. For example, the WQS from the Basin Plan for TSS is 100 mg/L, and according to sampling results there were values of 3,980 mg/L which is well over this threshold. *See* Ex. 1. Storm water discharging from the Facility on March 2, 2015 also

---

[11] The Basin Plan designates Beneficial Uses for the Receiving Waters. Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses. Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"), and water quality objectives in the Basin Plan. Industrial storm water discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 10 of 19

contains a concentration of iron of 319 mg/L, which is 319 times higher than the 1.0 mg/L threshold set forth in the Basin Plan. Since the 2015 sampling events, there has been no record of sampling conducted to determine if there is a presence of any other pollutants in the discharge. Additionally, inspections conducted by Regional Board staff and Waterkeeper personnel demonstrate storm water discharges from the Corona Clay Facility violate the Basin Plan's narrative WQS prohibiting discharges of floatable materials, settleable or suspended solids, or discolored water. *See* Exhibit C.

As explained herein, the Receiving Waters are impaired, and thus are unable to support the designated beneficial uses for some of the same pollutants discharging from the Facility. The 2010 303(d) List of Impaired Water Bodies lists the Receiving Waters as impaired for multiple pollutants, including copper and zinc. Information available to Waterkeeper indicates the Facility's storm water discharges contain elevated levels of pollutants, such as zinc, which can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic life in the Receiving Waters. Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health. These harmful discharges from the Facility are violations of the Storm Water Permit Receiving Water Limitations.

Waterkeeper puts the Facility Owners and/or Operators on notice that Storm Water Permit Receiving Water Limitations are violated each time polluted storm water discharges from the Facility. *See, e.g.*, Exhibit 1. These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the Storm Water Permit Receiving Water Limitations. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS, it is a separate and distinct violation of Receiving Water Limitation C(2) of the 1997 Permit, Receiving Water Limitation VI.A. of the 2015 permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Waterkeeper will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operators are subject to civil penalties for all violation of the Clean Water Act occurring since December 13, 2012.

Further, Waterkeeper puts the Facility Owners and/or Operators on notice that 2015 Permit Receiving Water Limitations are independent Permit requirements with which they must comply, and that carrying out the iterative process triggered by exceedances of the NALs listed at Table 2 of the 2015 Permit does not amount to compliance with the Receiving Water Limitations. The NALs do not represent water quality based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a water quality standard. Even if the Facility Owners and/or Operators submit any Exceedance Response Action Plan(s) pursuant to Section XII of the 2015 Permit, the violations of the Receiving Water Limitations described in this Notice Letter are ongoing.

### 3.4.    Failure to Develop, Implement, and/or Revise and Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires permittees to develop and implement Storm Water Pollution Prevention Plans ("SWPPP") prior to conducting, and in order to continue, industrial activities. The specific SWPPP requirements of the 1997 Permit and the 2015 Permit are described below.

Notice of Violation and Intent to File Suit
December 13, 2017
Page 11 of 19

### 3.4.1.   1997 Permit SWPPP Requirements

Section A(1) and Provision E(2) of the 1997 Permit require discharges to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objectives of the 1997 Permit SWPPP requirement are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. See 1997 Permit, Section A(2). These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9) of the 1997 Permit, and must be revised as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Sections A(9) and (10). Sections A(3) – A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, areas of industrial activity, and other features of the facility and its industrial activities (see 1997 Permit, Section A(4)); a list of significant materials handled and stored at the site (see 1997 Permit, Section A(5)); a description of potential pollutant sources, including industrial processes, material handling and storage areas, dust and particulate generating activities, significant spills and leaks, non-storm water discharges and their sources, and locations where soil erosion may occur (see 1997 Permit, Section A(6)).

Sections A(7) and A(8) of the 1997 Permit require an assessment of potential pollutant sources at the facility and description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

### 3.4.2.   2015 Permit SWPPP Requirements

As with the SWPPP requirements of the 1997 Permit, Sections X(A) - (H) of the 2015 Permit require dischargers to have developed and implemented a SWPPP that meets all of the requirements of the 2015 Permit. See also 2015 Permit, Appendix 1. The objective of the SWPPP requirements are still to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. See 2015 Permit, Section X(C).

The SWPPP must include, among other things and consistent with the 1997 Permit, a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the Storm Water Permit; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the

Notice of Violation and Intent to File Suit
December 13, 2017
Page 12 of 19

typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities, and; the identification of individuals and their current responsibilities for developing and implementing the SWPPP. 2015 Permit, Section X(A)-(H).

Further, the 2015 Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 2015 Permit, Section X(A)-(B). Like the 1997 Permit, the 2015 Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 2015 Permit, Section X(B) and Section XV.

### 3.4.3.   The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit SWPPP Requirements

Information available to Waterkeeper indicates that the Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP. For example, the SWPPP lists parameters to be sampled in Section 4.2, listing TSS, Oil and Grease, and pH and cites the 2015 Permit as the SWPPP's authority for the parameters. Table 1 of the 2015 Permit also requires facilities classified under SIC 3295 to analyze for iron, which is not included in the Corona Clay Facility's SWPPP.

The Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised SWPPP is a separate and distinct violation of the storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit SWPPP requirements since at least December 13, 2012. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

### 3.5.   Failure to Develop, Implement, and/or Revise and Adequate Monitoring and Reporting Program

The Storm Water Permit requires permittees to develop and implement storm water monitoring and reporting programs ("M&RPs") prior to conducting, and in order to continue, industrial activities. The specific M&RP requirements of the 1997 and 2015 Permit are set out below.

### 3.5.1   1997 Permit M&RP Requirements

Section B(1) and Provision E(3) of the 1997 Permit require facility operators to develop and implement an adequate M&RP by October 1, 1992, or prior to the commencement of industrial activities at a facility, that meets all of the requirements of the Storm Water Permit.

Notice of Violation and Intent to File Suit
December 13, 2017
Page 13 of 19

The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 1997 Permit, Section B(2).

The M&RP must therefore ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility, and must be evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *Id.* Sections B(3) – B(16) of the 1997 Permit set forth the M&RP requirements. Specifically, Section B(3) requires dischargers to conduct quarterly visual observations of all drainage areas within their facility for the presence of authorized and unauthorized non-storm water discharges. Section B(4) requires dischargers to conduct visual observations of storm water discharges from one storm event per month during the Wet Season.

Sections B(3) and B(4) further require dischargers to document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants. Dischargers must maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. *See* 1997 Permit, Sections B(3) and B(4). Dischargers must revise the SWPPP in response to these observations to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. *Id.*, Section B(4). Sections B(5) and B(7) of the 1997 Permit require dischargers to visually observe and collect samples of storm water from all locations where storm water is discharged.

The Facility was and/or is a member of the Building Materials Industry Group Monitoring Program, and thus the Facility Owners and/or Operators must comply with the group monitoring provisions set forth in Section B(15) of the 1997 Permit. Under Section B(15) of the 1997 Permit, the Facility Owners and/or Operators must collect at least two (2) samples from each discharge point at the Facility over a five (5) year period. *See* 1997 Permit, Sections B(5), B(7), and B(15). Storm water samples must be analyzed for TSS, pH, specific conductance ("SC"), total organic carbon or O&G, and other pollutants that are likely to be present in the facility's discharges in significant quantities, such as aluminum and nitrate plus nitrite. *See* Storm Water Permit, Section B(5)(c). The 1997 Permit requires facilities classified as SIC code 3273, such as the Facility, to also analyze storm water samples for iron. *See* 1997 Permit, Table D, Sector E.

### 3.5.2. 2015 Permit M&RP Requirements

As with the 1997 M&RP requirements, Sections X(I) and XI(A)-XI(D) of the 2015 Permit require facility operators to develop and implement an adequate M&RP that meets all of the requirements of the 2015 Permit. The objective of the M&RP is still to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the 2015 Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* 2015 Permit, Section XI. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

As an *increase* in observation frequency to the 1997 Permit, Section XI(A) of the 2015 Permit requires all visual observations at least once each month, and at the same time sampling occurs at a discharge location. Observations must document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor and the source of any pollutants. 2015 Permit, Section XI(A)(2).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 14 of 19

Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. 2015 Permit, Section XI(A)(3).

As an *increase* in sampling frequency to the 1997 Permit, Section XI(B)(1-5) of the 2015 Permit requires permittees participating in a group monitoring plan, such as the Facility Owners and/or Operators, to collect storm water discharge samples from a qualifying storm event[12] as follows: 1) from each discharge location, 2) from one storm event within the first half of each reporting year[13] (July 1 to December 31), 3) from one storm event within the second half of each reporting year (January 1 to June 30), and 4) within four hours of the start of a discharge, or the start of facility operations if the qualifying storm event occurs within the previous 12-hour period. Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit *all sampling* and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event. Emphasis added.

The parameters to be analyzed are also consistent with the 1997 Permit, however, the 2015 Permit no longer requires SC to be sampled. Specifically, Section XI(B)(6)(a)-(b) of the 2015 Permit requires permittees to analyze samples for TSS, oil & grease, and pH. Section XI(B)(6)(c)-(d) of the 2015 Permit requires permittees to analyze samples for pollutants associated with industrial activities. Table 1 of the 2015 Permit specifically requires SIC Code 3273 facilities, such as the Associated Facility, to analyze for iron. Section XI(B)(6)(e) of the 2015 Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads.

### 3.5.3.  The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit M&RP Requirements

The Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed, implemented, and or revised M&RP. For example, the Facility Owners and/or Operators have failed and continue to fail to conduct all required quarterly and/or monthly visual observations of unauthorized discharges. *See* 2015 Permit, Section XI(A)(1). Additionally, the Facility Owners and/or Operators have failed to conduct, and/or to provide the records required by the Storm Water Permit for, the monthly visual observations of storm water discharges in violation of Section XI(A)(3) of the 2015 Permit.

Further, the Facility Owners and/or Operators have failed and continue to fail to develop a M&RP that requires the Facility Owners and/or Operators to analyze storm water discharges from the Facility for all required parameters by failing to specify that storm water discharges will be analyzed for, at a minimum, lead, zinc, copper, COD, N+N, and BOD, in violation of Section XI(B)(6)(e) of the 2015 Permit. Dischargers are required to sample for pollutants known to be present at their facility if the receiving water is impaired, among other sampling requirements. *See* 2015 Permit, Sec. XI(B)(6). And the Facility Owners

---

[12] The 2015 Permit defines a qualifying storm event as one that produces a discharge for at least one drainage area, and is preceded by 48-hours with no discharge from any drainage areas. 2015 Permit, Section XI(B)(1).

[13] A reporting year is defined as July 1 through June 30. 2015 Permit, Findings, ¶ 62(b).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 15 of 19

and/or Operators have failed and continue to fail to implements the M&RP by failing to analyze storm water discharge samples for all pollutants listed in the M&RP such as BOD and pH.

The Facility Owners and/or Operators have also failed and continue to fail to develop an M&RP that requires the Facility Owner and/or Operator to collect storm water samples from all discharge locations at the Facility that occur during qualifying storm events, as required by the Permit.

The Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise an M&RP, in violation of M&RP requirements of the Storm Water Permit. Every day the Facility operates with an inadequately developed, implemented, and/or properly revised M&RP is a separate and distinct violation of both the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit M&RP requirements since at least December 13, 2012. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

**3.6.   Failure to Comply with the Storm Water Permit's Reporting Requirements**

Section B(14) of the 1997 Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section B(14) requires that the Annual Report include a summary of visual observations and sampling results, an evaluation of the visual observation and sampling results, the laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required, and other information specified in Section B(13). The 2015 Permit includes the same annual reporting requirement. *See* 2015 Permit, Section XVI.

The Facility Owners and/or Operators have failed to and continue to fail in their submission of Annual Reports that comply with the specific reporting requirements of the Permit. For example, in each Annual Report since the filing of the 2014-2015 Annual Report, the Facility Owners and/or Operators certified that: (1) a complete Annual Comprehensive Site Compliance Evaluation was done pursuant to Section A(9) of the Storm Water Permit; (2) the SWPPP's BMP's address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Waterkeeper indicated that these certifications are erroneous. For example, as discussed above, storm water samples collected from the Facility in their first Annual Report contain concentrations of pollutants that are above EPA benchmarks, thus demonstrating that the Facility BMPs do not adequately address existing potential pollutant sources. Further, the Facility's SWPPP does not include many elements required by the Storm Water Permit, and thus it is erroneous to certify that the SWPPP complies with the Storm Water Permit.

The Facility Owners and/or Operators have also submitted incomplete Annual Reports. For instance, since the filing of 2014-2015 Annual Reports, the Facility Owners and/or Operators have failed to properly report required sampling and/or observations. In the 2016-2017 Annual Report, the Facility Owners and/or Operators report that samples were collected from one storm event, but no sampling results are provided with the report, as required. Additionally, there are no monthly visual observation forms submitted with the Facility Annual Reports for both 2015-2016 and 2016-2017.

Notice of Violation and Intent to File Suit
December 13, 2017
Page 16 of 19

In addition, the facility must report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted including 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 2015 Permit, Section XI. The Facility Owners and/or Operators have not reported non-compliance, as required.

Information available to Waterkeeper indicates that the Facility Owners and/or Operators have submitted incomplete and/or incorrect Annual Reports that fail to comply with the Storm Water Permit. As such, the Facility Owners and/or Operators are in daily violation of the Storm Water Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least December 13, 2012. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

### 3.7.   Failure to Comply with Level 1 Exceedance Response Action Requirements

When the 2015 Permit became effective on July 07, 2015, all permittees were in "Baseline status." *See* 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See* 2015 Permit, Section XII(C). Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII(C). By October 1, following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a QISP, of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* 2015 Permit, Section XII(C)(1)(a)-(c). Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred all drainage areas shall be evaluated. *See* 2015 Permit, Section XII(C)(1)(c).

Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII(C)(2)(a)(i)-(ii). The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* 2015 Permit, Section XII(C)(2)(a)(iii). A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII(C)(2)(b).

Notice of Violation and Intent to File Suit
December 13, 2017
Page 17 of 19

The Facility Owners and/or Operators are in Level 1 status for iron based on NAL exceedances during the 2014-2015 reporting year. Specifically, the annual average for iron during the 2014-2015 reporting year was 3.9 mg/L – almost 4 times over the annual NAL for iron of 1 mg/L.

The Facility Owners and/or Operators have failed and continue to fail to conduct a Level 1 status evaluation and submit a Level 1 ERA Report, and/or have conducted an inadequate Level 1 status evaluation and submitted an inadequate Level 1 ERA Report that fails to comply with the Storm Water Permit. As such, the Facility Owners and/or Operators are in daily violation of the Storm Water Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without a Level 1 status evaluation and/or an adequate Level 1 ERA Report, as required by the Permit, is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's Level 1 status ERA requirements every day since at least December 13, 2012. These violations are ongoing, and Waterkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since December 13, 2012.

4.      RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five years prior to the date of the Notice Letter. These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009 and $51,570.00 per day per violations that occurred after November 2, 2015.

In addition to civil penalties, Waterkeeper will seek injunctive relieve preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Waterkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

5.      CONCLUSION

Waterkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Waterkeeper will file a citizen suit under Section 505(a) of the Clean Water Act for Corona Clay's violations of the Storm Water Permit.

///

///

///

///

Notice of Violation and Intent to File Suit
December 13, 2017
Page 18 of 19

If you wish to pursue settlement discussions, please contact Waterkeeper's legal counsel:

Inland Empire Waterkeeper
c/o Orange County Coastkeeper
ATTN: Colin A. Kelly
3151 Airway Ave., Suite F-110
Costa Mesa, CA 92626
Tel: (714) 850 1965 ext. 307

Sincerely,

Colin Kelly
Senior Staff Attorney
Inland Empire Waterkeeper
Orange County Coastkeeper

Notice of Violation and Intent to File Suit
December 13, 2017
Page 19 of 19

**SERVICE LIST**

<u>VIA U.S. MAIL</u>

Jefferson Sessions
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Scott Pruitt
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Alexis Strauss
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812

Hope Smythe
Executive Officer
Regional Water Quality Control Board
Santa Ana Region
3737 Main Street, Ste 500
Riverside, CA 92501

<u>Exhibit A</u>

1. <u>Sampling Conducted by Waterkeeper Demonstrating Noncompliance with BAT/BCT Standards</u>

| Date of Sample | Sample Location | Constituent | EPA Benchmark Limit | Sample Value | Multiple of EPA Benchmark[1] |
|---|---|---|---|---|---|
| 01.20.2017 | Discharge Point #1 | Total Suspended Solids (TSS) | 100 | 2400 | 24 |
| 01.20.2017 | Discharge Point #1 | Zinc | 0.117 | 0.36 | 3.08 |
| 01.20.2017 | Discharge Point #1 | Iron | 1.0 | 87 | 87 |
| 01.20.2017 | Discharge Point #1 | Aluminum | 0.75 | 62 | 82.67 |
| 01.20.2017 | Discharge Point #1 | N+N | 0.68 | 3.1 | 4.56 |

2. <u>Sampling Conducted by Corona Clay Demonstrating Noncompliance with BAT/BCT Standards</u>

| Date of Sample | Sample Location | Constituent | EPA Benchmark Limit | Sample Value | Multiple of EPA Benchmark Limit |
|---|---|---|---|---|---|
| 03.02.2015 | Discharge Point #1 | Iron | 1 | 319 | 319 |
| 03.02.2015 | Discharge Point #1 | Total Suspended Solids | 100 | 3980 | 398 |

3. <u>Sampling Conducted by Corona Clay Demonstrating Noncompliance with Basin Plan Water Quality Standards</u>

| Water Quality Standard | Date | Source |
|---|---|---|
| "Waste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affects beneficial uses." (Basin Plan 4-10). | 12.12.2014 | Regional Board Inspection |
| | 01.06.2016 | Regional Board Inspection 025117 |
| | 12.16.2016 | Regional Board Inspection 025117 |
| | 01.20.2017 | Waterkeeper Inspection |

---

[1] The values in the columns in this table and in the subsequent tables were calculated by taking the Sample Value and dividing it by the EPA Benchmark Limit. For example, the first TSS sample value (taken on 01.20.2017) of 2,400 divided by 100 (Benchmark Limit for TSS) equals 24.

Exhibit A
December 14, 2017
Page 2 of 2

| | | |
|---|---|---|
| 1)  "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses as a result of controllable water quality factors." (Basin Plan 4-19); | 12.12.2014 | Regional Board Inspection |
| | 01.06.2016 | Regional Board Inspection 025117 |
| | 12.16.2016 | Regional Board Inspection 025117 |
| | 01.20.2017 | Waterkeeper Inspection |
| | | |
| | | |
| | | |
| | | |
| 2)  "All inland surface waters of the region shall be free of changes in turbidity which adversely affect beneficial uses." (Basin Plan 4-20); | 12.12.2014 | Regional Board Inspection |
| | 01.06.2016 | Regional Board Inspection 025117 |
| | 12.16.2016 | Regional Board Inspection 025117 |
| | 01.20.2017 | Waterkeeper Inspection |
| | | |
| 3)  "Waste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses. (Basin Plan 4-10). | 12.12.2014 | Regional Board Inspection |
| | 01.06.2016 | Regional Board Inspection 025117 |
| | 12.16.2016 | Regional Board Inspection 025117 |
| | 01.20.2017 | Waterkeeper Inspection |
| | | |

Exhibit B

| Date | Day | Rainfall (Inches)[1] |
|------|-----|---------------------|
| 01.24.2013 | Thursday | 0.11 |
| 01.25.2013 | Friday | 0.18 |
| 02.08.2013 | Friday | 0.39 |
| 02.19.2013 | Tuesday | 0.24 |
| 03.08.2013 | Friday | 0.70 |
| 05.06.2013 | Monday | 0.13 |
| 08.05.2013 | Monday | 0.14 |
| 10.11.2013 | Friday | 0.22 |
| 10.13.2013 | Sunday | 0.12 |
| 12.29.2013 | Sunday | 0.27 |
| 01.09.2014 | Thursday | 0.14 |
| 01.11.2014 | Saturday | 0.17 |
| 01.13.2014 | Monday | 0.22 |
| 02.02.2014 | Sunday | 0.23 |
| 02.28.2014 | Friday | 0.10 |
| 03.04.2014 | Tuesday | 0.25 |
| 03.08.2014 | Saturday | 0.14 |
| 04.05.2014 | Saturday | 0.39 |
| 04.06.2014 | Sunday | 0.16 |
| 04.25.2014 | Friday | 0.14 |
| 08.03.2014 | Sunday | 0.14 |
| 11.01.2014 | Saturday | 0.25 |
| 04.24.2015 | Friday | 0.68 |
| 05.08.2015 | Friday | 0.21 |
| 05.14.2015 | Thursday | 0.31 |
| 07.18.2015 | Saturday | 0.33 |
| 07.19.2015 | Sunday | 0.67 |
| 09.15.2015 | Tuesday | 1.58 |
| 10.05.2015 | Monday | 0.32 |
| 10.14.2015 | Wednesday | 0.12 |
| 12.13.2015 | Sunday | 0.10 |
| 12.22.2015 | Tuesday | 0.55 |
| 01.05.2016 | Tuesday | 0.84 |
| 01.06.2016 | Wednesday | 0.84 |
| 01.07.2016 | Thursday | 0.88 |
| 01.31.2016 | Sunday | 0.34 |
| 02.17.2016 | Wednesday | 0.25 |
| 02.18.2016 | Thursday | 0.17 |
| 03.06.2016 | Sunday | 0.17 |
| 03.07.2016 | Monday | 0.37 |
| 03.11.2016 | Friday | 0.35 |
| 04.08.2016 | Friday | 0.10 |
| 04.25.2016 | Monday | 0.10 |
| 05.06.2016 | Friday | 0.17 |

[1] Source: Weather station KAJO (Corona Municipal Airport) on from December 13, 2012 to December 13, 2017, https://www.wunderground.com/history/airport/KAJO/ (last accessed Dec. 13, 2017).

| 10.23.2016 | Sunday | 0.50 |
|---|---|---|
| 10.24.2016 | Monday | 0.39 |
| 11.20.2016 | Sunday | 0.20 |
| 11.21.2016 | Monday | 0.38 |
| 11.26.2016 | Saturday | 0.36 |
| 12.16.2016 | Friday | 0.75 |
| 12.21.2016 | Wednesday | 0.44 |
| 12.22.2016 | Thursday | 0.49 |
| 12.23.2016 | Friday | 0.48 |
| 12.24.2016 | Saturday | 0.33 |
| 12.31.2016 | Saturday | 0.24 |
| 01.05.2017 | Thursday | 0.38 |
| 01.09.2017 | Monday | 0.48 |
| 01.12.2017 | Monday | 0.66 |
| 01.19.2017 | Monday | 1.01 |
| 01.20.2017 | Tuesday | 1.25 |
| 01.22.2017 | Thursday | 2.15 |
| 01.23.2017 | Friday | 0.40 |
| 02.06.2017 | Monday | 0.42 |
| 02.07.2017 | Tuesday | 0.19 |
| 02.11.2017 | Saturday | 0.11 |
| 02.17.2017 | Friday | 1.15 |
| 02.27.2017 | Monday | 0.23 |
| 05.07.2017 | Sunday | 0.14 |
| **TOTAL** | | **69** |

<u>Exhibit C</u>

Photographs captured Jan. 20, 2017













