**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a project of Orange County Coastkeeper; ORANGE COUNTY COASTKEEPER, a California non-profit corporation, | Nos. 20-55420 20-55678 |
| *Plaintiffs-Appellants/ Cross-Appellees*, | D.C. No. 8:18-cv-00333-DOC-DFM |
| v. | OPINION |
| CORONA CLAY CO., a California Corporation, | |
| *Defendant-Appellee/ Cross-Appellant.* | |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted March 4, 2021
Pasadena, California

Filed September 20, 2021

Before:  Eugene E. Siler,[*] Andrew D. Hurwitz, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge Collins

## SUMMARY[**]

### Environmental Law

The panel vacated the district court's partial summary judgment in favor of plaintiffs and partial judgment after a jury trial in favor of defendants in a citizen suit under the Clean Water Act alleging that Corona Clay Company illegally discharged pollutants into the navigable waters of the United States, failed to monitor that discharge as required by its permit under the National Pollutant Discharge Elimination System, and violated the conditions of the permit by failing to report violations.

The district court granted partial summary judgment to the plaintiffs on Claim One, alleging illegal discharge, and Claim Five, alleging violation of a permit requirement to develop an adequate Storm Water Pollution Prevention Plan for managing storm water discharges.  The jury returned a defense verdict on Claim Two, alleging discharge violations, Claim Six, alleging monitoring violations, and Claim Seven,

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

alleging reporting violations.  Other claims were voluntarily dismissed.

Plaintiffs were two affiliated nonprofit organizations with a mission to protect water quality and aquatic resources in the watersheds and coastal waters of Orange and Riverside Counties, including the Santa Ana River watershed and Temescal Creek, near Corona's industrial facility.  The panel held that the plaintiffs had Article III organizational standing to pursue their discharge and procedural claims because they established a concrete and particularized injury fairly traceable to the challenged conduct that likely could be redressed by a favorable decision.  They also showed that their members would have individual standing, the issues were germane to their purpose, and neither their claims nor the requested relief required individual participation.

The panel held that under *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987), the CWA bars citizen suits alleging only "wholly past" violations of permits.  In *County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020), the Supreme Court rejected the Ninth Circuit's prior interpretation of the CWA's discharge jurisdictional requirement and held that an offending discharge must reach the "waters of the United States," either through a direct discharge or a "functional equivalent."  Because *County of Maui* was decided after the district court entered final judgment, the jury instructions corresponded to prior Ninth Circuit law.   The panel disagreed with the district court's interpretation of *Gwaltney* and held that if the required jurisdictional discharge into United States waters has occurred, a CWA citizen suit can be premised on ongoing or reasonably expected monitoring or reporting violations.  The panel wrote that the change in

4    INLAND EMPIRE WATERKEEPER V. CORONA CLAY

law in *County of Maui* affected not only the jury instructions, but also the partial summary judgment, which were premised on an admitted discharge, and the parties deserved the ability to address whether the "indirect" discharge admitted by Corona was the "functional equivalent" of a direct discharge into the waters of the United States, or whether that required discharge could otherwise be established.  The panel therefore vacated the district court's judgment and remanded for further proceedings consistent with the panel's opinion and with the Supreme Court's intervening decision in *County of Maui*.

Dissenting, Judge Collins wrote that the district court erred by holding, at summary judgment, that plaintiffs had constitutional standing because there was a triable issue of fact as to whether Corona's alleged discharges reached or imminently threatened to reach Temescal Creek.  Corona argued that the jury verdict produced an express finding that overlapped with, and was dispositive of, the sole theory of Article III standing that plaintiffs presented at summary judgment, that Corona had contributed, and threatened to contribute, to the pollution of Temescal Creek, thereby affecting the water quality and impairing plaintiffs' members' enjoyment of the creek.  Judge Collins wrote that he did not think plaintiffs had established any basis for concluding that the verdict could not be given preclusive effect on the standing issue, but he would leave it to the district court on remand to determine whether to do so. Judge Collins wrote that he would not overturn the verdict based on jury instruction error, and he therefore would remand for the district court to address whether the verdict was dispositive of standing, and, if not, to proceed with a trial on the then-remaining claims.

## COUNSEL

Christopher Sproul (argued), Environmental Advocates, San Francisco, California; Sarah Spinuzzi, Orange County Coastkeeper, Inland Empire Waterkeeper, Costa Mesa, California; Jennifer F. Novak, Law Office of Jennifer F. Novak, Rancho Palos Verdes, California; for Plaintiffs-Appellants/Cross-Appellees.

Brian Neach (argued), Pacheco & Neach P.C., Irvine, California, for Defendant-Appellee/Cross-Appellant.

Robert W. Byrne, Senior Assistant Attorney General; Eric M. Katz, Supervising Deputy Attorney General; Carol A. Z. Boyd, Deputy Attorney General; Office of the Attorney General, Los Angeles, California; for Amicus Curiae California State Water Resources Control Board.

Anthony L. François, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Chantell and Michael Sackett, Duarte Nursery Inc., John Duarte, and Roger J. LaPant Jr.

**OPINION**

HURWITZ, Circuit Judge:

In this Clean Water Act ("CWA") citizen suit, the plaintiffs alleged that Corona Clay Company illegally discharged pollutants into the navigable waters of the United States, failed to monitor that discharge as required by its permit, and violated the conditions of the permit by failing to report violations. After the district court granted partial summary judgment to the plaintiffs, a jury returned a defense verdict on the remaining claims. Both sides appealed.

The resolution of the appeal is impacted heavily by two Supreme Court decisions. In the first, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, the Court held that the CWA bars citizen suits alleging only "wholly past" violations of permits. 484 U.S. 49, 67 (1987). The district court read *Gwaltney* as requiring proof of ongoing permit *discharge* violations and so instructed the jury. The second decision, *County of Maui v. Hawaii Wildlife Fund*, rejected this Court's prior interpretation of the CWA's discharge jurisdictional requirement, 33 U.S.C. §§ 1311(a), 1362(12)(A), and held that an offending discharge must reach the "waters of the United States," *id.* § 1362(7), either through a direct discharge or a "functional equivalent." 140 S. Ct. 1462, 1468 (2020). Because *County of Maui* was decided after the final judgment in this case, the jury instructions corresponded to prior Ninth Circuit law.

We disagree with the district court's interpretation of *Gwaltney* and hold that if the required jurisdictional discharge into United States waters has occurred, a CWA citizen suit can be premised on ongoing or reasonably expected monitoring or reporting violations. We therefore vacate the district court's judgment and remand for further

proceedings consistent with this opinion and with the Supreme Court's intervening decision in *County of Maui*.

I

Corona Clay Company processes clay products in Corona, California, at an industrial facility overlooking the Temescal Creek. Those industrial activities create "storm water discharge," which Corona may release under a General Permit from the California State Water Resources Board. The Board has the authority to issue permits under the National Pollutant Discharge Elimination System ("NPDES"). *See* 33 U.S.C. § 1342(b). The permit requires Corona to maintain a Storm Water Pollution Prevention Plan ("SWPPP") employing the "Best Available Technology Economically Achievable" ("BAT") for toxic pollutants and the "Best Conventional Pollutant Control Technology" ("BCT") for conventional pollutants. Corona's permit also requires implementation of "Best Management Practices" ("BMP") and monitoring programs that document the facility's storm water discharges, analyze runoff samples, and report results to the State Board. If a discharge exceeds specified pollutant levels, the permit requires specific "exceedance response actions."

The plaintiffs are two affiliated nonprofit organizations (collectively, "Coastkeeper"). Coastkeeper's mission is to "protect water quality and aquatic resources" in the watersheds and coastal waters of Orange and Riverside Counties. That area includes the Santa Ana River watershed and Temescal Creek, a tributary of the River. The organizations represent roughly 6,000 individual members.

Coastkeeper filed this action in 2018, alleging that Corona violated the conditions of its General Permit and discharged polluted storm water into Temescal Creek (which

then flowed into the Pacific Ocean, via the Santa Ana River). Counts Two, Three, and Four alleged permit violations directly related to discharge of pollutants, and the remaining counts asserted other permit violations, including failures to monitor discharges and report violations.

The district court granted partial summary judgment to Coastkeeper on Claims One and Five of the operative complaint. On Claim One, the district court found that Corona had violated the permit's requirement to develop BMPs through the implementation of BAT and BCT. On Claim Five, the court held that Corona violated the permit's requirement to develop an adequate SWPPP for managing storm water discharges. The district court found no dispute that "Defendant's SWPPPs do not comply" with the permit's performance standards, noting, for example, that Corona failed to "implement required BMPs regarding erosion controls." The court also found that because "Defendant is in violation of at least some requirements of the SWPPP," it necessarily violated the permit. Coastkeeper then voluntarily dismissed Claims Three and Four.

This left Claims Two (alleging discharge violations), Six (alleging monitoring violations), and Seven (alleging reporting violations) for trial. The district court instructed the jury that to prevail on those claims Coastkeeper must prove either a forbidden discharge after the complaint was filed, or a reasonable likelihood that discharge violations would thereafter recur. In issuing this instruction, the district court relied on *Gwaltney*, which precludes a citizen suit for "wholly past" violations of the CWA. *See* 484 U.S. at 67; *see also Sierra Club v. Union Oil Co.*, 853 F.2d 667, 670 (9th Cir. 1988) (interpreting *Gwaltney* to permit citizen suits predicated on "ongoing permit violations or the reasonable likelihood of continuing future violations"). The district

court held that *Gwaltney* required "not just *any* permit violation (such as violations of monitoring and reporting requirements), but specifically *discharge* violations" as a predicate to a CWA citizen suit.

The special verdict form therefore asked the jury to answer several questions in order. Question 1 asked whether Corona had discharged pollutants into the waters of the United States and whether the discharge occurred after the complaint was filed or "at any time, with a reasonable likelihood that such violations will recur in intermittent or sporadic violations?" The jury was to continue to Question 2 only if it answered Question 1 "Yes." Question 2 asked the jury to determine whether run-off of storm water adversely affected the beneficial uses of Temescal Creek, and, if so, to determine the number of violations. Only after answering these two questions "Yes" would the jury proceed to questions about whether monitoring or reporting violations had occurred.

The jury answered Question One "No," and did not proceed to the other questions. The district court then entered a final judgment in favor of Corona on Claims Two, Six, and Seven, and in favor of Coastkeeper on Claims One and Five. On Claims One and Five, the district court found Corona had committed 664 daily violations of the SWPPP and 1,688 daily violations of the technology-based effluent limitations of the permit. It ordered Corona to implement structural storm water BMPs "sufficient to retain 85th percentile, 24-hour storm event, including a factor of safety, from areas subject to the [permit] no later than December 1, 2020"; to update its SWPPP to comply with the permit; and to employ professional engineers to design and certify retention basins. The court also imposed $3,700,000 in civil penalties on Corona.

In denying post-trial motions from both parties, the district court candidly admitted that "it is certainly possible to read *Gwaltney* and *Sierra Club* to encompass not merely discharge violations, but *any* permit violation, as an ongoing violation on which a citizen suit can be based." The court nevertheless found any error in its instructions "not prejudicial" to Coastkeeper because it had introduced no evidence of discharge violations at trial. Although noting that Corona had responded to a Rule 36 request by admitting that its storm water discharge flowed "indirectly" into Temescal Creek, the court noted "[t]his evidence . . . was not introduced at trial," and "decline[d] at this juncture to admit this evidence post hoc and overrule the jury's verdict." Both parties timely appealed.

## II

We must first consider Corona's argument that Coastkeeper lacks Article III standing to pursue this citizen suit. Article III requires that the plaintiff have a concrete and particularized injury fairly traceable to the challenged conduct that likely can be redressed by a favorable judicial decision. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167, 180–81 (2000). When suing on behalf of its members, an organization must show that its members would have individual standing, the issues are germane to the organization's purpose, and neither the claim nor the requested relief requires individual participation. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977).

This case raises two types of claims: claims of discharge violations, which allege Corona harms Coastkeeper's members by releasing storm water with pollutant levels that violate its permit; and claims of "procedural" violations, involving Corona's failure to adhere to other permit

requirements, the obligation to monitor and report. "[S]tanding is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), so "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (cleaned up). We therefore analyze separately whether Coastkeeper established Article III organizational standing to pursue the discharge and procedural allegations.

A

The discharge claims arise in a familiar setting. In an environmental case, the "relevant showing . . . is not injury to the environment but injury to the plaintiff. To insist on the former rather than the latter as a part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits." *Laidlaw*, 528 U.S. at 181. Coastkeeper presented sworn testimony from several of its members that they lived near the Creek, used it for recreation, and that pollution from the discharged storm water impacted their present and anticipated enjoyment of the waterway.

We have routinely found such evidence sufficient to establish Article III standing. *See Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (finding "an aesthetic or recreational interest in a particular place . . . impaired by a defendant's conduct" sufficient); *see also id*. at 1151 ("*Laidlaw* recognized that an increased risk of harm can itself be injury in fact sufficient for standing."); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 639, 641 (9th Cir. 2004) (finding plaintiffs' "reasonable concern of injury" and "fear that [contaminated] liquid will contaminate their property" shows an injury in fact) (cleaned up); *Central

*Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002) ("[A] credible threat of harm is sufficient[.]").

We again so find here.  Coastkeeper established the requisite injury in fact and causation through its members' declarations averring to frequent use of the Temescal Creek for recreational or academic purposes, a noticeable decrease in water quality conditions because of Corona's discharges, and a resulting decline in their enjoyment of the waterway. These declarations show a present or imminent harm to the members' "aesthetic or recreational interest" in Temescal Creek.  *Pac. Lumber Co.*, 230 F.3d at 1147.  The operative complaint seeks an injunction to remediate the alleged harm, which the CWA authorizes a federal court to issue, *see* 33 U.S.C.  § 1365(a),  (d),  thereby  satisfying  the redressability requirement.  *Nat. Res. Def. Council v. SW Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (holding that redressability is established when a CWA citizen suit seeks injunctive relief).

B

We also reject Corona's argument that Coastkeeper failed to establish Article III standing to pursue its procedural claims.

It is settled that violations of a permit's "requirements for retaining records of discharge sampling and for filing reports" can be the subject of a CWA citizen suit.  *NW Env't Advocs. v. City of Portland*, 56 F.3d 979, 988, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce *all* permit conditions.").  Indeed, a contrary approach "would have us immunize the entire body of qualitative regulations from an important enforcement tool."  *Id.* at 989; *see also Pac. Lumber Co.*, 230 F.3d at 1151 (finding that "the Clean Water Act allows citizen suits based

on violations of any conditions of an NPDES permit, even those which are purely procedural").

To be sure, Article III standing requires "a concrete injury," but that injury need not be "tangible." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Congress plainly has the power to "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 578 (1992). Congress may not create standing by permitting a plaintiff to sue on a "bare procedural violation, divorced from any concrete harm." *Spokeo*, 136 S. Ct. at 1549. But, the Supreme Court has often recognized that Congress may recognize a plaintiff's interest in information or procedure, the deprivation of which can give rise to an Article III injury. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998) (holding that a voter's "inability to obtain information" can satisfy Article III); *Pub. Citizen v. Dep't of Just.*, 491 U.S. 440, 449 (1989) (holding that inability to obtain information subject to disclosure laws is sufficient).

We have also repeatedly recognized that failure to provide statutorily required information can give rise to Article III injury on the part of private plaintiffs. When the right to disclosure alone serves merely to "increase public participation in the decision-making process," a violation does not rise to the level of constitutional injury. *Wilderness Soc'y Inc. v. Rey*, 622 F.3d 1251, 1259–60 (9th Cir. 2010) (cleaned up) (finding that violation of a regulatory provision requiring the Secretary of Agriculture to give notice of proposed actions did not establish standing). But, when a statute provides a right to information, the deprivation of which "result[s] in an informational harm," violation of the statute gives rise to a cognizable "informational" injury. *Id.* at 1260; *Southcentral Found. v. Alaska Native Tribal Health*

*Consortium*, 983 F.3d 411, 419–420 (9th Cir. 2020) (finding
informational injury when a tribal health foundation
challenged amendments to a tribal health consortium's
amendment to its code of conduct); *Davidson v. Kimberly-
Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018) (recognizing
informational injury in a suit alleging false product labeling).

The monitoring and reporting requirements in Corona's
permits are far from "bare" procedure. *Spokeo*, 136 S. Ct.
at 1549. Rather, they serve the public's substantive interest
in clean water and the environment. The CWA elevated that
interest by providing a cause of action to affected citizens.
*Lujan*, 504 U.S. at 578; 33 U.S.C. § 1365(a), (g).

C

Because it is settled that CWA citizen suits may rest on
non-discharge violations of a permit, we turn to whether the
"irreducible constitutional minimum" of injury-in-fact has
been shown in this case. *Spokeo*, 136 S. Ct. at 1547. Corona
argues that the mere absence of a report that should have
been filed or an inspection that should have occurred could
not have injured Coastkeeper or its members.

We reject that argument. These permit violations
deprive the public both of information about past discharges
and likely future ones. If possession of that information
would reduce the risk of injury to a plaintiff who wishes to
know whether the water is polluted before using the Creek
for recreation, this "increased risk of harm can itself be
injury." *Pac. Lumber Co.*, 230 F.3d at 1151. The injury is
not simply "informational"—rather, Corona's failure to
report creates a genuine threat of undetected past or future
polluted discharge, harming the plaintiff's "aesthetic or
recreational interest." *Id.* at 1147.

The declarations of Coastkeeper's members also document an informational injury suffered because of Corona's failure to abide by the permit's monitoring and reporting requirements.  Coastkeeper member Heather Williams, an Associate Professor of Politics at Pomona College who teaches classes on the politics of water and land use, detailed her various studies of the human-environmental interactions in the waterway, including a forthcoming book on the Santa Ana River.  Her interest in accurate information about Corona's discharges is obvious.  Her declaration also established her aesthetic and recreational interests, expressing her concern that the industrial sediment would create both "visible effects of water pollution" and also "the less visible effects of pollution on wildlife."  Williams also fears that continuing violations would render the stream "uninhabitable to wildlife."

The declaration of Coastkeeper Associate Director Megan Brosseau similarly details an academic background in environmental studies and "human-environmental interaction."  Her professional and personal mission is to preserve the Santa Ana watershed as a "swimmable, drinkable, and fishable" waterway, and she reasonably fears that that pollution will harm both the water itself and the "educational programs" conducted in Temescal Creek. Former Executive Director and current Coastkeeper member Lee Reeder is a journalist, and he averred that the "turbid, brown and red mud" flowing into Temescal Creek had significantly harmed his enjoyment of the waterway.

These declarations plainly demonstrate individual concern about pollution of the waterway and in Corona's accurate reporting and monitoring.  Each declaration expresses the concern that, in the future, Corona's failure to follow the permit requirements will lead the water quality to

degrade and impair the declarant's ability to enjoy or study
the waterway. Each declaration averred to a specific
interest, whether academic, journalistic, or recreational, in
the information that was harmed because of the alleged
reporting and monitoring violations. This sufficiently
establishes an Article III injury arising from the procedural
allegations.

## D

Our dissenting colleague asserts that the district court
erred by holding that Coastkeeper had standing because
there was a triable issue of fact as to whether Corona's
alleged discharges reached or imminently threatened to
reach Temescal Creek. Dissenting Opinion ("Dissent")
at 24–36. But, this approach "confuses the jurisdictional
inquiry . . . with the merits inquiry." *Pac. Lumber Co.*,
230 F.3d at 1151; *see also id*. ("[A]n increased risk of harm
can itself be injury in fact sufficient for standing."). The
dissent would require Coastkeeper to conclusively establish
the discharge at the core of the merits question to
demonstrate standing. One does not lose standing to sue just
because his claims may fail on the merits.[1]

The dissent also would remand for the district court to
determine whether the jury verdict is preclusive on the issue

---

[1] The dissent concedes that the Plaintiffs' showing of Article III
standing was "sufficient to survive a defense motion for summary
judgment." Dissent at 27. If there is a triable issue of fact, it follows
that the party is entitled to have that issue submitted to the jury; it also
follows that our dissenting colleague must believe that the jury verdict
on the merits (which did not separately address standing) defeated
Article III jurisdiction. As noted above, our precedent plainly rejects the
notion that the failure to prevail on the merits defeats standing. *See Pac.
Lumber Co.*, 230 F.3d at 1151.

of standing.  Dissent at 23, 38–40.  Because we conclude
below that the jury verdict must be vacated, we necessarily
also conclude that it has no preclusive effect.  But more
fundamentally, even if given full effect, the jury verdict does
not resolve the standing issue.  The only question the jury
answered was phrased as follows:

> Did Plaintiffs prove, by a preponderance of
> the evidence, that Defendant Corona Clay
> Company discharged pollutants from a point
> source into streams or waters that qualify as
> jurisdictional "waters of the United States";
> and that such discharge was either (1) on or
> after February 27, 2018, or (2) at any time,
> with a reasonable likelihood that such
> violations will recur in intermittent or
> sporadic violations?

The jury answered that question with a simple "no," leaving
us unable to conclude exactly which of the several issues
posed by the question were decided.

### III

Relying on the text and structure of the CWA, we
conclude that the district court erred in interpreting *Gwaltney*
as requiring an ongoing *discharge* violation as a prerequisite
to a CWA citizen suit asserting ongoing monitoring and
reporting violations.

*Gwaltney* involved an NPDES permit regarding
discharge of pollutants from a meatpacking plant.  484 U.S.
at 53.  In the three years before the citizen suit was filed, the
defendant "repeatedly violated the conditions of the permit
by exceeding effluent limitations."  *Id.*  The Court concluded
that the CWA's reference to a defendant found "to be in

violation," 33 U.S.C. § 1365(a)(1), premises a citizen suit on
the "likelihood that a past polluter will continue to pollute in
the future." *Id.* at 57. So, an entirely past violation not likely
to recur, while of concern to regulators, cannot support a
citizen suit seeking injunctive relief.

The plaintiffs in *Gwaltney*, however, only alleged
discharge violations. *Id*. at 53. *Gwaltney* does not address
whether a CWA citizen suit alleging reporting or monitoring
violations must be premised on ongoing or reasonably likely
*discharge* violations. But the district court's holding that it
must is undercut by the text of the Act. The CWA allows a
citizen suit "against any person . . . who is alleged to be in
violation of [] an effluent standard or limitation under this
chapter." 33 U.S.C. § 1365(a)(1). Section 1365(f)(7) in turn
defines an "effluent standard or limitation" as including "a
permit *or a condition of a permit* issued under section 1342."
(emphasis added). The Corona permit has multiple
"conditions," some of which relate to storm water discharge,
but others that relate only to monitoring and reporting.

Corona contends that reporting and monitoring
violations cannot support a citizen suit because 33 U.S.C.
§ 1318, which provides for reporting and monitoring
requirements in a permit, gives the EPA Administrator
power to undertake enforcement actions. Noting that
reporting and monitoring requirements are not expressly
mentioned in the definition of "effluent limitations" in
§ 1365(f), Corona claims Congress left violations of these
permit requirements to the Administrator alone. However,
the only statute cross-referenced in the definition of "effluent
limitation" in § 1365(f)—a "permit or a condition of a
permit"—is "section 1342 of this title." *Id*. That section lays
out the NPDES permitting scheme as a whole. Thus, the
most natural reading of the statute is that any "condition of a

permit" issued under the NPDES system is an "effluent limitation."

Ninth Circuit cases applying *Gwaltney* do not support the district court's conclusion that a CWA suit alleging monitoring and reporting violations can only lie if there are also current forbidden discharges. *See Nat. Res. Def. Council*, 236 F.3d at 998–99 (affirming a district court's finding of ongoing permit violations, including the failure to make and keep records of daily inspections); *NW Env't Advocs.*, 56 F.3d at 986 (holding that "the plain language of [the CWA] authorizes citizens to enforce *all* permit conditions"); *Pac. Lumber*, 230 F.3d at 1151 (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural").

To be sure, the CWA vests district courts with jurisdiction over a citizen suit only upon proof of discharge into the navigable waters of the United States. *See* 33 U.S.C. § 1365(a)(1), § 1342(a). But, nothing in the statute requires the jurisdictional discharge be current or likely to occur. Thus, we hold that *Gwaltney* permits a citizen suit based ongoing or imminent procedural violations. Because the district court's jury instructions required Coastkeeper to prove elements not required by the statute or *Gwaltney*, we vacate the jury verdict.

IV

The qualifying jurisdictional discharge into navigable waters presents a separate problem. At the time of trial, we required CWA plaintiffs to show only that pollutants in navigable waters were "fairly traceable from the point source." *Haw. Wildlife Fund v. Cnty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). Shortly after final judgment issued in

this case, the Supreme Court held that an NPDES permit is
required only when discharge from a point source flows
directly into navigable waters, or when there is "functional
equivalent of a direct discharge." *Cnty. of Maui*, 140 S. Ct.
at 1468. An emission of polluted water is therefore a
"discharge" for CWA purposes only "when a point source
directly deposits pollutants into navigable waters, or when
the discharge reaches the same result through roughly
similar means." *Id.* at 1476. "Time and distance are
obviously important," but there are "too many potentially
relevant factors" to allow a bright-line test. *Id.*

The parties in this case reasonably tailored their cases to
our Court's then-extant law. In responding to a Rule 36
request for admission, Corona admitted that its storm water
discharge flows "indirectly into Temescal Wash." Plaintiffs
claimed below that this admission, together with evidence
that waters from the Wash flow into the Santa Ana River and
then into the Pacific Ocean, sufficed to prove jurisdictional
discharge. This may have been true under prior law, but it
is not obvious from the record that this flow was "direct," as
required by *County of Maui*. Nor was the jury asked to
answer that question.

The change in law affected not only the jury instructions,
but also the partial summary judgment, which were premised
on the admitted discharge. The parties deserve the ability to
address whether the "indirect" discharge admitted by Corona
is the "functional equivalent" of a direct discharge into the
waters of the United States, or whether that required
discharge can otherwise be established. As we did in similar
circumstances in *County of Maui*, we therefore vacate the
judgment below and remand for further proceedings in light

of the Supreme Court's intervening opinion.  *See Cnty. of Maui*, 807 F. App'x 695, 696 (9th Cir. 2020) (order).[2]

V

We address one additional matter.  Coastkeeper did not present Corona's Rule 36 admission, that "storm water from the industrial area on the property . . . flows indirectly to Temescal wash," to the jury.  Rather, Coastkeeper asked the district court to deem the discovery response a binding judicial admission and to instruct the jury that the facts were admitted.  The court construed this request as an attempt to "admit this evidence post hoc" and denied it.  And, in denying a motion for a new trial, the court again faulted Coastkeeper for not itself putting the admitted fact before the jury.

Although the issue is not likely to recur on remand, the district court erred.  Federal Rule of Civil Procedure 36 permits a party to "serve on any other party a written request to admit . . . the truth of any matters" within the scope of discovery.  Fed. R. Civ. P. 36(a).  A matter "'admitted under

---

[2] The dissent finds no basis for setting aside the verdict due to the intervening change in law and faults Coastkeeper for not meeting the new and more demanding standard of *County of Maui*.  Dissent at 42–43.  But, when confronted with a similar situation in *County of Maui*, we remanded for further proceedings.  *See* 807 F. App'x at 696.  Fairness requires that we do so here; there was also no need under then-extant law for Coastkeeper to prove direct discharge and Corona had admitted to indirect discharge.  That admission was sufficient to make Coastkeeper's case on discharge under then-applicable law, and for the reasons above, we conclude that the district court erred by not instructing the jury of this conceded fact.  Although *County of Maui* now requires more, the record does not allow us to conclude with any degree of certainty that, if required to show direct discharge or its functional equivalent, Coastkeeper would have been unable to do so.

this rule is conclusively established' unless the court grants a motion to waive or amend" under Rule 36(b). *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111–12 (9th Cir. 2006) (cleaned up). "[T]he rule seeks to serve two important goals: truth-seeking in litigation and efficiency in dispensing justice." *Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007). For Rule 36 to be effective, "litigants must be able to rely on the fact that matters admitted will not later be subject to challenge." *In re Carney*, 258 F.3d 415, 419 (5th Cir. 2001).

Rule 36 makes plain that the admitted fact is no longer subject to dispute. In dealing with other facts not subject to "reasonable dispute," Federal Rule of Evidence 201 allows the Court to take judicial notice of adjudicative facts at "any time." Fed. R. Evid. 201(d). "In a civil case, the court must instruct the jury to accept the noticed fact as conclusive." *Id.* 201(f). Although the better practice might have been for Coastkeeper to ask the district judge to instruct the jury on the admitted fact before the close of evidence, its request that the jury be instructed in the final instructions sufficed, particularly because Corona never filed a Rule 36(b) motion to withdraw or amend the admission. *Conlon*, 474 F.3d at 621.[3]

---

[3] The dissent argues that the district court did not err in declining to instruct the jury on the admission because "parties should know before resting that the other side plans to use a Rule 36 admission on a particular point." Dissent at 44. But a matter "admitted under this rule is conclusively established unless the court grants a motion to waive or amend." *Tillamook Country Smoker*, 465 F.3d at 1111–12 (cleaned up). Corona filed no such motion here.

VI

The district court's judgment is vacated, and the case is
remanded for further proceedings consistent with this
opinion.  Because we vacate the judgment, we do not address
Corona's objections to the district court's costs order, the
civil penalty, or the permanent injunction entered pursuant
to the partial summary judgment.  Each party shall bear its
own costs.

**VACATED AND REMANDED**.

COLLINS, Circuit Judge, dissenting:

In my view, the district court erred by holding, at the
summary judgment stage, that Plaintiffs Inland Empire
Waterkeeper ("Waterkeeper") and Orange County
Coastkeeper ("Coastkeeper") satisfied the requirements for
Article III standing.  Although that would ordinarily mean
that the district court must now resolve the standing question
on remand, Defendant Corona Clay Company ("Corona")
contends that the jury trial that took place on the merits of
certain claims produced an express finding that overlaps
with, and is dispositive of, the Article III standing issue.
Corona therefore asks us to order dismissal of all claims for
lack of standing.   Plaintiffs, however, disagree with
Corona's standing analysis, and they argue that, in any event,
the verdict must be set aside due to a number of asserted
errors.  I do not think that Plaintiffs have established any
basis for concluding that the verdict may not be given
preclusive effect on the standing issue, but I would leave it
to the district court on remand to determine whether to do
so.  Because the majority's analysis of the case is very

different—and is contrary to well-settled authority—I respectfully dissent.

## I

Because Article III standing is jurisdictional, we must address that issue at the outset, before considering any question concerning the merits of Plaintiffs' various claims, all of which were brought under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). On this record, I think it is clear that the district court erred in granting summary judgment in favor of Plaintiffs on the standing issue.

## A

In May 2019, Plaintiffs moved for summary judgment as to liability on five claims, *viz*., the first, second, fifth, sixth, and seventh causes of action in Plaintiffs' operative First Amended Complaint.[1] Plaintiffs' first and second causes of action were based on alleged discharges of polluted stormwater from Corona's facility: the first asserted that polluted storm water discharges from that facility violated the "Effluent Limitations" in the applicable "Storm Water Permit" ("SWP") and the second alleged that the facility's storm water discharges violated the "Discharge Prohibitions" of that permit. The fifth cause of action alleged that Corona had failed adequately to develop, implement, or revise a "Storm Water Pollution Prevention Plan" ("SWPPP"), in violation of the SWP. The sixth and seventh causes of action asserted that Corona had failed to

---

[1] Plaintiffs ultimately dismissed their third and fourth causes of action with prejudice.

comply with its monitoring and reporting obligations. Specifically, the sixth cause of action alleged that Corona had failed adequately to develop, implement, or revise a "Monitoring and Reporting Plan," in violation of the SWP, and the seventh alleged that Corona had failed to comply with the applicable reporting requirements of the SWP.

In contending that they had Article III standing to assert these five claims, Plaintiffs did not rely on the theory that the organizations themselves had suffered an injury-in-fact that gave rise to standing. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Rather, Plaintiffs relied only on the doctrine of associational standing recognized in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977). Under that doctrine, an association may establish standing "'solely as the representative of its members,'" by showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 342–43 (citation omitted); *see also United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554–57 (1996) (noting that the first *Hunt* requirement is "an Article III necessity for an association's representative suit," but that the third prong is a prudential requirement that Congress may abrogate). The second and third prongs are not contested here. Thus, the only question is whether Plaintiffs showed that their members would otherwise have Article III standing to sue in their own right.

The elements of Article III standing are that "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citation omitted).  In arguing that these elements were satisfied by their members, Plaintiffs relied on the declarations of three persons, all of whom are members of Waterkeeper.[2]  Each of those declarants explained the ways in which Corona's alleged discharges into Temescal Creek (sometimes called "Temescal Wash") harmed their "use and enjoyment" of that creek by degrading, or threatening to degrade, the quality of the water in it.  In explaining how these declarations established the Article III standing of these three members, Plaintiffs' summary judgment motion likewise asserted that "Defendant's continued discharges" impaired these members' "use and enjoyment" of the creek.  Because all of the alleged violations in the complaint involved laws that were "legally and technically designed to reduce the level of pollutants in [Corona's] discharge," Plaintiffs' motion argued that the members' injuries were fairly traceable to the alleged violations.

The district court granted summary judgment to Plaintiffs on the issue of standing and also granted them partial summary judgment as to liability on the first and fifth causes of action.[3]  The court, however, denied summary

---

[2] Although the declarants all described themselves as members of "Waterkeeper," an additional declaration submitted by Plaintiffs explained that Waterkeeper is a "program" of Coastkeeper and is not a "separate legal entity" from Coastkeeper.

[3] Corona is wrong in suggesting that the district court's order only addressed the issue of standing as to the first and fifth causes of action.

judgment as to the second, sixth, and seventh causes of
action. As to standing, the court concluded that Plaintiffs'
three members had established injury-in-fact that was fairly
traceable to the challenged conduct because their
declarations stated "that pollution from Defendant's Facility
has discharged pollution into the Creek, affecting the water
quality of the habitat." The court held that it did not matter,
for standing purposes, whether that pollution had caused
"actual environmental harm"; it was sufficient that the
"pollution" affected the members' "enjoyment from
recreation" in the area.

## B

In granting summary judgment to Plaintiffs on the issue
of standing, the district court seemed to lose sight of the fact
that the requirements of Article III standing are "an
indispensable part of the plaintiff's case," and that "each
element must be supported in the same way as any other
matter on which the plaintiff bears the burden of proof, *i.e.*,
with the manner and degree of evidence required at the
successive stages of the litigation." *Lujan v. Defenders of
Wildlife*, 504 U.S. 555, 561 (1992). Thus, to succeed on its
motion for summary judgment as to standing, Plaintiffs
needed to show, not merely that they had made a *sufficient*
showing to allow the trier of fact to find standing, but that
there was "no genuine dispute as to any material fact" as to
their standing and that they were therefore "entitled to
judgment as a matter of law" in their favor on that issue.
FED. R. CIV. P. 56(a). I agree that Plaintiffs' showing was
sufficient to survive a defense motion for summary judgment

---

That is not consistent with how the parties briefed the issue, how the
court's order described its ruling, or how the court later in the trial
proceedings construed its earlier ruling.

had one been made, but it was not enough to establish that their members' Article III standing had been proved as a matter of law.

As noted earlier, the only theory of standing presented in Plaintiffs' members' declarations was that Corona had contributed, and threatened to contribute, to the pollution of Temescal Creek, thereby affecting the water quality and impairing the members' enjoyment of the creek. *See supra* at 26. That is likewise the only theory on which the district court predicated its ruling on Article III standing, *see supra* at 27, and it is the only theory of standing that Plaintiffs invoke in their appellate briefs. Plaintiffs' theory that their declarants suffered an injury-in-fact that is fairly traceable to Corona's conduct thus rested dispositively on the assertion that Corona's pollution *reached Temescal Creek or threatened to do so*. Accordingly, Plaintiffs' claim of standing could be resolved in their favor as a matter of law only if, *inter alia*, they presented sufficient evidence to show that there was no genuine issue of material fact as to whether Corona's alleged polluted discharges reached the creek or threatened to do so.

Moreover, in addition to showing that the declarants suffered a fairly traceable injury-in-fact, Plaintiffs also had to show that those injuries would be *redressed* by the particular remedies that are available under the CWA and that were sought in this case. *Steel Co.*, 523 U.S. at 106–07. The law is clear that the CWA only permits citizen suits when, at the time of filing of the suit, there is an "ongoing" violation or a "reasonable likelihood" of future violations, and that "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 57, 59 (1988). Given that focus, it follows that the

declarants' asserted aesthetic and recreational injuries would be redressed by the CWA's forward-looking remedies only if the declarants are "injured or face[] the threat of future injury due to illegal conduct *ongoing at the time of suit*" or imminently threatened in the future. *Friends of the Earth*, 528 U.S. at 185 (emphasis added). Thus, for example, to the extent that a private plaintiff in a CWA suit can request that the defendant be ordered to pay civil penalties to the Government, it has standing to do so only because, and only if, the deterrent effect of those penalties would redress ongoing or future injuries by "abating current violations" or "preventing future ones." *Id*. at 187; *see also id*. at 188 ("private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations"). Consequently, in order for Plaintiffs to establish at summary judgment their sole standing theory—*i.e.*, that Corona's various CWA violations led to pollution that reached Temescal Creek or threatened to do so, thereby causing ongoing or threatened future injuries—Plaintiffs had to show that there is no genuine dispute that, at the time of their suit, Corona's polluted discharges were reaching the creek or imminently threatened to reach it. *See Lujan*, 504 U.S. at 569 n.4 (standing is evaluated based on the facts "'as they exist when the complaint is filed'" (citation omitted)).[4]

---

[4] This result is true even assuming *arguendo* (as Plaintiffs contend) that *Gwaltney* only requires that a private CWA plaintiff show *some* ongoing violation of the CWA and not necessarily a *discharge* violation. *Cf*. Maj. Opin. at 17–18. Here, Plaintiffs' only Article III standing theory was that the alleged violations—including reporting violations—are fairly traceable to their members' injuries because those violations *led to actual or threatened polluted discharges* and that those discharges led to the members' injuries. Thus, even assuming that *Gwaltney* did not require a showing of ongoing or futures discharges, the particular theory

Plaintiffs did not carry this burden, as the district court's own summary judgment order elsewhere recognized. In granting summary judgment as to liability on the first cause of action (relating to discharges in violation of "effluent limitations"), the district court placed loadbearing weight on its (arguably erroneous) view that, to prevail on the issue of whether Corona had exceeded the relevant effluent limitations, "Plaintiffs need not show that discharges have reached the body of water in question." By contrast, the district court concluded that Plaintiffs' second cause of action required a showing that the "receiving waters" were discolored or that beneficial uses were adversely affected. Finding triable issues on these latter points, the district court denied summary judgment on the second cause of action. Thereafter, the parties tried, and the district court expressly submitted to the jury, the question of whether Corona's discharges were reaching Temescal Creek "on or after February 27, 2018"—the date of filing of Plaintiffs' suit— or were "reasonabl[y] likel[y]" to "recur," and the jury answered that question "No." That negative answer then provided the basis for the district court's entry of judgment against Plaintiffs on the second, sixth, and seventh causes of action.[5]

Because the record on summary judgment presented a triable issue of fact as to whether, at the time of the filing of the complaint, polluted storm water discharges from Corona's facility were reaching Temescal Creek or

of Article III standing on which Plaintiffs chose to rely required them to make such a showing.

[5] In challenging the jury verdict on appeal, Plaintiffs have expressly not done so vis-à-vis the second cause of action. The adverse judgment on that cause of action is thus unchallenged.

imminently threatened to do so, the district court erred in resolving the Article III standing issue in Plaintiffs' favor as a matter of law.[6]

## C

In evaluating the district court's upholding of Plaintiffs' discharge-based theory of Article III standing, the majority commits the very same error that the district court did—it erroneously holds that Plaintiffs made a *sufficient* showing of standing, but without ever asking whether Plaintiffs had shown that there were *no genuine issues of material fact* as to standing.   *See* Maj. Opin. at 10–13.   The majority nonetheless insists that I am somehow "'confus[ing] the jurisdictional inquiry . . . with the merits inquiry.'"   *Id*. at 16 (quoting *Ecological Rts. Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000)).   On the contrary, it is the majority's position that is confused and, indeed, contrary to controlling Supreme Court and Ninth Circuit precedent.

---

[6] Moreover, even apart from the triable issue concerning whether polluted discharges reached the creek, the declarations submitted by Plaintiffs in support of standing also contained potential deficiencies or ambiguities that could have been resolved, at a trial, against Plaintiffs. As Corona notes, some of the declarants' statements or photographs concerning their use of the creek appear to relate to segments that are upstream from Corona's facility and that thus could not plausibly have been affected by Corona's alleged discharges.   Another declarant vaguely described looking for a home "in the Temescal Creek area" and claimed that she was worried about Corona's actions' effect on home prices, but a trier of fact could reasonably conclude that this particular theory of injury was inadequate to establish standing.   *See Lujan*, 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require").

As I have explained, *Lujan* squarely holds that the elements of Article III standing are "an indispensable part of the plaintiff's case" and that, as a result, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, *with the manner and degree of evidence required at the successive stages of the litigation*." 504 U.S. at 561 (emphasis added). That means that, if (as here) Plaintiffs seek summary judgment *in their favor*, they must establish that their Article III standing "cannot be . . . genuinely disputed." *See* FED. R. CIV. P. 56(c)(1); *see also Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). If they fail to make this showing, because there *is* a triable dispute as to standing, then Plaintiff's standing contentions "must be 'supported adequately by the evidence adduced *at trial*.'" *Lujan*, 504 U.S. at 561 (emphasis added) (citation omitted). As the majority concedes, "[i]f there is a triable issue of fact" as to standing, "it follows that the party is entitled to have that issue submitted to the jury." *See* Maj. Opin. at 16 n.1.

Here, the *only* theory of Article III standing that Plaintiffs presented at summary judgment—and the only one that they assert on appeal—rested on the premise that pollutants actually reached the creek or threatened to do so, thereby impairing Plaintiffs' enjoyment of that creek. *See supra* at 26. Accordingly, under a straightforward application of *Lujan*, Plaintiffs' burden at summary judgment was to show that there was no genuine dispute that pollutants from Corona *did* reach Temescal Creek or *imminently threatened* to reach it. They inarguably failed to carry that burden; indeed, the majority does not contend otherwise. But despite the majority's concession that Corona was "entitled to have that issue submitted to the jury," *see* Maj. Opin. at 16 n.1, the majority inexplicably

upholds the district court's order *declining* to submit that issue to the jury.[7]

The majority instead posits that, because this theory of standing overlapped with the merits of Plaintiffs' claims, Plaintiffs were somehow excused from making the showing that *Lujan* requires. *See* Maj. Opin. at 16–17. That is quite wrong. The majority relies on *Pacific Lumber*'s admonition that courts must not confuse a "jurisdictional inquiry" with a "merits inquiry," 230 F.3d at 1151, but that does not mean (as the majority would have it) that, in such a case of overlap, the plaintiff is thereby *excused* from making the showing of Article III standing that *Lujan* requires. On the contrary, *Pacific Lumber* simply reaffirmed what the Supreme Court held in *Friends of the Earth*, namely, that the Article III standing inquiry is not as demanding as the merits inquiry, because the former can be satisfied without showing actual "environmental harm." 528 U.S. at 180–81. As *Pacific Lumber* explained, a plaintiff can show actual or imminent harm to its "aesthetic and recreational interests" *without* showing that there was "actual *environmental degradation*."

---

[7] Even more baffling is the majority's assertion that, because I think that the district court should be reversed on this point, I therefore "must believe that the jury verdict on the merits (which did not separately address standing) defeated Article III jurisdiction." *See* Maj. Opin. at 16 n.1. I have said nothing of the sort. As I have explained, the district court's order granting summary judgment to Plaintiffs on the standing issue must be reversed because it wrongly resolved a genuinely disputed issue that *should* have been submitted for resolution at trial *but was not*. This case is really that simple. In the quoted comment, the majority crosses the wires by referencing the entirely separate question of whether Corona is correct in contending that the jury's findings on the merits issues that *were* submitted to the jury should now have the effect of precluding a trial on the standing issue. As I explain below, I take no position on that issue, but would instead leave it for the district court to address on remand. *See infra* at 38–40, 45.

230 F.3d at 1149, 1151 (emphasis added); *see also Friends of the Earth*, 528 U.S. at 181 ("The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff."). However, given the particular theory of standing Plaintiffs asserted here, there could be *neither* harm to their aesthetic and recreational interests *nor* environmental degradation unless pollutants from Corona's facility reached the creek. Nothing in *Pacific Lumber* excuses Plaintiffs from making the lesser showing that Article III standing requires merely because that inquiry, on these facts, overlaps with the more demanding standards that apply with respect to the merits of the claims.

But even worse than all of this, the majority proceeds to uphold a portion of the district court's grant of summary judgment on the standing issue based on a theory that was neither presented nor substantiated below and that Plaintiffs have not asserted in their appellate briefs. The majority contends that, as to the sixth and seventh causes of action (which rested on Corona's alleged monitoring and reporting deficiencies), Plaintiffs have standing by virtue of their "informational injury suffered because of Corona's failure to abide by the permit's monitoring and reporting requirements." *See* Maj. Opin. at 15. According to the majority, when an interested party is deprived of a statutory right to obtain specified information, that "gives rise to a cognizable 'informational' injury" that itself suffices for Article III standing purposes. *See id*. at 13 (citing *Wilderness Soc'y v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010)). Noting that one of Plaintiffs' declarants mentioned that she was writing a book about the Santa Ana River (into which Temescal Creek flows), the majority announces that her "interest in accurate information about Corona's discharges is obvious," and that this interest establishes her

standing to assert the sixth and seventh causes of action. *See* Maj. Opin. at 15. For several reasons, this analysis is plainly incorrect.

As an initial matter, Plaintiffs' declarations and summary judgment motion never mentioned or relied upon the pure information-deprivation theory of standing that the majority concocts here. *See supra* at 26. Rather, they rested on the alternative theory that, as the majority puts it, "Corona's failure to report creates a *genuine threat of undetected past or future polluted discharge*, harming [Plaintiffs'] 'aesthetic or recreational interest.'" *See* Maj. Opin. at 14 (emphasis added) (citation omitted). But as the italicized language makes clear, *that* theory would only establish a fairly traceable injury-in-fact that could be redressed by the forward-looking remedies in a citizen suit under the CWA only if there were ongoing or threatened future discharges. *See Gwaltney*, 484 U.S. at 59 (the particular "harm" that is traceable to the "ongoing violation" sought to be enjoined must "lie[] in the present or the future, not in the past").[8] That latter issue concerning discharges was triable for the reasons explained earlier.

Moreover, there simply is no factual basis in the summary judgment record for concluding that Plaintiffs established a pure information-deprivation standing theory

---

[8] Because the "harm sought to be addressed" by a CWA private citizen suit must lie "in the present or the future," *Gwaltney*, 484 U.S. at 59, the majority is wrong to the extent that it implicitly suggests that *aesthetic or recreational* harms associated with *past pollution that has since abated* would somehow be redressed by the mere disclosure of information about that past pollution. *See* Maj. Opin. at 14. The majority may be correct that a purely *informational* harm that is caused by ongoing reporting violations would be redressed by such a disclosure, but no such theory has been raised here.

*as a matter of law*.  Although, as the majority notes, one of Plaintiffs' declarants mentions that she is working on a book "that describes the politics of governing the Santa Ana River in Southern California," she mentions that fact only in the "personal background" section of her declaration, and she never links it to her alleged injuries in the way that the majority does.  When she turns, in her declaration, to describing the injuries that she asserts are fairly traceable to Corona's challenged conduct, she never contends (as the majority would have it) that Corona has deprived her of information she needs for her book.  On the contrary, her *only* theory of injury is that Corona's actions have affected the waters of Temescal Creek and thereby impaired her "use and enjoyment" of that creek.  Far from reading the factual record in the light most favorable to the party opposing summary judgment—*viz.*, Corona—the majority instead aggressively reads it in Plaintiffs' favor in order to uphold granting them summary judgment as a matter of law.  All of this is contrary to well-settled law.  *See, e.g.*, *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016) (noting that, on a "motion for summary judgment, not only does the movant carry the burden of establishing that no genuine dispute of material fact exists, but the court also views the evidence in the light most favorable to the non-moving party").

## II

Given that the standing issue should not have been resolved in Plaintiffs' favor at summary judgment as to any claim, the next question is what follows from that conclusion.  At a minimum, it means that the judgment in Plaintiffs' favor as to the first and fifth causes of action—which were partially decided in Plaintiffs' favor at summary judgment—should be reversed.  But that leaves the question

of whether those claims should now be tried on remand, as well as the issue of what effect, if any, the district court's error has on the jury's verdict in Corona's favor on the sixth and seventh causes of action.

Corona raised this issue in a post-trial motion that alternatively invoked Federal Rules of Civil Procedure 60(b)(4) and 59(e). In that motion, Corona argued that the jury's finding concerning Corona's lack of polluted discharges into "waters of the United States" was binding on Plaintiffs and was dispositive of the Article III standing issue. Plaintiffs opposed the motion, arguing that, in light of Plaintiffs' already-pending appeal, the district court should summarily deny the motion, leaving it for this court to resolve Corona's arguments on Corona's expected cross-appeal. Alternatively, Plaintiffs argued that the motion lacked merit, because the jury's verdict was flawed and would be set aside on appeal and because, in any event, the jury's verdict was insufficient to establish that Plaintiffs lacked standing. The district court summarily denied Corona's motion, concluding that Corona should present these arguments to this court on appeal. Corona then cross-appealed the judgment and the denial of its post-trial motion.

The resulting remaining issues on appeal can be grouped into two categories. First, we must address whether Plaintiff is correct in contending that the jury's verdict must be set aside. If it must be, then the judgment on all four remaining claims—the first, fifth, sixth, and seventh causes of action—must be reversed, and the case remanded for a retrial that includes the standing issue.[9] But if that verdict survives,

---

[9] As noted earlier, Plaintiffs have expressly stated that they are not challenging the adverse judgment on the second cause of action, and so that claim would not be retried. *See supra* note 5.

then we must address whether Corona is correct in arguing
that the verdict establishes that Plaintiffs failed to prove
standing, thereby requiring dismissal of all claims.  I will
address these questions in reverse order.

### A

As set forth earlier, the only theory of Article III standing
that Plaintiffs put forward at summary judgment required
them to establish as a matter of law that, at the time Plaintiffs
filed suit, either polluted discharges were reaching Temescal
Creek from Corona's facility or there was an imminent threat
that future discharges would reach the creek.  *See supra*
at 28–29.  That issue was improperly removed from the jury,
as I have explained.  Ironically, however, the district court
for different reasons imposed a similar requirement at trial
as a *statutory* matter.  *See infra* at 40–42.  The result was that
the jury ended up making an express finding that Plaintiffs
had *failed* to prove that:

> [Corona] discharged pollutants from a point
> source into streams or waters that qualify as
> jurisdictional "waters of the United States";
> and that such discharge was either (1) on or
> after February 27, 2018, or (2) at any time,
> with a reasonable likelihood that such
> violations will recur in intermittent or
> sporadic violations.

By its terms, this verdict establishes either that
(1) Corona never discharged pollutants into Temescal
Creek; or (2) Corona ceased all such discharges before
February 27, 2018, with no reasonable likelihood of a

recurrence of "such violations."[10]   In asserting that this
finding is not dispositive of the Article III standing issue,
Plaintiffs first contend that the jury may have misconstrued
the phrase "discharge . . . into" to exclude the sort of indirect
runoff that was alleged here, but they point to nothing in the
jury instructions or the arguments of the parties at trial that
invited the jury to conclude that, even if Corona's discharges
reached the creek, that would not count as a "discharge . . .
into" the creek.   On the contrary, for example, Corona's
closing argument to the jury at trial was that polluted
discharges *did not reach* the creek at all.   On this record,
there is no reasonable likelihood that the jury construed the
instructions and verdict form as excluding indirect
discharges.   *See R.H. Baker & Co. v. Smith-Blair, Inc.*,
331 F.2d 506, 509 (9th Cir. 1964) ("'A special verdict must,
of course, be construed in the light of the surrounding
circumstances.'" (citation omitted)).

Plaintiffs also note the verdict's reference to
"violations," and they argue that, in light of that word, the
jury could theoretically have found that Corona's discharges
did reach the creek, that those discharges did contain
pollutants, but that the *level* of pollutants did not amount to
a "violation."   And because environmental harm is not
necessary for Article III standing, *see Friends of the Earth*,
528 U.S. at 181–82, Plaintiffs suggest that such a jury
finding would not necessarily be dispositive of Plaintiffs'
sole theory of Article III standing.   Concluding that the
parties' briefing on this point is insufficient to resolve that
narrowly focused issue, I would remand that aspect of

---

[10] The district court specifically instructed the jury that "Temescal
Wash is a qualifying water of the United States."

Corona's post-trial motion to the district court for it to
address in the first instance.[11]

## B

There should be no such remand, however, if Plaintiffs
are correct in contending that the jury's verdict must in any
event be set aside.  Plaintiffs challenge that verdict in this
court on four different grounds, but in my view, all of them
lack merit.

### 1

Over Plaintiffs' objection, the district court instructed
the jury that, to prevail on its second, sixth, and seventh
causes of action, Plaintiffs were required to show that
Corona's discharges reached "waters of the United States"
on or after the date on which the complaint was filed or that
there was a likelihood of a "recurrence in intermittent or
sporadic violations."  As already noted, the court's verdict
form reflected the same requirement.  The district court did
*not* impose this requirement under the theory that it was
needed to establish Article III standing; indeed, the court had
reiterated at a pretrial conference concerning motions in
limine that it had resolved the standing question at summary
judgment.  Rather, the district court concluded that this
showing was required by the citizen-suit provisions of the
CWA, as construed in *Gwaltney*.  The court thus imposed
the requirement as a matter of "statutory standing," rather
than Article III standing.  *See Friends of the Earth*, 528 U.S.

---

[11] Without even considering how the jury's verdict should be
understood in light of the instructions and the parties' arguments and
evidence, the majority simply announces, without analysis, that the
import of the verdict cannot be known.  *See* Maj. Opin. at 17.  That is
manifestly not the proper resolution of this question.

at 175 (explaining that *Gwaltney* held that "citizens lack statutory standing under [the CWA] to sue for violations that have ceased by the time the complaint is filed"); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128, n.4 (2014) (clarifying that "statutory standing" does not "implicate subject-matter jurisdiction"). Plaintiffs contend, and the majority agrees, that the district court's instruction rested on a misreading of *Gwaltney* and that, so long as "the required jurisdictional discharge into United States waters has occurred," a plaintiff in a private CWA action need only show *some* ongoing or threatened violation of the CWA and not necessarily a *discharge*-related violation. *See* Maj. Opin. at 6.

In my view, it is unnecessary to resolve this issue. In the current posture of this case, the relevant question is whether Plaintiffs have shown a basis for refusing to give the jury's verdict preclusive effect with respect to the Article III standing issue that was wrongly withheld from the jury. The resolution of the parties' competing positions concerning *Gwaltney*, however, would have no effect whatsoever on whether the jury verdict may be given such effect. As I have explained earlier, when Plaintiffs successfully sought and obtained summary judgment in their favor on the Article III standing issue, they did so based only on the theory that pollutants from Corona's facility were reaching, or threatened to reach, Temescal Creek, thereby harming their aesthetic and recreational interests. *See supra* at 26, 29 n.4, 35 n.8. Because Plaintiffs' only Article III standing theory has always been a discharge-based theory, the fact that the jury verdict was for other (and possibly erroneous) reasons serendipitously focused on actual or threatened discharges provides no basis for declining to give that verdict preclusive effect vis-à-vis Plaintiffs' discharge-based Article III standing theory. Put another way, the fact that the jury's

finding was tailored to discharges as opposed to reporting and monitoring violations—even if erroneous for *other* purposes—provides no basis for declining to give it binding effect on the issue of Plaintiffs' discharged-based theory of standing.

## 2

Plaintiffs further contend that the jury instructions were erroneous because they did not reflect the standards later announced in *County of Maui vs. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1476 (2020). This subsequent change in law provides no basis for setting aside the jury's verdict.

Soon after the district court entered a final judgment in this case, the Supreme Court in *County of Maui* held that the CWA's permit requirements are triggered only when "there is a *direct* discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*." 140 S. Ct. at 1476 (simplified). At the time this case was tried, our court had adopted a less demanding standard that required only that the pollutants be "fairly traceable from the point source to a navigable water." *Hawaii Wildlife Fund v. County of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). The Supreme Court held that our court's "broad interpretation of the statute," which could trigger permitting requirements even when a pollutant "traveled long and far (through groundwater) before it reached navigable waters," was "too extreme." 140 S. Ct. at 1470, 1472, 1476.

Had the jury been instructed under the Supreme Court's new standard, it arguably would have been permitted to conclude that the distance that Corona's discharges had to travel to reach the creek—1100 feet—did *not* amount, on this record, to the "functional equivalent of a *direct*

discharge." 140 S. Ct. at 1476 (emphasis added). I do not
see how Plaintiffs were possibly prejudiced by the fact that
the jury was not permitted to hold them to this stricter
standard. As I have explained, given the context of the trial
and the parties' arguments, there is no reasonable likelihood
that the jury would have construed the instructions and the
verdict form to *exclude* the sort of indirect discharge that was
at issue here. *See supra* at 38–39. In other words, the jury
here was given the opportunity to hold Corona liable under
the *looser* standards that we had previously applied, and it
concluded that those standards had *not* been met. Because
any post-verdict change in the law on this point was thus less
favorable to Plaintiffs, it provides no basis for setting aside
an adverse verdict that was based on more permissive
standards.[12]

### 3

Relatedly, Plaintiffs also assert that the jury verdict must
be set aside because the district court erroneously "failed to
instruct the jury as to what the law defines as a discharge
'into' waters" and therefore did not make clear to the jury
that indirect discharges were covered. But, once again, there
is no reasonable likelihood, on this record, that the jury

---

[12] Contrary to what the majority contends, I do not "fault[]"
Plaintiffs "for not meeting the new and more demanding standard of
*County of Maui*." *See* Maj. Opin. at 21 n.2. Rather, my view is that,
given Plaintiffs' failure to satisfy the more *lenient* standard, there is no
conceivable reason why they should be given a retrial in order to try to
prove what the majority concedes is a "more demanding standard." *Id*.
The majority points to our remand in *County of Maui*, but that does not
support the majority's remand here. In that case the plaintiffs *prevailed*
under the more lenient standard, and so they obviously had to be given a
chance to meet the newer and more demanding standard. 140 S. Ct.
at 1469. That reasoning is inapplicable here.

would have construed the instructions and verdict form as excluding indirect discharges. *See supra* at 38–39. Accordingly, even if an instruction on this point should have been given, any error in this case would be harmless.

## 4

Finally, Plaintiffs argue that the district court should have instructed the jury that Corona was bound by its response, in an answer to a request for admission under Federal Rule of Civil Procedure 36, that "storm water from the industrial area on the property . . . indirectly flows to Temescal wash." Plaintiffs, however, did not present the admission until after the close of evidence, when they asked the district court to treat the statement as a binding judicial admission. Because the purpose of Rule 36 admissions is to frame the issues *for trial*, *see Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981), a party does not have an automatic right to introduce such an admission for the first time *after* the trial record is closed. As a general matter, parties should know before resting that the other side plans to use a Rule 36 admission on a particular point, so that they can meet the point with trial evidence.[13] Reopening might be warranted in some cases, but that is plainly a matter within the district court's "sound discretion." *See Zenith Radio Corp. v. Hazeltine Research,*

---

[13] The majority's reliance upon *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102 (9th Cir. 2006), is unavailing. Unlike this case, *Tillamook* did not involve a party's *belated* use of an answer to a request for admission. On the contrary, the answer was properly submitted in support of a summary judgment motion, and the opposing party had a full opportunity to respond with argument and evidence in the ordinary course. *Id*. at 1111–12. The same cannot be said here, where a party first sought to submit an answer to a request for admission *after* the trial record had already been closed.

*Inc.*, 401 U.S. 321, 331 (1971).  Plaintiffs have not shown that that discretion was abused here.[14]

### III

Because I do not perceive any basis at this point to overturn the jury verdict, I would remand for the district court to address whether the verdict is dispositive of the sole theory of Article III standing that Plaintiffs presented at summary judgment.  If the district court answered that question in the affirmative, then it should enter judgment dismissing this action in its entirety.  If it answered that question in the negative, then it should proceed with a trial on the then-remaining claims.[15]  Because the majority instead vacates the judgment on the first, fifth, sixth, and seventh causes of action, and remands with different instructions, I respectfully dissent.

---

[14] Because Plaintiffs' request to rely on the admission was properly rejected as untimely, the majority is wrong in suggesting that the admission somehow provides a basis for granting a do-over based on *County of Maui*.  *See* Maj. Opin. at 21 n.2.  Moreover, contrary to what the majority insinuates, the admission did not concede that *polluted* storm water flowed from Corona's facility to the creek.

[15] That would include at least the first and fifth causes of action.  Moreover, if on remand the district court concluded that the standing issue needs to be tried, then the court would be required to address whether its prior construction of *Gwaltney* was correct.  If the answer to that question is no, then the sixth and seventh causes of action might need to be retried as well.