William Frentzen (SBN 343918)
wfrentzen@mofo.com
Matthew Robinson (SBN 333652)
MRobinson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-6413
Facsimile: (415) 268-7522

Lauren Chase (SBN 324162)
lauren@coastkeeper.org
Barry Lee (SBN 349773)
barry@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone:   (714) 850-1965

*Attorneys for Plaintiffs*
*Additional Counsel Listed on Next Page*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a project of Orange County Coastkeeper, and ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CORONA CLAY CO., a California corporation,<br><br>Defendant. | Case No.: 8:18-cv-00333 DOC (DFM)<br><br>Hon. David O. Carter<br><br>**PLAINTIFFS' POST-TRIAL SUPPLEMENTAL REMEDIES BRIEF**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)<br><br>Hearing date: August 28, 2023<br>Time: 10:00 AM<br>Location: Courtroom 10A, 10th Floor<br>Action Filed: February 27, 2018 |

*Additional Counsel for Plaintiffs*

Jennifer F. Novak (SBN 183882)
novak@jfnovaklaw.com
LAW OFFICE OF JENNIFER F. NOVAK
500 Silver Spur Road, Suite 206
Rancho Palos Verdes, California 90275
Telephone:    (310) 693-0775
Facsimile:    (310) 627-0172

Christopher Sproul (SBN 126398)
csproul@enviroadvocates.com
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695

1

**TABLE OF CONTENTS**

2

3   I.      INTRODUCTION                                                    3

4        I.      FACTUAL BACKGROUND                                      5

5   II.     ARGUMENT                                                         6

6           A. CWA Civil Penalties are Mandatory and Subject to the

7               Miscellaneous Receipts Act.

8

9           B. The Court Can and Should Provide Corona Clay the Opportunity to

10              Reduce its Civil Penalty by Implementing a Voluntary, Meaningful

11              Environmental Project.                                       6

12          C. The Court Should Not Reduce Corona Clay's Civil Penalty on the

13              Basis of Corona Clay's Own Long-Overdue CWA Compliance

14              Costs.                                                       9

15          D. In All Circumstances, the Court Should Impose Substantial Civil

16              Penalties and Meaningful Injunctive Relief.                  11

17  III.    CONCLUSION                                                       15

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**<u>FEDERAL CASES</u>**

3 *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d

4      819 (9th Cir. 2001) ...............................................................................7, 8, 12

5 *Envt'l Prot. Info. Ctr. v. Pac. Lumber Co.*, 430 F. Supp. 2d 996, 1006

6      (N.D. Cal. 2006)..........................................................................................14

7 *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528

8      U.S. 186 (2000) ...................................................................................5, 10, 13

9 *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 53

10      (1987) ..................................................................................................3, 4, 6

11 *Humane Soc'y of U.S. v. HVFG, LLC*, No. 06-6829, 2010 WL

12      1837785, at *14-15 (S.D.N.Y. May 6, 2010).........................................7, 8, 9

13 *Inland Empire Waterkeeper v. CMC Steel Fabricators, Inc*, No. 8:21-

14      cv-00236- ..................................................................................................9

15 *Leslie Salt Co. v. United States,* 55 F.3d 1397 (9th Cir. 1995) .......................4, 6, 11

16 *Pub. Int. Rsch. Grp. Of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,

17      720 F. Supp. 1158, 1166 (D.N.J. 1989) ...........................................................9

18 *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1355

19      (9th Cir. 1990)..........................................................................................6, 11

20 *Tull v. United States* 481 U.S. 427 (1987)....................................................3, 4, 6, 13

21 *United States v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 444,

22      436-37, 447 (W.D. Pa. 2002) .......................................................................10

23 *United States v. City of San Diego*, No. 88-1101, 1991 WL 163747, at

24      *6 (S.D. Cal. Apr. 18, 1991) ..................................................................8, 9, 12

25

26

27

28

**FEDERAL STATUTES**

31 U.S.C. § 3302 ........................................................................................6

33 U.S.C. § 1319 ...............................................................................6, 8, 10

33 U.S.C. § 1365(a))...............................................................................4, 6

**FEDERAL REGULATIONS**

40 C.F.R. § 19.4...........................................................................................8

88 Fed. Reg. 986, 989 (Jan. 6, 2023)........................................................8

## I.      INTRODUCTION

For years, Defendant Corona Clay Company ("Corona Clay") has discharged polluted stormwater to Temescal Creek in violation of the Clean Water Act ("CWA"). Dkt. 308. As a main tributary of the Santa Ana River, Temescal Creek provides habitat for wildlife, including endangered and native species, and supports human recreation. *See* Dkt. 225-3 at 19, 24 (Santa Ana River Basin Plan designating Temescal Creek's beneficial uses; noting the Creek "is the breeding center of the local Arroyo Chub population, the second native fish species still present in the middle river system"). Following trial on remand in this citizen's suit, the jury reached a verdict establishing: (i) this Court's jurisdiction to hear Waterkeeper's claims and (ii) Corona Clay's liability for 12,541 CWA violations. Dkt. 308. Per *Tull v. United States*, it is up to this Court to determine appropriate remedies, including injunctive relief and civil penalties. 481 U.S. 412, 427 (1987); *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 53 (1987).

Rightfully and commendably so, this Court has continually emphasized its focus on environmental protection. Lee Dec. Ex. B at 4:4-6. More specifically to this remedies phase, this Court has admirably expressed a desire to designate a portion of the forthcoming civil penalty to environmental remediation. *Id.* at 6:4-10, 12:14-16. This Court also communicated its laudable goal of maintaining jobs. *Id.* at 5:7-11 (discussing the need to balance Corona Clay's ability to stay in business while acknowledging the Court will consider "other assets"). Environmental non-profit citizen plaintiffs Orange County Coastkeeper and Inland Empire Waterkeeper (together, "Waterkeeper" or "Plaintiffs") share this Court's inclination to subject Corona Clay to an appropriate, deterrent sanction while having said expenditures benefit the local environment and maintain jobs. *Id.* at 13:16-23. Plaintiffs submit this supplemental briefing to explain how the Court can accomplish all three.

Here, environmental protection takes three main forms: (1) remediating the affected environment for past harm, (2) improving Corona Clay's facility to avoid

---

1    additional harm, and (3) deterring future violations, both from Corona Clay and
2    others in the CWA-regulated community. *See generally Tull*, 481 U.S. at 422; *see*
3    *also Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167,
4    186 (2000). For the second category, to ensure Defendant's CWA compliance and
5    avoid further environmental harm from its sediment-laden stormwater discharges,
6    the Court should order the injunctive relief requested by Waterkeeper in prior
7    briefing. *See* Dkt. 313 at 24-32; Dkt. 320 at pp. 26-30 (Plaintiffs' initial remedies
8    briefs discussing why this Court should impose injunctive relief); *and see* Dkt. 320-
9    16 at 3-9; Dkt. 224-9 at 11-21 (Waterkeeper's expert outlining specific BMP
10   recommendations). *See also* Lee Dec. Ex. A at 7 (Corona Clay's consultant
11   recommending improvements); *and see* Dkt. 35-1 at 11-17 (Plaintiffs' stormwater
12   expert discussing environmental harm of elevated solids and metals in Corona
13   Clay's stormwater discharges, including asphyxiation of juvenile fish, habitat
14   degradation, and toxicity); Dkt. 314-6 at 3-4 (Mr. Raymond Hiemstra noting
15   impacts of high clay concentrations in aquatic habitats, including suffocation, water
16   chemistry alteration, and decreased light penetration); Dkt. 314-7 at 3-4 (Plaintiffs'
17   hydrology expert discussing how excessive clay and iron concentrations alters water
18   chemistry and impacts biota).
19       In addition to meaningful injunctive relief and to address the first and third
20   categories, this Court should order an appropriate, deterrent civil penalty while
21   giving Corona Clay the option of contributing funds to local restoration projects.
22   Given the jury's finding of Corona Clay's CWA liability, the Court must impose
23   some "civil penalty," which – once designated as such – must go to the U.S.
24   Treasury. *Gwaltney*, 484 U.S. at 53 (citing 33 U.S.C. § 1365(a)); *Leslie Salt Co. v.*
25   *United States,* 55 F.3d 1388, 1397 (9th Cir. 1995) (some "civil penalty" mandatory
26   upon a finding of CWA liability). As further discussed below, the Court could
27   consider an optional, mutually agreeable, tailored and meaningful environmental
28   restoration project voluntarily committed by Corona Clay as part of its highly

discretionary CWA penalty factor analysis. Still, upon due consideration of the
CWA penalty factors and as outlined in prior briefing, the Court should award a
substantial civil penalty in excess of this Court's prior $3,700,000 penalty to achieve
Congress's deterrence goals. *See* Dkts. 191, 313, 320. Corona Clay's sizable
holdings in its true enterprise – real estate investment – render the company more
than sufficiently capitalized to fund necessary improvements, an environmentally
beneficial project(s), and a civil penalty. *See, e.g.* Lee Dec. Ex. B at 7:18-21
(Corona Clay's C.E.O. Mr. Craig Deleo confirming the company has "become a –
primary [sic] a real estate receiving company"). Considering its hundreds of acres of
assets, Corona Clay's indications that it will be forced to go out of business if this
Court imposes Waterkeeper's requested relief are disingenuous. *Compare* Dkts. 317
at 5:16-20, 316-1 at 5:13-15 (Mr. Deleo claiming Waterkeeper's requested civil
penalty "would only serve to put Corona Clay out of business") *with* Lee Dec. Ex. B
at 9:4-12 (Mr. Deleo affirming that Corona Clay could pay Waterkeeper's requested
civil penalty and remain in business if it chose to do so).

## I.    FACTUAL BACKGROUND

The facts pertinent to the Court's remedy decision are documented in detail in
Plaintiffs' Post-Trial Remedies Brief (Dkt. 313) and Remedies Reply Brief (Dkt.
320), including: (1) background information on Corona Clay's extensive industrial
operations (which date to the 1950s), both its clay manufacturing and open-pit
mining; (2) Corona Clay's failure to comply with the California State Water
Resources Control Board ("State Board's") General Industrial Stormwater Permit
(the "General Permit") in violation of the CWA for years – despite repeated
admonitions to comply from regulators, ultimately resulting in 12,541 jury-
determined CWA violations; (3) the environmental harm to Temescal Creek posed
by Corona Clay's polluted stormwater runoff from its industrial facility; (4) Corona
Clay's failure to adhere to crucial monitoring and reporting requirements, thereby
undermining the integrity of the State and Regional Boards' regulatory programs

1    and depriving these agencies and the public of the important information needed to

2    assess water pollution risks; (5) the economic benefit Corona Clay realized in

3    skirting General Permit requirements; and (6) Corona Clay's extensive financial

4    resources and thus ability to implement Waterkeeper's requested injunctive relief

5    and pay the requested civil penalty. Dkt. 313 at 8-9, 13-23; Dkt. 320 at 16-30.

6    **II.    ARGUMENT**

7    **A. CWA Civil Penalties Are Mandatory And Subject to The**

8    **Miscellaneous Receipts Act.**

9        Some amount of civil penalty is mandatory upon a finding of CWA liability.

10   *Leslie Salt,* 55 F.3d at 1397. District courts have broad discretion in setting penalties

11   provided they duly consider the CWA's six statutory penalty assessment factors,

12   including "good faith efforts to comply with the applicable requirements" and "such

13   other matters as justice may require." 33 U.S.C. § 1319(d); *Tull*, 481 U.S. at 422-23.

14   Once a court's monetary assessment is labeled a "civil penalty," the sum must be

15   made payable to the U.S. Treasury. *Gwaltney*, 484 U.S. at 53 (citing 33 U.S.C. §

16   1365(a)); *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th

17   Cir. 1990). Though the CWA itself does not specify where civil penalties are to be

18   paid, the Miscellaneous Receipts Act requires government agents "receiving money

19   for the Government from any source . . . deposit the money in the Treasury as soon

20   as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b).

21   **B. The Court Can And Should Provide Corona Clay The Opportunity to**

22   **Reduce Its Civil Penalty by Implementing A Voluntary, Meaningful**

23   **Environmental Project.**

24       Though this Court cannot order Corona Clay to make payments to an

25   organization other than the U.S. Treasury, this Court could reduce Corona Clay's

26   civil penalty payment to the Treasury if Corona Clay were to commit substantial

27   resources to a voluntary, significant environmental project(s). 33 U.S.C. § 1319(d)

28   (CWA civil penalty factors including "matters as justice may require"); *see also*

1    *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810, 817,

2    819 (9th Cir. 2001), *remanded for a limited recalculation on other grounds*; *United*

3    *States v. City of San Diego*, No. 88-1101, 1991 WL 163747, at *6 (S.D. Cal. Apr.

4    18, 1991); *Humane Soc'y of U.S. v. HVFG, LLC*, No. 06-6829, 2010 WL 1837785,

5    at *14-15 (S.D.N.Y. May 6, 2010).

6         Courts have previously considered environmental restoration efforts in

7    assessing CWA civil penalties. *See Borden Ranch*, 261 F.3d at 817, 819; *City of San*

8    *Diego*, 1991 WL 163747, at *6; *HVFG, LLC*, 2010 WL 1837785, at *14-15. In

9    *Borden Ranch*, the Ninth Circuit affirmed a District Court's suspension of a sizable

10   portion of a large CWA civil penalty if the defendant restored acres of affected

11   wetlands. 261 F.3d at 817, 819. Similarly, in *City of San Diego*, a district judge

12   imposed a $3,000,000 CWA civil penalty with an "optional penalty arrangement"

13   whereby $500,000 was payable to the U.S. Treasury upon entry of judgment and the

14   remaining $2,500,000 was payable months later unless the defendant enacted water

15   conservation ordinances as outlined by the court. 1991 WL 163747 at *6. Likewise,

16   in the citizen suit context, a district court fashioning remedies determined "an

17   environmental project paid for by Defendant would be suitable and just" and

18   instructed the parties to discuss and reach agreement on project details. *See HVFG*,

19   2010 WL 1837785 at *16.

20        Thus, before determining the final "civil penalty," this Court could and

21   should, in alignment with the above-discussed cases, issue an order that: (1)

22   tentatively sets an appropriate proposed civil penalty that the Court would impose

23   on Corona Clay on the present facts, which Waterkeeper requests be in the amount

24   of $18,589,538, (2) allows Corona Clay four months to implement or enter into a

25   binding commitment to implement a significant project substantially benefitting the

26   local environment and entailing a substantial financial resource commitment, (3)

27   sets forth an alternative, reduced civil penalty sum of at least $3,700,000 that the

28   Court will impose if Corona Clay proceeds with the environmental project

1   commitment, and (4) retains jurisdiction for as long as needed to ensure that Corona
2   Clay honors any commitment(s). *See Borden Ranch*, 261 F.3d at 817, 819; *City of*
3   *San Diego*, 1991 WL 163747 at *6; *HVFG*, 2010 WL 1837785 at *16.

4           Regarding the environmental project amount, in *City of San Diego*, the
5   environmentally beneficial project was valued at $2,500,000. 1991 WL 163747 at
6   *6. In *Borden Ranch*, the restoration was valued at $1,000,000. 261 F.3d at 817. In
7   both cases, however, the then-available statutory maximum CWA penalty was
8   $25,000 per day per violation. 33 U.S.C. § 1319(d); 261 F.3d at 816. The CWA
9   statutory maximum penalty is now $64,618 per day per violation, a 258% increase.
10  88 Fed. Reg. 986, 989 (Jan. 6, 2023); 40 C.F.R. § 19.4. Thus, by averaging the
11  environmental project amounts from *City of San Diego* and *Borden Ranch*
12  ($2,500,000 + $1,000,000 / 2 = $1,750,000) and adjusting commensurate for the
13  now-applicable CWA statutory maximum, this Court would be in line with
14  precedent in providing Corona Clay the option of contributing $4,515,000 to an
15  environmental project ($1,750,000 x 2.58 = $4,515,000) and reducing the civil
16  penalty it would otherwise issue in light of the same.

17          Any Corona Clay-funded environmental restoration project that the Court
18  would consider as a suitable basis for penalty reduction should be meaningful,
19  specific, and not otherwise legally required of Corona Clay. Waterkeeper is aware of
20  environmentally beneficial projects seeking support in the Temescal Creek
21  watershed including habitat restoration and threatened and endangered species
22  management. Lee Dec., Ex. D. Additionally, Waterkeeper is aware of organizations,
23  such as the Rose Foundation for Communities and the Environment (the "Rose
24  Foundation"), with proven track records of receiving environmental mitigation
25  payments mandated by federal court consent decrees and utilizing these funds to
26  implement or grant fund local environmentally beneficial projects *Id.*, Ex. C. Indeed,
27  the U.S. Department of Justice has repeatedly approved consent decrees involving
28  environmental mitigation funding to the Rose Foundation. *See, e.g. Id.*, Ex. E (DOJ

letter stating no objection to entry of citizen suit consent decree in *Inland Empire Waterkeeper v. CMC Steel Fabricators, Inc.*, No. 8:21-cv-00236-JVS-KES and selected relevant pages of consent decree). The Court should order Corona Clay to confer with Waterkeeper over the next 60 days to attempt to reach consensus on an appropriate combination of projects that will benefit the Temescal Creek watershed, which could include specific projects Corona Clay will directly fund and/or funding to a proven grant-making organization such as the Rose Foundation. *Id.*

To ensure any remediation projects are satisfactorily completed, this Court should: (i) require Corona Clay to provide regular status updates, including proof of completion and (ii) retain jurisdiction to reconsider its civil penalty order should Corona Clay fail to follow-through on its commitment(s). *See City of San Diego*, 1991 WL 163747 at *7 ("retain[ing] jurisdiction to monitor administration . . . [and] order[ing] accounting and audit information as necessary to assure complete performance" of environmental project); *HVFG*, 2010 WL 1837785 at *16 ("retain[ing] jurisdiction to resolve questions involving the relief granted").

**C. The Court Should Not Reduce Corona Clay's Civil Penalty on The Basis Of Corona Clay's Own Long-Overdue CWA Compliance Costs.**

This Court should not reduce Corona Clay's civil penalties for Defendant's own long-overdue CWA compliance costs. To serve Congress's deterrence goals, CWA civil penalties

> must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business. Otherwise, a rational profit maximizing company will choose to pay the penalty rather than incur compliance costs. Additionally, the probability that a penalty will be imposed must be high enough so that polluters will not choose to accept the risk that non-compliance will go unpunished.

*See, e.g. Pub. Int. Rsch. Grp. Of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1166 (D.N.J. 1989), *remanded for a limited penalty recalculation on other grounds* (internal citations omitted); *see also* Plaintiffs' Post-Trial Remedies

1    Reply Brief, Dkt. 320 at 15-16 (discussing EPA Penalty Policy requirements that

2    penalties be large enough to recover a defendant's economic benefit realized in

3    violating the CWA plus an added sum to achieve deterrence).

4         Discounting Corona Clay's civil penalty for expenditures on work it should

5    have done years ago to comply with the CWA would disincentivize willing CWA

6    compliance contrary to Congressional goals. *See, e.g. Laidlaw*, 528 U.S. at 186 ("an

7    actual award of civil penalties does in fact bring with it a significant quantum of

8    deterrence . . . A would-be polluter may or may not be dissuaded by the existence of

9    a remedy on the books, but a defendant once hit in its pocketbook will surely think

10   twice before polluting again"); *United States v. Allegheny Ludlum Corp.*, 187 F.

11   Supp. 2d 426, 444, 436-37, 447 (W.D. Pa. 2002), *aff'd in part and vacated in part*

12   *on other grounds*, 366 F.3d 164 (3rd Cir. 2004) (to achieve deterrence, CWA

13   penalties must not only recover economic benefit, but must include "an additional

14   punitive component that takes into account the penalty factors listed in [CWA]

15   Section 1319(d). Without the second component, those regulated by the Clean

16   Water Act would have nothing to lose by violating it").

17        As discussed in the recent hearing and in Waterkeeper's prior briefing,

18   Corona Clay does not need a discount to afford a substantial civil penalty while

19   continuing operations and making improvements. *See* Lee Dec. Ex. B at 9:4-12

20   (Corona Clay's C.E.O. responding "Yes, sir" to the Court asking: "So that's where

21   the plaintiffs get the – figure that you've got the largesse to pay off – an $18 million

22   fine and still exist in business if you chose to? I mean, that would be a choice,

23   wouldn't it?"); *see also* Dkt. 320 at 24-26. Plus, expert estimates for the necessary

24   improvements are modest in sum. *See* Dkt. 227-8 at 143-144 (Corona Clay's

25   consultant pricing an advanced storm water treatment system at $300,000 for initial

26   installation, plus $30,000 in annual operation and maintenance); *see also* Dkt. 224-9

27   at 16-21 (Waterkeeper's expert noting advanced treatment systems would be

28   feasible at a "greater cost" than his specific recommendations based upon Corona

1    Clay's existing retention-based framework). These figures are modest compared to

2    Corona Clay's vast interstate property portfolio. Based on Corona Clay's in-court

3    statements and ownership of hundreds of acres of real property, it is undisputed that

4    Corona Clay is more than adequately capitalized to afford necessary improvements

5    and a substantial civil penalty while staying in business,. *See* Lee Dec. Ex. B at 9:4-

6    12. *See also* Dkt. 320 at 24-26. This Court should not give Corona Clay a gratuitous

7    discount for work it should have completed long ago.

8              **D. In All Circumstances, the Court Should Impose Substantial Civil**

9                        **Penalties and Meaningful Injunctive Relief.**

10        As noted, given the jury verdict establishing Corona Clay's CWA liability,

11   this Court's assessment of some civil penalty is mandatory. *Leslie Salt,* 55 F.3d at

12   1397. Congress intended CWA civil penalties to deter conduct that causes or risks

13   causing water pollution and thwarts the CWA permitting program designed to guard

14   against water pollution problems and inform regulatory agencies and the public

15   about water pollution risks. *See, e.g. Allegheny*, 187 F. Supp. 2d at 444, 436-37, 447.

16   To achieve Congress's goals, this Court should impose some amount of a

17   meaningful "civil penalty" and, in accord with controlling precedent in *Sierra Club*

18   *v. Elec. Control Design*, specify that Corona Clay is to pay this amount to the U.S.

19   Treasury. 909 F.2d at 1355. Notably, in its April 2020 Judgment (Dkt. 191), this

20   Court previously imposed a $3,700,000 civil penalty on Corona Clay for only 2,352

21   CWA violations the Court found Corona Clay liable for in its June 2019 summary

22   judgment order (Dkt. 55). The jury in November 2022 found Corona Clay liable for

23   *more than five times* this number of violations, a total of 12,541, surely indicating

24   Corona Clay must appropriately be fined a larger sum than the $3,700,000 imposed

25   by the Court in April 2020. As argued in Waterkeeper's opening and reply remedies

26   briefs (Dkts. 313 and 320), a civil penalty of $18,589,538 would be proportional to

27   the penalty approach previously adopted by the Court (though slightly more

28   generous to Corona Clay). The Court's April 2020 approach penalized Corona Clay

---

1  $1,573 per violation ($3,700,000 / 2,352 = $1,573) whereas Waterkeeper's

2  recommended approach in its opening briefing penalized Corona Clay $1,482 per

3  violation ($18,589,538 / 12,541 = $1,482).

4      Waterkeeper is mindful that at the June 12, 2023 hearing the Court expressed

5  reservations about imposing a civil penalty of Waterkeeper's requested size. Lee

6  Dec. Ex. B at 5:25. However, the Court should impose a civil penalty of no less than

7  $8,215,000 in this matter, which reflects the Court's original $3,700,000 civil

8  penalty plus an additional $4,515,000 (which figure, as noted above, is equal to an

9  adjusted average of the sum that the *Borden Ranch* and *City of San Diego* cases

10  reduced civil penalty assessments by to reflect environmentally beneficial projects).

11  Specifically, the Court should issue an order: (1) stating a tentative intention to

12  impose a civil penalty on Corona Clay of at least $8,215,000, (2) allowing Corona

13  Clay four months to implement or enter into a binding commitment to implement a

14  significant project that will substantially benefit the local environment and will

15  entail Corona Clay's financial expenditure of at least $4,515,000, (3) requiring

16  Corona Clay to confer with Waterkeeper over the next 60 days to discuss whether

17  the parties can reach consensus about appropriate project(s), (4) setting forth at least

18  $3,700,000 as the alternative, reduced civil penalty sum payable to the U.S.

19  Treasury that the Court will impose if Corona Clay proceeds with the project

20  commitment(s), and (5) retaining jurisdiction for as long as needed to ensure that

21  Corona Clay honors any commitment(s). The Court should further set a hearing for

22  early January 2024 to hear whether Corona Clay has elected to implement/fund an

23  environmental project and issue its final civil penalty order in light of the facts at

24  that time.

25      Notably, to date, Corona Clay has failed to provide this Court with any

26  amount of civil penalty it thinks the Court should impose beyond an unspecified

27  "nominal" amount. Dkt. 317 at 1, 5. This suggestion must be disregarded. As

28  discussed in Plaintiffs' Post-Trial Remedies Reply Brief (Dkt. 320 at 6-7), a merely

1   nominal penalty would, of course, be the functional equivalent of no penalty at all,

2   which would contravene Congress's intent in providing for CWA civil penalties. As

3   the Supreme Court has emphasized, "[t]he legislative history of the [Clean Water]

4   Act reveals that Congress wanted the district court to consider the need for

5   retribution and deterrence, in addition to restitution, when it imposed civil

6   penalties." *Tull*, 481 U.S. at 422; *Laidlaw*, 528 U.S. at 186. Echoing this case law

7   and applicable legislative history, the EPA has opined that "[t]he first goal of

8   penalty assessment is to deter people from violating the law." Dkt. 320-3 at 4. As

9   EPA further acknowledged, for Congress's deterrence goals to be achieved, the

10   penalty must be substantial enough to achieve specific deterrence, *i.e.*, to deter the

11   specific violator from repeating its violations, and to achieve "general deterrence,"

12   *i.e.* to deter others from violating the law. *Id.* In conflict with Supreme Court

13   doctrine and EPA policy, a nominal civil penalty would impose no real punishment

14   on Corona Clay and fail to serve either specific or general deterrence.

15        Similarly, reducing Corona Clay's civil penalty to a sum less than the

16   $8,215,000 discussed above would be inconsistent with Congressional intent in

17   providing for CWA civil penalties, as well as Supreme Court precedent and EPA

18   Policy. As discussed at length in Waterkeeper's initial remedies briefs (Dkts. 313,

19   320), Corona Clay exhibited extreme recalcitrance in continuing wholesale General

20   Permit violations despite multiple warnings from regulators, Waterkeeper, this

21   Court, and even its own consultants, leading to the astounding jury-confirmed

22   12,541 CWA violations. *See* Dkt. 313 at 17-21. As noted above, Corona Clay's

23   monitoring and reporting violations undermined the integrity of the State and

24   Regional Boards' regulatory programs and deprived these agencies and the public of

25   important information needed to assess water pollution risks. *Id.* at 14, 26. These

26   violations also polluted or at a minimum risked polluting Temescal Creek. *Id.* at 12-

27   14. Corona Clay realized tangible economic benefit to not complying with the CWA

28   and, importantly, has ample resources as a real estate investment company to pay

1   the requested civil penalty and keep its clay business going if it chooses (while this

2   business appears to be of limited profitability, it will not close because of the civil

3   penalty assessment; if Corona Clay shuts this business down it will be because it is

4   not profitable for reasons independent of any penalty Corona Clay must pay). *See*

5   *Id.* at 23; Dkt. 316-1 at 5 (Corona Clay's C.E.O. Mr. Craig Deleo stating their clay

6   business will not last much longer as a result of brick supply loss); Dkt. 320 at 24-

7   26; Lee Dec. Ex. B at 9:4-12 (Mr. Deleo confirming Corona Clay could pay

8   Waterkeeper's requested civil penalty and remain in business).

9   　　　　Corona Clay, relying on selected post-trial observations, inaccurately argues

10   its civil penalty should be reduced to a token amount because it no longer discharges

11   stormwater to Temescal Creek, has not done so for years, and is now in full CWA

12   compliance. *See* Dkts. 316, 316-1 at 4, 328-1, 328-2; Lee Dec. Ex. B at 10:12 (Mr.

13   Deleo stating Corona Clay is in "complete compliance"). As pointed out in Corona

14   Clay's own compliance filings and Plaintiffs' rebuttal post-trial observations, these

15   assertions are not true. *Compare* Lee Dec. Ex. B at 10:12-16 (Mr. Deleo declaring

16   Corona Clay "[hasn't] had a test in three years because [they] haven't had any water

17   to test," and wondering "[h]ow can you do better than perfection?") *with* Lee Dec.

18   Ex. A at 7 (Corona Clay's consultant providing additional site recommendations,

19   including further basin construction); Dkt. 227-8 at 139 (Corona Clay's consultant

20   noting an un-sampled, unobserved "release" from the facility in December 2021);

21   Dkts. 224-1 at 9-12, 224-5 (Mr. Hiemstra documenting Corona Clay's December

22   2021 discharge); Dkt. 329-1 at 7-54 (Mr. Hiemstra documenting Corona Clay's

23   March 2023 discharge); Dkt. 320-16 at 3-9 (Plaintiffs' stormwater expert discussing

24   Corona Clay's ongoing deficiencies). Corona Clay's inaccurate, self-serving

25   statements only underscore the need for this Court to enjoin Corona Clay from

26   further violations. *See Envt'l Prot. Info. Ctr. v. Pac. Lumber Co.*, 430 F. Supp. 2d

27   996, 1006 (N.D. Cal. 2006) (where a CWA defendant persistently denies the

28   illegality of its conduct, the likelihood of recurrence is greater).

---

**III.   CONCLUSION**

For the foregoing reasons, the Court should forthwith award Waterkeeper's requested injunctive relief and issue an order: (1) stating a tentative intention to impose a civil penalty on Corona Clay of $18,589,538, but at a minimum no less than $8,215,000, (2) allowing Corona Clay four months to implement or enter into a binding commitment to implement a significant environmental project that will substantially benefit the local environment and entail Corona Clay's financial expenditure of at least $4,515,000, (3) requiring Corona Clay to confer with Waterkeeper over the next 60 days to discuss whether the parties can reach consensus about appropriate project(s), (4) setting forth at least $3,700,000 as the reduced civil penalty sum payable to the U.S. Treasury that the Court will impose if Corona Clay proceeds with the environmental project commitment(s), and (5) retaining jurisdiction for as long as needed to ensure that Corona Clay honors any project commitment(s). The Court should further set another hearing for early January 2024 to hear whether Corona Clay has elected to implement/fund an environmental project(s) and issue its final civil penalty order in light of the facts at that time.

Dated:        July 10, 2023            Respectfully submitted,

Lauren Chase

_____
Attorney for Plaintiffs Orange County
Coastkeeper and Inland Empire Waterkeeper