UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, ) et al., ) ) Plaintiffs, ) ) v. ) ) CORONA CLAY COMPANY, ) ) Defendant. ) ) | Case No. SACV 18-333-DOC (DFMx) Santa Ana, California Wednesday, August 3, 2022 5:05 P.M. to 5:22 P.M. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:               See Page 2

Deputy Clerk:              Karlen Dubon

Court Reporter:            Recorded; CourtSmart

Transcription Service:     JAMS Certified Transcription
                           16000 Ventura Boulevard #1010
                           Encino, California  91436
                           (661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:


For the Plaintiffs:    Orange County Coastkeeper
                       By:  SARAH SPINUZZI
                       3151 Airway Avenue, Suite F110
                       Costa Mesa, California  92626
                       (714) 850-1965
                       sarah@coastkeeper.org

                       Law Office of Jennifer Novak
                       By:  JENNIFER F. NOVAK
                       500 Silver Spur Road, Suite 206
                       Rancho Palos Verdes, California  90275
                       (310) 693-0775
                       novak@jfnovaklaw.com


For the Defendant:     Law Offices of Brian Neach
                       By:  BRIAN NEACH
                       10171 Peregrine Circle
                       Fountain Valley, California  92708
                       (714) 475-4550
                       brianneachlaw@gmail.com

SANTA ANA, CALIFORNIA, WEDNESDAY, AUGUST 3, 2022, 5:05 P.M.

THE COURT:  -- the matter of *Inland Empire Waterkeeper v. Corona Clay Company*.  It's 18-00333.

And if you'd make your appearances.  Come up for a moment.

(Court confers with court staff.)

JENNIFER F. NOVAK:  Good evening, Your Honor.  Jennifer Novak for plaintiffs.

THE COURT:  Good evening.  How are you tonight?

MS. NOVAK:  Wonderful.  Thank you.

SARAH SPINUZZI:  Good evening, Your Honor.  Sarah Spinuzzi also on behalf of plaintiff.

THE COURT:  Thank you.

BRIAN NEACH:  Hello, Your Honor.  Brian Neach for Defendant Corona Clay Company.

THE COURT:  Okay.  And we're in litigation on a patent case so -- and counsel, your argument.  We've distributed a tentative on this matter, so please.

MS. NOVAK:  Thank you very much, Your Honor.  Again, Jennifer Novak for plaintiffs.

We did have a chance to look at the Court's tentative, and where we see the meat of the discussion is at page 6 with respect to stating that the Court felt there was a disputed material fact regarding the issue of whether the defendant's discharges have ever discharged pollutants to a

water of the United States.  We saw the only relevant discussion at being at page 6, lines 23 through 26 --

THE COURT:  Okay.

MS. NOVAK:  -- where the Court says there are disputes of fact about three factors that it believes comes from the United States Supreme Court's case in *Maui*.  Looking at the *Maui* case, we did not see the issue of frequency --

THE COURT:  Okay.

MS. NOVAK:  -- being a factor at all.  So we're not certain where the Court came up with that factor.  We also would object to adding factors to the Supreme Court's test that we weren't aware of before the motion.

THE COURT:  Uh-huh.

MS. NOVAK:  With the Court's indulgence, I'd like to actually go to the *Maui* case to go through those factors.

THE COURT:  Certainly.

MS. NOVAK:  I'd like to put this in context, which is of course the Supreme Court in *Maui* said there's no bright-line test, this is going to be a case-by-case determination to -- as it says at 1476, the object in a given scenario will be to advance in a manner consistent with the Clean Water Act's language the statutory purposes that Congress sought to achieve.  So "for that reason."  It didn't say you had to find only these factors.  It said, "We're going to look case by case."  And specifically, then, it

didn't suggest that we have to meet every factor it listed, and that would be ridiculous given the context in *Maui*.

To reframe *Maui*, the question before the Court was whether, when the County of Maui was injecting polluted water into wells that then traveled a half mile through beach before reaching the Pacific Ocean, that was a significant enough set of factors to qualify as a jurisdictional discharge under the Clean Water Act when traditionally groundwater was reserved to the state's authority and federal law was generally not applying to groundwater. Given those circumstances, the Court listed out its factors that it thought, given the context in *Maui*, were relevant to that case.

So with that in mind, I will also note that at 1476 of *Maui*, it specifically notes that these tests are really to deal with, quote, "middle instances," situations where we don't know what's happening with the discharges and the questions we have to ask to determine if it went from the point source --

THE COURT:  Right.

MS. NOVAK:  -- to the water of the United States.

THE COURT:  What was troubling to me -- and by the way, I somewhat welcome this reversal.  It's -- the law changed.  And what was of concern to me was the breadth of the field that I recall.  It was portrayed to be quite a

substantial distance --

MS. NOVAK:  So -- oh.

THE COURT:  -- and it causes concern, and it seemed, to me, it was still a issue of fact for the jury to decide.

MS. NOVAK:  So with that in mind, Your Honor, let me point the Court again to some of the evidence that we referenced.  A lot of it does come from the declaration of Raymond Hiemstra, who by happenstance during a rain event happened to be able to observe discharge coming from the Corona Clay facility and walked along a pathway --

THE COURT:  I remember.

MS. NOVAK:  -- until it reached a culvert. Exactly.

THE COURT:  It just didn't go down to the stream.

MS. NOVAK:  No, no, no.  This is in his declaration in support of this MSJ, Your Honor.

So there's no dispute that where the water is seen entering a culvert -- and we have pictures of it, and we have the video.  No one has disputed that that is Temescal Creek. No one has disputed that where he starts his walk along the road that that is Corona Clay.  No one has disputed that there is discharge coming from Corona Clay, and in fact, the declarations that the defendant has submitted explain it away, but they don't say, "This is not coming from our

property."  Mr. Hiemstra walks along and videotapes and takes photographs walking back and forth between the discharge point and the culvert and is able to document that this is a flow of water going all the way long.  So this is not merely what we presented at trial.  This is something he found in December of 2021.

Now, again, we aren't talking about the half mile of *Maui*, where it goes into the ground, we have no idea where it's going, where it's dispersing, what's there.  This is something that we have presented video evidence of.

THE COURT:  Right.

MS. NOVAK:  Okay.  So with that in mind, Your Honor --

THE COURT:  So we've got the same volume, the same quantity, you know, the same conditions?

MS. NOVAK:  We --

THE COURT:  It is troublesome to me because it puts the Court in the position of being that fact finder, doesn't it?  It really does.

MS. NOVAK:  The Court is perfectly capable of --

THE COURT:  Oh, no.  I'm capable.  I know that, but it does, and the end result is, you know, I'd really like to see this case go up to the Supreme Court.  One way or the other.

MS. NOVAK:  I think we will likely get the chance.

THE COURT:  And I'd really like to sort that out in the Ninth -- with *Maui*, et cetera, I think it would be good for the nation.  Now, that doesn't mean I'm pushing you to litigation because of that, but certainly I'm not afraid of the litigation here, and I'm not afraid of a much better record.  Okay?  Much better record.

MS. NOVAK:  So, Your Honor, may I speak then to --

THE COURT:  Sure.

MS. NOVAK:  -- the Court's tentative?

THE COURT:  Sure.  Which you find just excellent.  I'm just joking with you.

MS. NOVAK:  Well -- so --

THE COURT:  And you disagree with (indecipherable).

MS. NOVAK:  Yeah.  So first of all, as I mentioned, the Court's tentative lists as a *Maui* factor a factor that is not in *Maui*.

THE COURT:  Got it.

MS. NOVAK:  The other two that the Court discusses --

THE COURT:  And that's, minimally, the frequency.

MS. NOVAK:  Yes.

THE COURT:  Yeah, I understand.  Yeah, I --

MS. NOVAK:  Right.  The other two don't apply in a situation like this, where we're talking about surface water.  It goes to the fact that *Maui*, again, in the context, is

looking at how much of the pollutant is going into the wells so that we can trace it later on the other side, and sand and gravel and dirt -- whenever water travels through them, it acts as a filter.  So the question of what is the composition? is relevant to knowing how much of it is going to filter out.

THE COURT:  Uh-huh.

MS. NOVAK:  In our situation, what we can see is the water travels along the surface.  So it's not the same question.  We see the water going.  We know, and it's undisputed, that the defendant's storm water discharges have contained total suspended solids and iron, among other things.  Those are undisputed.

So, when we also, then, talk about the Court's discussion saying that there's a dispute, the tentative does not cite to any evidence.  So we don't know what the Court is relying upon as that disputed fact on these issues.  There's no dispute from Dr. Parra about the distance, which defendant's expert at trial said was about 1100 feet.  We've provided the maps from FEMA showing it's more like 900 feet.  It's not a half-mile situation.  You can see where Corona Clay is on the maps.  You can see where it enters the creek, right, with a culvert point.

Dr. Parra, the defendant's expert, never says that Corona Clay has never discharged, and again, this is a

jurisdictional question.  We have not put before the Court a question of how many times are they discharging?  Is that a violation, that they needed a permit because they already have a permit?  We are not asserting that there's a damage to the creek as a result of it.  Does this Court have jurisdiction under the Clean Water Act or not?  That was the question the Ninth Circuit left the Court with.  Dr. Parra's opinion is that he doesn't think there's been a discharge since 2012.  It's highly unlikely that in minor storms Corona Clay's discharge has reached Temescal Creek.  That's not evidence rising to the level of a dispute -- a genuine dispute of material fact, right.

THE COURT:  Right.

MS. NOVAK:  So that's one.

The second is that -- we have time.  We have distance.  The *Maui* factors also include things like can you see how it's traveling?  Yes.  That's presented in the evidence we've had.  Does it maintain its identity?  You can see the water traveling.  Time and distance being the most important factors, and those are the ones that we highlighted because those are the most obvious.  The *Maui* court specifically said that, when we're trying to ensure that we're not harming waters of the United States, we are going to look to the factors that kind of fall within that realm. As opposed to *Maui*, where the water travels a half mile

through sand to then go to the ocean, we have Corona Clay, and we have less than -- 1100 feet away we have Temescal Creek.  We have tremendous evidence from the past of a sheer volume of storm water coming off their site looking like a chocolate milkshake.

THE COURT:  Yeah.

MS. NOVAK:  We know it floods.

Given all of that, Your Honor, and given the factors that *Maui* has elicited, given the policy that the Court, you know, noted in *Maui*, and given the fact they have said it would create a tremendous loophole if we say that a facility that's just, you know, a few feet where the storm water has to travel, you know, along a surface to get there that that is not what Congress intended.  Here, we have a similar situation.

So for those reasons, we believe the Court is wrong.  We would appreciate that the Court's tentative, you know, before it gets finalized, would at least list the evidence that it's trying to rely upon because Dr. Parra offered no evidence about the time it would take to travel. Dr. Parra offered no evidence about the distance it would travel.  In short, he didn't go to any of these factors nor did he discuss the fact that while he has a theory about what happens to the water now given that defendant has finally installed some best management practices --

THE COURT:  Well, that's good to hear.

MS. NOVAK:  Right.  He didn't -- excuse me.  I lost my train of thought.

He didn't note that Mr. Hiemstra actually has provided this Court with video where it can see it.

THE COURT:  Okay.  Now I'd like to hear from the opposition.

MS. NOVAK:  We -- so we would argue these are undisputed material facts, they haven't met their burden, and this is exactly the kind of situation where summary judgment is appropriate.

THE COURT:  Okay.  Now I'd like to hear from you for a moment.

MR. NEACH:  Thank you, Your Honor.  Nice to see you again.  Mr. Pacheco sends his hello to you.  He's a little bit ill.

I've read the tentative.  I didn't get to read it in detail.  I thought from the beginning that this just wasn't -- what they're asking to do is quite a reach for Your Honor to do, to go through -- one, two, three, four, five, six -- seven factors, all of which, arguably, apply here, the nature of the material through which the pollutant travels.

They talked about Dr. Parra.  Dr. Parra talked specifically about the infiltration level of the soil.  Their

expert doesn't even touch that subject.  So I don't see how you can apply their expert to all these factors.  It doesn't get them there.  Dr. Parra looked at the same video that their expert looked at and arrived at a completely opposite conclusion.  I mean, that is a question of fact, and for them to ask you to decide they're going to pick your expert -- or their expert over our expert, that's actually not what the Court is supposed to do.  That's what the fact finder is supposed to do, and that's why it should go to a jury, and, you know, I guess that's happening in September.

THE COURT:  I'll go back, as counsel has requested, and take another look at *Maui* and especially the factor that you're concerned about.

Let me ask you to that, if I hold to the tentative, what's our trial date?

MR. NEACH:  September 23, I believe.

MS. NOVAK:  September 20.

THE COURT:  September 20th.  We have a three-week criminal trial, et cetera.  I'm wondering, just as a courtesy, if we do end up going to trial, I would probably put you over to the first week of October, but I don't know what your -- and I'm not worried about another court.  I'm the second senior judge.  If it's Judge Wilson, fine; otherwise, not concerned.  But I don't know what your plans are, and normally I don't interfere with vacation, you know,

birthdays, anniversaries, et cetera.  So I don't know what October -- I think it's 4th or 2nd.  I'm -- what does that first week of October look like for you folks?

MS. NOVAK:  I do have a prior commitment for that Friday of that week, Your Honor.

THE COURT:  Okay.  Okay.  Well, you'll keep it.  In other words, I --

MS. NOVAK:  Thank you.

THE COURT:  Yeah, I just don't interfere with family.  That's what I need to know.  What about the week after?  In other words, that Friday are you gone until that -- over the weekend or just --

MS. NOVAK:  It's a one day.  However, the following week --

THE COURT:  Okay.

MS. NOVAK:  -- I am on vacation Wednesday, Thursday, Friday -- the following week in October.

MS. SPINUZZI:  Your Honor, I'm on vacation the last week of October as well as --

THE COURT:  Well, that takes me out of October. You're not --

MS. SPINUZZI:  Yeah.

THE COURT:  -- giving me any time.  Okay.  Well, we've got this oil spill coming up in November for a month or so, but I'm not certain if the U.S. attorney is going to file

a First Superseding Indictment at the last moment, and if so, then I've got a block of time.  Let me just -- I can advance you, but I don't want to advance you.  I could put you in the first week of September, but I'm not sure we're going to finish this other criminal matter, and what happened is, when we shut down, everything came back in, and by statute I've to resolve the criminal matters first, which is why I'm trying to be courteous and just reach out to everybody and ask personally what your personal issues are instead of getting what I used to get, and that's just a note in the mail, "Here's your date."

So you're pretty much tied up in October, it sounds like, aren't you?

MS. NOVAK:  Yes.

THE COURT:  Okay.  Well, let me work with that. Let me see.  Are you available the first couple weeks in November in case the civil trial falls through?

MS. NOVAK:  Yes, Your Honor.

THE COURT:  Are you available?

MR. NEACH:  Yes, Your Honor.  The things where it starts to get scary is mid-December because I'm supposed to be in Australia for a month.

THE COURT:  You'll be there.

MR. NEACH:  Okay.

THE COURT:  That's why I'm asking.  I'm not trying

to take your personal lives away from you -- or vacations. Okay?

Well, let me see what I do with this first, and I will take another look at it, but I'm pretty certain there's a material issue of fact here.  Maybe I got it wrong in terms of *Maui* in terms of the prongs, but I'll take a look.

MS. NOVAK:  And, Your Honor, we would just ask the Court to actually look at what Dr. Parra says and not to --

THE COURT:  Counsel --

MS. NOVAK:  -- take --

THE COURT:  Counsel --

MS. NOVAK:  Thank you.

THE COURT:  Counsel, I've looked at what Dr. Parra says.  Okay?  All right now.

MR. NEACH:  Do you get this back, Your Honor?  The tentative?

THE COURT:  No.  Keep it.

MR. NEACH:  Okay.

THE COURT:  Yeah.  Let me look at it.  I'll publish the final.  Tentative means nothing.  Okay?

MR. NEACH:  Thank you, Your Honor.

THE COURT:  All right.  Bye-bye now.

MS. NOVAK:  Thank you, Your Honor.

THE COURT:  Good night.

MS. NOVAK:  Have a good night.

THE COURT:  You too now.

MS. NOVAK:  Long night.

THE COURT:  Yeah.  Long night.

(Proceedings adjourned at 5:22 p.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Julie Messa                    October 20, 2024
Julie Messa, CET**D-403            Date
Transcriber