UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION - SANTA ANA

INLAND EMPIRE WATERKEEPER,  )   Case No. SACV 18-333-DOC (DFMx)
et al.,                     )
                            )   Santa Ana, California
        Plaintiffs,         )   Tuesday, November 15, 2022
                            )   5:16 P.M. to 10:29 P.M.
            v.              )
                            )
CORONA CLAY COMPANY,        )
                            )
        Defendant.          )
_____)

TRANSCRIPT OF JURY TRIAL - DAY 5
BEFORE THE HONORABLE DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Appearances:                See Page 2

Deputy Clerk:               Karlen Dubon

Court Reporter:             Recorded; CourtSmart

Transcription Service:      JAMS Certified Transcription
                            16000 Ventura Boulevard #1010
                            Encino, California  91436
                            (661) 609-4528

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:    Morrison and Foerster
                       By:  WILLIAM FRENTZEN
                       425 Market Street
                       San Francisco, California  94015
                       (415) 268-6413
                       wfrentzen@mofo.com

                       Orange County Coastkeeper
                       By:  SARAH SPINUZZI
                       3151 Airway Avenue, Suite F110
                       Costa Mesa, California  92626
                       (714) 850-1965
                       sarah@coastkeeper.org

                       Law Office of Jennifer Novak
                       By:  JENNIFER F. NOVAK
                       500 Silver Spur Road, Suite 206
                       Rancho Palos Verdes, California  90275
                       (310) 693-0775
                       novak@jfnovaklaw.com


For the Defendant:     Law Offices of Brian Neach
                       By:  BRIAN NEACH
                       10171 Peregrine Circle
                       Fountain Valley, California  92708
                       (714) 475-4550
                       brianneachlaw@gmail.com

SANTA ANA, CALIFORNIA, TUESDAY, NOVEMBER 15, 2022, 5:16 P.M.

(Jury not present.)

THE COURT:  Okay.  So let's go on CourtSmart (indecipherable) if we're on CourtSmart.  Are we?  And the record should reflect we've gone from our court reporter with our thanks and appreciation to all of you folks who helped us get the CourtSmart up and operating, and let me say good night to you, and we'll turn that off whenever we're done, okay, with our appreciation.

Okay.  Now we're on the record, and we're going on be record for the rest of the time with CourtSmart.  So everything is being recorded now.

And we'd had an informal discussion about a title report pertaining to Corona Clay, and I'd asked Mr. Deleo to take a look at those documents because all I've seen are documents being waved in the air.  I have no idea whether this is complete or not.

Is it possible to agree that this is Corona Clay's property, or is there a disagreement?

BRIAN NEACH:  There's no disagreement, Your Honor and --

THE COURT:  Okay.  So what number would we give these documents tonight?  What exhibit number would we have?

WILLIAM FRENTZEN:  I'd deem them as --

MR. NEACH:  May -- Your Honor, may I -- but --

THE COURT:  Sure.

MR. NEACH:  There's two sets of documents I was given.  One is basically maps and we --

THE COURT:  One is what?

MR. NEACH:  Basically maps.  And we would recognize a lot of these maps, because we've seen the property, and some of them have values -- assessed values.  I don't think that's particularly relevant in this aspect of the case.

THE COURT:  No, it's not.  The value of your property isn't --

MR. NEACH:  Happy to --

SARAH SPINUZZI:  There's no dispute.

MR. NEACH:  So what I would suggest -- and Ms. Deleo -- Kiana Deleo can testify -- she knows about this -- that, "Yes, we own this.  Yes, we own that.  Yes, we own that."  I would be fine with these documents with the values redacted.  This document --

THE COURT:  No.  Well, let's take -- whatever document you'd have, I'd like a number on it.

MR. NEACH:  Okay.

THE COURT:  I have no idea what you're referring to, and that's happened repeatedly during the trial -- a bunch of documents are waved in the air.  What number is this batch?

MS. SPINUZZI:  247.

THE COURT:  247.  Thank you.  Okay.

This is 247, which sounds like we'll have a stipulation.  Why do we have assessed value on that?

MS. SPINUZZI:  I'm happy to redact it.  No dispute.

THE COURT:  Okay.  So it's resolved, isn't it?

MR. NEACH:  It's completely resolved.

THE COURT:  Okay.  Counsel?

MS. SPINUZZI:  Resolved.

THE COURT:  See we have cooperation.

MS. SPINUZZI:  Great work.

MR. NEACH:  And I assume that we don't need, then, this title report which has --

THE COURT:  Well --

MR. NEACH:  -- a lot of stuff I'd object to.

MR. FRENTZEN:  Your Honor, may I --

THE COURT:  No.  Just a moment.  No.  We're not going to do this, with each of you talking over --

MR. FRENTZEN:  Sorry.

THE COURT:  -- the top of each other.  We're all done with that.  Otherwise, I'll just take a recess, and you come back in an hour.  So now I'm listening to the defense. I'm not listening to the plaintiff.  You're simply there.

Your objection is to the second batch of documents, and I don't even have a number on that second batch of documents yet.  What number is that?

MS. SPINUZZI:  248.

THE COURT:  Okay.  248.

Now, tell me about 248 and what your objection is to it.

MR. NEACH:  It's got several financial items in there that are irrelevant.  It's duplicative given the agreement we have on the other maps.  They're not going to be very meaningful to the jury because it just talks about parcel numbers and taxes.  It references judgments such as judgments in eminent domain that I think a jury wouldn't understand.  It's not particularly helpful, and I think ultimately it might be more prejudicial than probative.  And I don't see why you --

THE COURT:  All right.

MR. NEACH:  -- need it on top of the maps that are very clear.

THE COURT:  Now --

MS. SPINUZZI:  Your --

THE COURT:  No, no.  Just a moment.

Who's doing the representation here?  I really am cautioning you.  I'm getting frustrated, on occasion, listening to two of you speak over the top of each other.

Lead counsel -- your lead counsel.  If you want to start, please, but not two of you.

MR. FRENTZEN:  Thank you, Your Honor.

The maps which he's agreeable to letting in, he's agreeable to letting in because they don't indicate who owns them.  In other words, those are the parcel numbers in the map -- the second part -- and we're happy to redact extraneous information.  We simply want it to show its owned by Corona Clay.  So what he's agreed to is to let us have a map of parcels which does not reflect ownership.  We're happy to redact from the second -- 248 --

THE COURT:  Now, let me stop.  Let me start with 247.  Could I see that document for a moment?

(Pause.)

THE COURT:  You just come on up informally.  Just give me 2- -- I just want to see 247.  I do not want to see 248.

Because I think we should at least have the parcel number on the document.  So the assessment number.  The assessed value is of no interest, I would think.  So why can't we take out the assessed value --

MR. FRENTZEN:  No objection.

THE COURT:  -- leave the assessment number on it, and why can't we have a simple stipulation between the two of you that these are the properties owned by Corona Clay -- as to 247?

MR. NEACH:  That's what I previously said, yes.

MR. FRENTZEN:  If it is --

THE COURT:  Well, I didn't hear that.  I want to make sure now.

MR. NEACH:  Okay.

THE COURT:  Is that acceptable?

MR. FRENTZEN:  If it is stipulated, Your Honor, that those are the properties owned by Corona Clay, and we have that in a stipulation, we do not need 248, in other words, that those properties there are owned by Corona Clay.

THE COURT:  Now, is it acceptable to you (indecipherable) so we do this by the numbers -- that the valuation is taken out --

MR. FRENTZEN:  Absolutely.

THE COURT:  -- and we have the assessment numbers, then could you two -- is that acceptable to you?

MR. NEACH:  That's acceptable.

THE COURT:  Then go write out the stipulation now.

MR. NEACH:  I would only suggest that Ms. Deleo would be able to say, "We own those properties."

THE COURT:  Well, fine.  Then she'll be able to say it also.

MR. NEACH:  Okay.  That's fine.

THE COURT:  Okay?  And a joint stipulation is simply a stipulation.  It doesn't inure to the benefit of either one.

MR. NEACH:  It makes our stipulated-fact jury

instruction relevant now.

THE COURT:  It does.

MR. NEACH:  Yeah.

THE COURT:  Okay.  So why don't you handwrite out this stipulation, and then we'll get to 248 in just a moment.

(Pause.)

THE COURT:  I suggest you do this as quickly as possible because I'm great at going out at coffee and coming back in half an hour.  You'll be amazed.  Take a look at it.

MR. FRENTZEN:  I've handwritten a stipulation.

THE COURT:  No.  No.  Take a look at it.  Redraft it if you want -- for the defense.

(Pause.)

THE COURT:  Okay.  Now, would you be kind enough to help me.  Would you come back up with 247, and would both of you, then, right now correct 247 for me, take out the assessed value, leave in your parcel number, and show it to each other.  Thank you.

You've got the directions from the Court.  You heard what I said, please.

(Pause.)

THE COURT:  Counsel -- counsel is walking over. Make sure that this document is the way you want it to read. Leave the parcel numbers.  Take out the assessed valuation.

(Pause.)

THE COURT:  Mr. Deleo, I want you to make sure you personally check these documents, as a courtesy.

(Pause.)

THE COURT:  And what I think you're really worried about, on the defense side, and my guess is tactfully -- remember, when I was practicing, I never won a lawsuit. Okay?

MR. NEACH:  I'm sorry.  I missed --

THE COURT:  When I was practicing, I never won a lawsuit.  Okay.

My guess is tactically what you're worried about is giving this stipulation to the plaintiff because, when you present your case, you'd like to look like the willing person coming forward with all the information.  You don't have to respond to that, but I understand that.  I'm simply going to couch it that the defense has entered into a stipulation, it's being presented during the plaintiff's case -- I'll wait.

(Pause.)

THE COURT:  All right.  Now read the stipulation that you're agreeing to into the record so we have a record of it, please.

MR. FRENTZEN:  (Reading) It is hereby stipulated and agreed between the parties that the jury may accept as proven that the properties identified in yellow in

Plaintiff's Exhibit 247 are owned by Corona Clay.  So stipulated, William Frentzen and Brian Neach.  Signed --

THE COURT:  I'm going to couch that so there's no disadvantage because this would normally be evidence that you would be presenting, and plaintiff is entitled to present this, also, but they don't have the certified copies.  Okay.  To simply say that this evidence would have been presented by either the plaintiff or the defendant, that this just as could -- would have come in the defendant's case and that the stipulation that this property belongs to Corona Clay.  Okay?  And that gives you the benefit that both sides are being treated fairly.

All right.  Now, let me turn to 248.  What's 248?

MR. FRENTZEN:  We now don't need it, Your Honor.

THE COURT:  All right.

MR. FRENTZEN:  With the stipulation that it's owned by Corona Clay, we can get rid of it.

THE COURT:  Okay.  Now, who's going to keep this stipulation tomorrow?  Because, when it's read, you can join them at the lectern if you'd like to?

(Counsel confer.)

THE COURT:  In other words, visually you could both be up at the lectern.

MR. NEACH:  I -- sure.

THE COURT:  Okay?

MR. NEACH:  Yeah.

THE COURT:  So there's no tactical advantage or disadvantage, and it could have been presented during the defense case.  Both counsel have simply decided to present it at this time.  Okay?

MR. FRENTZEN:  Understood.

THE COURT:  All right.  Now, Karen [sic] Deleo, your daughter, is the CFO and is going to show some pictures and videos -- and this isn't the order necessarily.  You've got Cynthia Gabaldon, who I do recall from the first trial, who's the water consultant to Corona Clay.  Refresh my memory.  I don't -- I actually don't remember her.

MR. NEACH:  I don't think she testified in the first trial.

THE COURT:  She didn't and --

MR. NEACH:  Her name might have come up.

THE COURT:  Yeah, it came up but I -- she didn't testify.  And she's going to testify about the BMPs that were instituted, probably, with the filtration basin, et cetera, et cetera.

MR. NEACH:  Correct.

THE COURT:  And many of those photographs have been shown, but you may have other photographs that you wish to show, plus the timing of those being put in.

MR. NEACH:  Correct.

THE COURT: Okay. Who is another witness you might be calling tomorrow?

MR. NEACH: Martin -- M-a-r-t-i-n -- Samstag -- S-a-m-s-t-a-g.

THE COURT: And tell me about Martin Samstag.

MR. NEACH: Mr. Samstag has lived in the area for years, I think decades. He submitted a declaration in connection with summary judgment in this case in our opposition.

THE COURT: I apologize. With 400 cases, I have to admit, I just don't recall it.

MR. NEACH: I'm just -- he's already been connected in the case, and he has knowledge about water movement in the area and especially the field that's been at play.

THE COURT: Okay. And is he a local property owner?

MR. NEACH: Yes.

THE COURT: Okay. Is he involved in the clay business or cattle business or just --

MR. NEACH: Not that I know of.

THE COURT: Okay. Who's another witness you might call?

MR. NEACH: I think -- I'm pretty sure our last witness will be Dr. Luis -- L-u-i-s -- Parra -- P-a-r-r-a.

THE COURT: And potentially -- I mean, not --

that's your expert?

MR. NEACH:  Correct.

THE COURT:  So, if I were to give rebuttal, which I promised depending upon what you hear, then you would be calling Dr. --

MR. FRENTZEN:  Mr. Moreno.

THE COURT:  Yeah, but let me get the first name.

Jamie Moreno.  But that means, also, that there may be surrebuttal depending upon what's said by Moreno.  And I'm open to that.  I just don't know yet.  Which means, when you excuse your expert, you might want your expert to stick around depending upon what comes up on rebuttal and if we're staying within the parameters.

Now, before you finish your case, though -- that may have resolved the issue concerning the title report, but you may have another witness that you wanted to present, and who would that be, for the plaintiff, tomorrow?

MR. FRENTZEN:  Your Honor, this would be with respect to the Water Board and the issue of the qualifying storm events.

THE COURT:  Okay.  And you're trying to get somebody here?

MR. FRENTZEN:  That's correct.  Although, we may be able to package something for the Court in -- as my co-counsel discussed, about the law, in other words, if the

Court were to recognize it as a legal matter, but we're nonetheless trying to get somebody here.

THE COURT:  If I did that, though, I wouldn't instruct on it.  I would want to be comfortable stating that as a finding by the Court during the evidence.  I don't want to get into an instruction -- pinpoint instructions in this matter so --

MR. FRENTZEN:  That's fine.

THE COURT:  -- if we're going to do that, then we need to do that, hopefully, this evening or tomorrow.  Okay?

MR. FRENTZEN:  That's fine.  We're trying to get it together --

THE COURT:  Yeah.

MR. FRENTZEN:  -- for the Court, and we'll see --

THE COURT:  Okay.

MR. FRENTZEN:  -- but we're also -- so that may be very brief, I think --

THE COURT:  Okay.

MR. FRENTZEN:  -- in the morning if we can get somebody here.

THE COURT:  So it's, maybe, one more witness or a package of materials for me to examine?

MR. FRENTZEN:  That's correct, Your Honor.

THE COURT:  Okay.  Fair enough.

MR. FRENTZEN:  And then we've got a couple other

issues, but they won't require a witness.

THE COURT:  Well, let's go over, then, the next issue.

MR. FRENTZEN:  Sure.

THE COURT:  What's your next issue?

MR. FRENTZEN:  Just in terms of evidence, Your Honor, we would seek to read the -- counsel's response to the request for admissions.  This is the admission related to Corona Clay's indirectly discharging into Temescal Wash --

THE COURT:  Right.

MR. FRENTZEN:  -- which we think the Ninth Circuit --

THE COURT:  Yeah.  And --

MR. FRENTZEN:  -- addressed, and we think we have the right to present that to the jury.

THE COURT:  And I'd like to hear what those admissions are or see them this evening.

MR. FRENTZEN:  Yeah, they're filed, but we'll highlight them.  We'll give -- we'll hand up a copy to the Court.

THE COURT:  I'm sitting here waiting, and just tell me if I need to take a recess and -- or if you can get them quickly.  If not, I'll see you in 15 minutes.

MR. FRENTZEN:  I -- and then there's, at least, one other issue, Your Honor, which I think we could take up, if

the Court's willing, which is the dates of the photographs admitted through Dr. Horner. We've now filed a motion about it because we couldn't get a stipulation. When the Court ordered the defense to provide the dates the following morning effectively, which was Friday, and they did that --

THE COURT: Sure.

MR. FRENTZEN: -- we asked for some clarification, and they did that. So we now have the dates, they've given us what the dates are, but that's relatively meaningless to us without being able to present those dates to the jury, which was the point of getting the dates. So we have tabulated those dates by exhibit and --

THE COURT: Yeah, would you get those, then, for a moment so we create a record tonight.

MR. FRENTZEN: Yes, Your Honor. I can read it into the record. We'll grab that in a second. We're simply seeking to introduce that to the jury so that the photographs that they saw, they now understand when those were taken in the progress of the court -- case.

THE COURT: Sure. I understand. We just need them.

(Pause.)

THE COURT: So right now we are on counsel's responses, which would probably be termed legally as "admissions." I'd like to know what those admissions are.

I'd like to know the number.  I'd like counsel for the defense to be aware of them.  I'd like to see them.  And if you don't have them now, that's fine.  Just tell me when to come back.

Okay.  What numbered admissions?

MS. SPINUZZI:  This is defendant's response to plaintiffs' Request for Admission Set 2, Admission No. 68.

THE COURT:  Okay.  No. 58 --

MS. SPINUZZI:  68.

THE COURT:  I'm -- 68.  Thank you.

MS. SPINUZZI:  Signed by defense counsel with a proof of service dated April 2, 2019 --

THE COURT:  Well, I -- Counsel, I understand that. Just give me the numbers for a moment.

MS. SPINUZZI:  Sure.  The request is: (Reading) Admit that discharges of storm water from the --

THE COURT:  No, no.  Counsel, I'm sorry.  Just give me all the numbers for a moment, and then I can read them.  I can look at them.

MS. SPINUZZI:  Oh.  Just 68.

THE COURT:  68.  What's the other one?

MS. SPINUZZI:  That's it.

THE COURT:  Just 68?  Well, now -- I apologize. Now go ahead and read it.  Okay?

MS. SPINUZZI:  (Reading) Admit that discharges of

storm water from the facility flow indirectly to Temescal Creek.  Response: Responding party objects to this request on the ground that the defined term "facility" purports to cover the entire 20.3 acre parcel of land on only part of which industrial activity occurs despite the industrial site only being 7 acres.  The request is therefore vague, ambiguous, overbroad, seeks information that is not relevant to any claims or defenses, and is not reasonably calculated to lead to the discovery of admissible evidence.  Subject to the foregoing objections, responding party states as follows: Admitted that discharges of storm water from the industrial area on the property identified in propounding party's Exhibit B indirectly flows to Temescal Wash.

We would also like to publish to the jury propounding party's Exhibit B.

THE COURT:  No.  I just want to hear the little reading for a moment before you switch to your argument.

MS. SPINUZZI:  Apologies.

THE COURT:  Okay.  Just finish the reading.  Was that the end of the reading?

MS. SPINUZZI:  Yes.

THE COURT:  Now, can I see that document for just a moment?

MS. SPINUZZI:  Yes, you may.

THE COURT:  Thank you.  Come on up.

(Pause.)

THE COURT:  Thanks a lot.  Sorry to have you traveling so far.

MS. SPINUZZI:  Need our steps.

THE COURT:  Yeah.  Appreciate it.  Thank you.

(Pause.)

THE COURT:  So your industrial site, you believe, is 7 acres?

MR. NEACH:  Yes.

THE COURT:  And then the -- is the entire property approximately 20 acres?

MR. NEACH:  Yeah, I mean, you have to -- you have to read their definitions to understand why it was a problem from our end.

THE COURT:  Yeah.  But the point is "We own 20 acres there, but the industrial site is only 7 acres"?

MR. NEACH:  Correct.

THE COURT:  Okay.  And --

MR. NEACH:  And there might be discharge from somewhere on the 20.7 that doesn't matter.

MS. SPINUZZI:  That's not what the admission says.

THE COURT:  Well, just a moment.

MR. NEACH:  That was the reason for the objection.

THE COURT:  Now, would you say that again.  I'm sorry.

MR. NEACH:  The reason for the objection was because the way it was phrased with the definition was that it would suggest that there might be discharges from nonindustrial portions of the property that might go to Temescal Creek that don't matter, aren't jurisdictional. Because, if they're not from the industrial portion, it doesn't matter.  I'm just explaining why the objection is there.  The important point --

THE COURT:  So what are you uncomfortable with about reading Admission No. 68?

MR. NEACH:  The only thing I'm uncomfortable with is that the way it's been portrayed in the jury instructions is they keep changing "Temescal Wash" and "Temescal Creek." As long as -- as long as the request is read along with the response -- because there's a reason why they asked about "Temescal Creek" and the response refers to "Temescal Wash." I mean, that's the whole discussion about "creek" versus "wash."  I mean, I'm not trying to argue to keep this out because, you know, I don't' want to go back to the Ninth Circuit to explain that one again.

THE COURT:  (Indecipherable.)

MR. NEACH:  So -- but I think it's very important that that language in the request is different than what's in the response.

THE COURT:  There's a last portion "identified in

propounding party's Exhibit B directly flows to Temescal Wash."

MR. NEACH:  Uh-huh.  I'm sorry.  Say that again.

THE COURT:  Well --

MR. NEACH:  Yeah.  It says --

THE COURT:  -- you have a copy of this?

MR. NEACH:  The response says "Temescal Wash."  The request was about "Temescal Creek."

THE COURT:  Now just a moment.

MS. SPINUZZI:  Here's a copy for you, Brian.

MR. NEACH:  Oh, I know it well.  That's fine.  Thank you.

THE COURT:  Yeah, the request is (reading) Admit that discharges of storm water from the facility flow indirectly to Temescal Creek.

And your response basically -- the important portion is (reading) Admitted that discharges of storm water from the industrial area on the property identified in propounding party's Exhibit B indirectly flows to Temescal Wash."

MR. NEACH:  Yes.

THE COURT:  Okay.  And therefore, from your perspective, you want to be able to argue it doesn't flow to the creek?

MR. NEACH:  Yeah.  To the wash because plenty of

people refer to the field as the "wash."

THE COURT:  Then what would be the objection by either one of you to me reading this alleged admission?  And you're not restricted in arguing, and in fact, I would include "the request is therefore vague, ambiguous, overbroad" -- in other words, I would read the document as is.

MR. NEACH:  That would be acceptable to us, Your Honor.

THE COURT:  In other words, I read the entire thing: (Reading) Request for Admission No. 68.  Admit that discharges of storm water from the facility flow indirectly to Temescal Creek.  Response to Request for Admission No. 68: Responding party objects to this request on the ground that the defined term "facility" purports to cover the entire 20.3 acre parcel of land on only part of which industrial activity occurs despite the industrial site being only approximately 7 acres.  The request is therefore vague, ambiguous, overbroad, and seeks information that is not relevant to any claims or defenses and is not reasonably calculated to lead to discovery of the admissible evidence. Subject to the foregoing objections, responding party states as follows: Admitted that discharges of storm water from the industrial area on the property identified in propounding party's Exhibit B indirectly flows to Temescal Creek.  So --

or, I'm sorry -- to Temescal Wash.

So what you're able to argue is it's ambiguous.

MR. NEACH:  Correct.

THE COURT:  We meant "wash," and that's -- and we were cooperatively responding.

You're able to argue that it's synonymous, that it's being used in both ways.

I don't know why it wouldn't be -- I don't understand the disagreement between you on it.

MR. FRENTZEN:  Your Honor, I don't think there's a disagreement about what -- about reading the response.  I don't think it would be ordinary to involve the jury in an objection that was made --

THE COURT:  Oh, this is for argument.  It seems to me that this is what you're going to end up arguing, amongst many other things, the decision between "creek" and "wash."

MR. FRENTZEN:  Which is fine.  We understand where they're at, and we've actually got an additional issue we'll tack on later that relates to that.  But all I'm simply saying is we understand they responded "wash," and that's what we think should be read to the jury.  All I'm saying is the preceding objection, effectively, doesn't seem properly before the jury.

THE COURT:  I've forgotten what that objection even is.

MR. FRENTZEN:  No.  I mean, the objection which they -- that it's vague and ambiguous and -- et cetera, et cetera.

THE COURT:  No.  I would read it as is.  That was your objection.  That it's vague and ambiguous.  You're entitled to that.  You're entitled to the literal reading of what you wrote back in terms of a response.  So I'll read Request for Admission No. 68 and your total response to it.

MR. FRENTZEN:  Well, I'm not sure that -- well (indecipherable).

THE COURT:  I keep that.

MR. FRENTZEN:  Yeah.  Your Honor, if we could just -- again -- if the Court's going to read the whole thing, it's going to read the whole thing.  I just don't understand in -- typically the jury is not involved in the objections.  The Court deals with the objections, and then the jury gets what's left.

THE COURT:  I'm going to read the entire response.  It's an accurate response.

MR. FRENTZEN:  Okay.

THE COURT:  All right.  All right.  Issue number two.  Issue number one.

Issue number three, the date of the photographs.  There was an interchange that was supposed to be on Friday -- it occurred at some point -- and you're trying to match up

dates on those photographs that were taken, and these were photographs taken by the defense; is that correct?

MR. NEACH:  Correct.

THE COURT:  Aren't these going to become clear during your case?  In other words, aren't you the ones who eventually are going to bring these forward?

MR. NEACH:  Your Honor, here's -- can I -- they sent me the stipulation -- I sent them the dates.  I conferred with the client, and I send them the dates, and they sent back a stipulation, and if it had just been the photo dates, fine, but they threw in a couple things about the dates that Dr. Horner visited.

THE COURT:  Yeah.

MR. NEACH:  And I kind of said, "All right.  I need to go back and check the record," and I just haven't had time.  I'll do it.  I don't think there's any issue with the photo dates.

THE COURT:  But from my perspective, either you can set these dates when you present your case, or in cross-examination I would let the plaintiff set these dates, but these were -- who took these photographs?  Horner?

MR. FRENTZEN:  No, Your Honor.

MR. NEACH:  No.

THE COURT:  Who took these photographs?

MR. NEACH:  Corona Clay did.

THE COURT:  I know, but who?

MR. NEACH:  Oh.  Typically, either Kiana Deleo or Jose Arana --

THE COURT:  Okay.

MR. NEACH:  -- or Mr. Deleo.

THE COURT:  And these are photographs that you want in?  I mean, you tried to get them in front of the jury on the cross-examination; so I don't understand the battle going on.  In other words, you want these in -- is it -- did you want these in during your case?  Fine.

MR. NEACH:  There's -- yeah, there's really not a battle other than I just haven't had a chance to go back and check the other two facts.

THE COURT:  Well, take your time.  Tell me what time you want me to come back.

MR. NEACH:  Yeah, I mean -- yeah.  Just let me check the records --

THE COURT:  Well, go ahead.  Check it now.

MR. NEACH:  Yeah.  That's fine.

THE COURT:  Yeah.  Let's -- and, Counsel, please have a seat for a second.  Okay?  Just have a seat.

(Pause.)

(Counsel confer.)

MR. NEACH:  Okay.

THE COURT:  Well, okay, what?

MR. NEACH:  I can either -- they can either just file that stipulation with my signature -- whatever they want to do.

THE COURT:  Well, let's find out tonight so there's no surprises tomorrow.

MR. NEACH:  Fine.

THE COURT:  How do you want to resolve this?  Do you want to just stipulate on the record?  Follow the same process?  Do you want to --

(Pause.)

THE COURT:  In other words, these are the documents that you want in.

MR. NEACH:  Correct.  I thought they were already admitted, actually.

MR. FRENTZEN:  Conditionally with respect to the dates.

MR. NEACH:  Oh, it was just conditionally?

THE COURT:  Yeah.  I --

MR. NEACH:  Okay.

THE COURT:  I just took the representation.

MR. NEACH:  Yeah.

THE COURT:  You could lay the foundation that they were taken by somebody at Corona Clay.

MR. NEACH:  Okay.  There we go.

THE COURT:  And they can come during your case, or

they can -- you know, it doesn't matter.  Just tell me what you want.

MR. NEACH:  We just signed the stipulation.

THE COURT:  Okay.  Read me the -- read the stipulation to me, then, so I have a record of it.

MR. FRENTZEN:  Sorry, Your Honor.  Let me just --

(Pause.)

THE COURT:  Now for all you folks in the audience, there may be some word processing that we can do tonight to save some time because I'm just going to take one instruction, hear the argument, go back and try to make a decision.  The ones I can't, then I'll make it after you leave tonight.  Okay?  So anything that you can do in terms of word processing and getting it on the table.

MS. SPINUZZI:  The instructions have been processed.  Our instructions have been word processed already.  We did that last night and --

THE COURT:  Thank you.

MS. SPINUZZI:  -- and Mr. Robinson is working on exhibits right now --

THE COURT:  Okay.

MS. SPINUZZI:  -- to make sure they are in line for your --

THE COURT:  Okay.

MS. SPINUZZI:  -- courtroom clerk tomorrow.

THE COURT: Okay. Thank you.

MR. FRENTZEN: Does the Court still want me to read this?

THE COURT: I want to read -- I want that read into the record so I have a record of it.

MR. FRENTZEN: (Reading) The parties stipulate to the following: Dr. Horner's first site inspection occurred on October 18, 2018. Exhibits 329 and 330 were taken on June 12, 2019. Exhibits 405-1 and 405-2 were taken on August 6, 2019. Exhibit 407-29 was taken on October 22, 2020. Exhibit 407-66 was taken on January 25, 2021. Exhibits 407-74 and 407-75 were taken on January 29, 2021. Exhibits 411-6 and 411-7 were taken on December 14, 2021. Exhibit 399 was taken on December 17, 2021. Exhibits 401 and 411-18 were taken on February 16, 2022. Dr. Horner's second site inspection occurred on April 15, 2022.

THE COURT: Okay. Now, this is a piece of evidence that you wanted in. Why can't plaintiffs stipulate to that, and why can't you read that in when you begin your case? In other words, why should it come during the plaintiffs' case? I've conditionally allowed this to be viewed through Dr. Horner, but it's really a piece of evidence that you would find valuable, and you should be in the position, I would think, of being able to introduce this piece of evidence on your behalf. So why can't plaintiffs stipulate

to this when defense begins the case, and why can't you read that in, and then I will undue my conditional acceptance and be received?

MR. FRENTZEN:  Your Honor --

THE COURT:  Some are not part of your case.  It's part of the defense case.

MR. FRENTZEN:  It's -- the dates themselves we wanted --

THE COURT:  You'll have them.

MR. FRENTZEN:  I know, but it's significant to us that they are --

THE COURT:  Yeah.

MR. FRENTZEN:  -- late in the game, and that's why we wanted them, and that's why we got them, and that's why we're pushing for them.

THE COURT:  No.  I think that's an unfair advantage.  I think that this is part of your case.  These are exhibits that you wanted to be received through Dr. Horner.  This isn't going to be something that the plaintiff presents.  This is something that you can present.

MR. FRENTZEN:  Your Honor, the problem with that is then we don't know that it's -- a, we don't know that it's going to be presented --

THE COURT:  Oh, it's going to be presented because I've got counsel's representation.

MR. NEACH:  I will represent that.

THE COURT:  Okay.  That's the end of the -- I trust you.  I trust both of you, believe it or not.  I trust my counsel.  That's it.  You'll read it during your case. Because, otherwise, everything starts being subsumed in the plaintiffs' case and tactically that's not fair.

MR. FRENTZEN:  Well --

THE COURT:  This is part of the exhibits that you wanted in.  I allowed it conditionally so you could have a thorough examination of Dr. Horner and hopefully we didn't have to bring him back at cost to the plaintiffs.  I've taken that conditionally.  Their case doesn't rest on this, and they're not entitled to it.  You are.  And I think that plaintiff would pay the same courtesy of stipulating to this. So -- if not, I'm going to receive it.

Now, what's our fourth issue?

MR. FRENTZEN:  Your Honor, just if I could return very briefly to the request for admission only to ask that the Court include the map that was attached.

THE COURT:  Oh, I didn't see that, and I apologize. Could I see that again?  I just read the admission, and I didn't know there was a map.

(Pause.)

THE COURT:  Well, I have the map.  Why was I worried, (indecipherable).  Thank you so much.

And you believe that this was in relation to Admission 68?

MR. FRENTZEN:  Yes, Your Honor.

THE COURT:  Counsel?

MR. NEACH:  I'm checking.  I --

THE COURT:  Okay.

MR. NEACH:  -- trying to look it up so I can see it.

MS. SPINUZZI:  I just handed you a copy, Brian.

MR. NEACH:  Oh.  I didn't realize I had everything.

MS. SPINUZZI:  You have everything.

(Pause.)

THE COURT:  That seems fair.  This shows the 20.29 acres; so the 20.3 acres that you're referring to.

MR. NEACH:  It's fine with me, Your Honor.

THE COURT:  Okay.  Done.

Okay.  What's our -- we've got to have a fourth issue.  That was too easy so far.  What's your fourth issue?

MR. FRENTZEN:  Your Honor, this is with respect to this wash-creek issue.  We filed a motion.  There's been this --

THE COURT:  When did you file that motion?

MR. FRENTZEN:  Several days ago -- couple days ago. Days are blurring together for me, Your Honor.

MR. NEACH:  I believe it was yesterday.

THE COURT:  (Laughs.)

MR. FRENTZEN:  Yesterday.  Sorry, Your Honor.

THE COURT:  That's fine.

MR. FRENTZEN:  We worked on it for about a day before that.

This is with respect to this wash-creek inconsistency, and if the Court recalls, there's an issue about Ray Hiemstra and that supposedly he changed from a declaration to the -- whatever.  Well, as I pointed out with him today, back in 2019 it was actually defense counsel that was trying to get him to agree that the "wash" and the "creek" were functionally the same, and in fact, in argument in the prior trial, counsel for Corona Clay represented that you could use the term "wash" for the "creek" and they were functionally the same, and so it's really Corona Clay, through its agent, that has taken a 180 in this particular trial trying to argue that they're somehow two different things.

We believe under the case law we're entitled to introduce the prior representations regarding the "creek" and the "wash" being the same and that in a retrial, when counsel takes a diametrically different position on a particular issue, that that creates these issues in a certain admissibility of their admissions through their agent from the prior proceeding.  We also -- we filed it basically

saying, "Look, if you forego this wash-creek issue with Hiemstra, then maybe we don't have an issue."  They went there; so we think we do have a fully engaged issue here, in other words, to show that in the first case they argued the two were synonymous effectively.

THE COURT:  Okay.

MR. FRENTZEN:  And so we think we're entitled to that.  We actually think that, in addition to that, there is a certain rule of estoppel, effectively, so as not to argue such incompatible positions.  We think in the first instance, and especially in light of the admission, which the Court has already taken notice of and is going to read in, that that's not proper, but if it is allowed, then at a minimum we ought to be able to offer their prior statements as an admission by Corona Clay and its agents --

THE COURT:  And what prior statements are those? In other words, I got concerned in the piecemeal reading of the deposition and allowed this alleged impeachment, if it even was impeachment, concerning the declaration that started on page -- whatever -- 114 -- or whatever -- and then I think you were able to get in an earlier deposition where counsel started with the supposition that they were the same.

MR. FRENTZEN:  Correct.

THE COURT:  But all of that's in evidence.  All of that is arguable, and I don't know why I would then start

making decisions about -- I don't know why I would start giving conclusiveness to one party's argument in that regard. Counsel are entitled to change. In fact, some of this case has changed on the plaintiffs' part. So I don't think you're precluded from arguing your new theories on a second retrial or bringing up defenses that may have not been put before the jury before just as I haven't constrained plaintiff. So I'm a little concerned. But I haven't read that. I've got to go back and look at it tonight, and I will.

MR. FRENTZEN: And if the Court is -- the Court started with the question of What will we be presenting? I can -- it's very short.

THE COURT: Sure.

MR. FRENTZEN: It would be a statement by counsel from the first trial -- and we could just say "counsel." I don't need anybody's name attached to it -- and this was the argument in the first trial: (Reading) There's been mention of a creek called "Temescal Creek." Temescal Creek. "Creek" is a euphemism. Temescal Creek. It's gone dry. It should be called and has been called and will be called in this case "Temescal Wash" because that's really what it is.

That's it.

THE COURT: So was this Mr. Pacheco's closing argument?

MR. FRENTZEN: I believe it was opening statement

--

THE COURT:  Opening statement.

MR. FRENTZEN:  -- Your Honor, but I'd have to go back and check whether it was opening or closing.

THE COURT:  You know, I will tell you tentatively I'm not inclined to accept an opening statement or a closing argument as evidence.  But let me go back and look at the motion, and I don't think you're bound by an opening statement or a closing argument.  It's argument, and it's not a conclusion.  But I'll look at it tonight.  I haven't seen it yet.

MR. FRENTZEN:  And just so the Court's -- I mean, that's the position they took throughout that --

THE COURT:  Okay.  Fine.

MR. FRENTZEN:  -- first trial until they --

THE COURT:  All right.

MR. FRENTZEN:  -- needed to get away from "wash."

MR. NEACH:  It's not a position, Your Honor.

THE COURT:  Well --

MR. NEACH:  That was not a point in dispute whatsoever.

THE COURT:  I don't see how we go any further with this argument tonight because I haven't read the motion.

MR. FRENTZEN:  Yeah.

THE COURT:  But if you want to spend your time that

way, look at the clock.  We're here until we're done with instructions, and that can be by 7:00 o'clock, and it could be by midnight.  It's up to you.

MR. FRENTZEN:  We filed it.  We'll rely on the Court to take a look at it.

THE COURT:  Okay.

MR. FRENTZEN:  I just wanted to raise it because before we rest --

THE COURT:  Okay.

MR. FRENTZEN:  -- that would be something we would offer.

THE COURT:  I'm just giving you a tentative thought.  I'm tentatively inclined denying those kinds of motions where it's an opening argument by counsel, but let me look at it.

MR. FRENTZEN:  Thank you, Your Honor.

THE COURT:  Give me that opportunity.

MR. FRENTZEN:  There's case law.

THE COURT:  Okay.  Now, any more issues before we get to the instructions?

(Pause.)

THE COURT:  So it's 6:00 o'clock now.  Do you want a break?  I mean, I don't care if we take 15 minutes, I don't care if you come back at 7:00 o'clock, but we will done with these instructions tonight.  So you guide me about how long

you can hold up and hold in there.

MR. NEACH:  I could use ten minutes, Your Honor.

THE COURT:  Sure.  Give me a time.

MS. SPINUZZI:  You just need ten?

MR. NEACH:  If you want more, that's fine with me.

THE COURT:  It's up to you.  I mean, trust me --

MS. SPINUZZI:  Yeah.  Ten minutes is fine.

THE COURT:  I'm not joking.  You can leave at 7:00.  You can leave at midnight.  And ask John Quinn.  He left at 2:30 in the morning -- on Mattel.  Up to you.

MR. NEACH:  I heard about that.  Yes.

THE COURT:  Okay?

MS. SPINUZZI:  That's fine.

THE COURT:  So ten minutes.  We'll see you in ten minutes.

MR. NEACH:  Thank you.

(Break from 6:02 p.m. to 6:17 p.m.)


                    AFTER RECESS
    (Jury not present.)

THE COURT:  Okay.  Then so we should be back on CourtSmart.  All counsel are present.

Has lead counsel for the plaintiff excused himself this evening?  That's fine.

MS. SPINUZZI:  Yes.

THE COURT: All right. First disputed instruction on the table with markings has to do with "Functional Equivalent of a Direct Discharge Defined." There is a defense version, a plaintiffs' version. I'm assuming that each of you have read these versions. Otherwise, if you'd like me to read the three pages -- or the two pages and the one page, I'm happy to do that. That just takes an extra ten minutes, but I'll leave that to you.

So on half of the -- behalf of the plaintiff, your argument is?

MS. SPINUZZI: Yes, Your Honor. Our argument for our instruction is that there is not actually a seven-factor test established in *County of Maui*. In fact, the Supreme Court said that the court should consider a variety of factors, some of which may be relevant, some of which may not be relevant.

The Supreme Court also asked lower courts to look at the purpose of the Clean Water Act, the intent of Congress, and very, very clearly did not establish a seven-factor test. It said, "Here's some factors that might be relevant. Some of them might not." And overall, when we're deciding issues of jurisdiction, we should be looking at the intent of Congress in drafting the Clean Water Act, which was to have the broadest scope possible based on constitutional jurisdiction. Ultimately, the scope of the Clean Water Act

is as broad of reach as is permissible under the commerce clause of the U.S. Constitution.

And so the Supreme Court also listed out -- and we have actually previously briefed this, but the Court also said that it may be relevant whether -- is the Court --

THE COURT:  Keep arguing, Counsel.

MS. SPINUZZI:  Yeah -- whether the agencies have rendered opinions as to whether a facility discharges into waters of the United States, whether the agency believes that the discharge is regulated.  And just basically, seven factors is one part of *Maui*, and it's actually a much broader call to courts to very carefully look at the scope and intent of the Clean Water Act, the breadth and depth of federal jurisdiction under the Clean Water Act, take into account agency opinions and give them the deference that they are due, as well as a variety of factors, again, some of which may be relevant and some of which may not.

And so we do not think that the defendant's instruction --

THE COURT:  Let me hear from the defense for a moment.

MR. NEACH:  Your Honor, my first response to their instruction, when I look at it, it has policy discussions.  I mean, if --

THE COURT:  Assume that the Court understands that

also.  It's a pinpoint, it's argumentative, I'm rejecting it out of hand, but for the factors.  The factors are what we need to point -- their instruction for the plaintiff is extraordinarily argumentative.  So --

MR. NEACH:  -- have to wait.

THE COURT:  -- it seems to me that we need to get down to the factor test.  And these -- I agree with plaintiff -- are suggested factors.  The Court can come up with other factors that the Supreme Court has not set forth.  But also, we need a catchall phrase.  We need something like in the credibility instruction, where it ends with "any other factors that bear on believability."  What we need -- no matter what, the latitude of each of you to argue and any other factors that do something.

So I don't think we're in any disagreement that the factor test -- those are the minimum factors we should be requiring.  I'm asking you if there are additional factors that you'd like.  But in its present form, I'm not accepting plaintiffs' instruction, but the defendant's instruction is not complete.  We need to get down to the factors or a combination thereof, and it's not the most important factor, et cetera, and it's not starting off with "an admission by the defendant's that."  That's for argument.

So understanding that, we can take as long as we want with it.  I can set you two free.  I can come back at --

in 45 minutes, if you'd like to, or I can go back and compose.  It's up to you.

MS. SPINUZZI:  I'd like to be heard.

THE COURT:  Pardon me?

MS. SPINUZZI:  I'd like to be heard.

THE COURT:  Please.

(Indecipherable) arguing policy now, and I want you to bear down on the factors.

MS. SPINUZZI:  Your Honor, the Supreme Court explicitly said that "When we're deciding jurisdiction, we're deciding policy," and I would like to read from the *County of Maui* opinion.

(Reading) "The underlying statutory objective" -- and this is a quote from -- 1477 is the pin site.  I'm sorry. 140SCT at 1477.  "The underlying statutory objectives also provide guidance.  Decisions should not create serious risks either of undermining state regulation of groundwater or creating loopholes that undermine the statute's basic federal regulatory objectives."  That's a policy.

THE COURT:  Well, Counsel, that's a policy when the Court writes it, and this Court abides by it.  I'm now instructing.  I need to give the jury instruction, and the factors that I give them are critical to the Court.

MS. SPINUZZI:  But the policy for determining jurisdiction is also what you're asking the jury to decide,

which is why we actually argued vehemently that jurisdiction was not something for the jury to decide, but, you know, here we are five days into a jury trial; so I see that the Court has rejected that argument.

I'm simply saying that, if the Court were deciding jurisdiction, the Court would certainly look to the policy objectives of the Clean Water Act, and the Court would look to case law, and the Court would have the guidance and the benefit of looking at case law. You know, the jury is being asked to decide, ultimately, a jurisdictional legal issue, and the jury should have the same benefit that the Court does in understanding what has been found to be the "functional equivalent" because this is a legal term of art under which there is some guidance.

And we don't disagree that -- with the factors. I wouldn't say that there is a seven-factor test because the Supreme Court very clearly said that there is not, but we're not -- we don't object to the Court reading the factors to the jury, only that some of them are relevant, some of them might carry no weight at all. And in fact, that's what has happened in the majority of cases interpreting *Maui*, and so this idea that the plaintiff must have evidence on every factor is clearly inconsistent with existing precedent and with the direct words in *Maui*.

THE COURT: First of all, the plaintiff doesn't

have to have evidence on any factor -- any one factor alone may be sufficient.  I have a concern, though, when an instruction says "the most important factor is."  I have problems with your instruction when you say and start with, not even the factor test, but there's admission.

MS. SPINUZZI:  That's what *Maui* said.

THE COURT:  That --

MS. SPINUZZI:  *Maui* said time and distance are the most important factors.

THE COURT:  Finish your argument.  We've got all the time you need.

MS. SPINUZZI:  Yeah.  I'll be taking it.  This is important.

The Supreme Court in *County of Maui* specifically stated that time and distance were the most important factors, and that's why that's in our instruction.

We also believe that the jury should be given the benefit of anything that would be before the Court in determining this important jurisdictional and, frankly, policy issue, which would include examples given by the U.S. Supreme Court which said, if a pipe ends 50 miles from navigable water and the pipe emits pollutants that travel into groundwater mixed with much other material, then that likely doesn't apply.  But where a pipe ends a few feet from navigable waters and the pipe emits pollutants that travel

those few feet through groundwater over a beach, the permitting requirement clearly applies.

And so the Court -- if the Court were deciding jurisdiction, the Court would have all of these available resources in front of it to understand the *County of Maui* opinion, to understand, frankly, constitutional jurisprudence under the commerce clause, none of which the jury has the benefit of.

And that's why we proposed the -- I admit it's a lengthy instruction.  It's a complicated issue we don't think should be before the jury, but if it is before the jury, then we should at least give them and arm them with the benefit of having the full scope and breadth of the law that they will need to be applying, which includes issues of the breach of the commerce clause, the policy of the Clean Water Act when it was passed, the agency deference that we give agencies when they decide to regulate a facility, and none of that is before the jury without the instruction that we proposed.

That's all.

THE COURT:  Counsel, on behalf of the defense?

MR. NEACH:  Well, I'll start with this whole idea of the admission being in there.  It's false because, as we've said, Corona Clay didn't admit anything going into Temescal Creek.  The admission says "Temescal Wash."  So they're playing games right there.  But I agree.  There's no

place for that in this instruction.

In terms of the policy, all right, if we're going to start grabbing the policy bits out of this case and start putting them in, I guess we need to add in the Court's discussion about what was left for the states to regulate. I guess, maybe, we should add Justice Kavanaugh's concurring opinion about how he thinks the Court's right because they aligned with Justice Scalia's opinion -- or plurality opinion, I guess, in the *Rapanos* case. I mean, they can't just pull out the little pieces of policy that they find beneficial. Anyway, a jury is a fact finder. They're not a policy dictator, a policy finder. So there's just no place for that in this instruction.

THE COURT: Is there any more important factor, from your perspective -- because the plaintiff has argued and pointed to *Maui* what they believe is the, quote-unquote, "most important factor." How would the Court deal with that?

MR. NEACH: I mean, I think the Court -- the Supreme Court does say that, but I do think that when they're also arguing that you're supposed to look at all the factors -- and I have yet to hear any other factors other than what the Supreme Court identified, which I think all, arguably, apply here to a certain extent. I think the Supreme Court -- it's almost like it was looking at this case at what might

happen.  So I mean --

THE COURT:  I don't think the Supreme Court was aware of this case.

MR. NEACH:  I said it's "almost" as if.  I didn't suggest that they actually knew.

But it cogently does state out factors that all argue apply -- arguably, apply in this case.  If we want to throw in language that says, "The jury has to look at several factors, including the following," I'm fine with that.

THE COURT:  Now, I want to take the next instruction, and then we'll go back and take a look at both of these for a moment.  The "Definition of a Point Source."

MS. SPINUZZI:  Your Honor, before we move on, I want to address the request for admission that is in our proposed instruction and just address that point briefly.

The Ninth Circuit, when it overruled this Court previously, stated: In a civil case the court must instruct the jury to accept the noticed fact as conclusive.

I understand we have this creek-wash distinction, which we will get into later.  Nonetheless, we request that the Court instruct the jury to accept the noticed fact as conclusive.

THE COURT:  All right.  The next instruction is (reading) Under the Clean Water Act, the term "point source" means any discernible, confined and discrete conveyance,

including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or floating craft, from which pollutants or -- are or may be discharged.

Now, you both seem to agree to that initial paragraph.  The difficulty is this: We don't have a feeding operation here, do we?  A vessel?  So much of this is redundant and silly that we could strike it, quite frankly, but if you both agree, I'll give it.

Second, what you're disagreeing: "As an industrial facility that has designated two points from which it discharges pollutants and storm water, Corona Clay is considered a 'point source.'"  I'd like to hear argument on that disagreement.

MS. SPINUZZI:  That's your disagreement, Brian.

MR. NEACH:  Yeah.  That is very pinpoint, Your Honor.  It's --

THE COURT:  I'm sorry?

MR. NEACH:  It's very pinpoint.  It's unnecessary, doesn't add anything, and it is basically asking -- telling the jury to -- I'm not even sure saying "Corona Clay is considered a 'point source'" is even a correct statement. I'm not sure why it's there.  It wasn't in the previous one. I'm not quite sure what it adds.  Again, it's very pinpoint.

THE COURT:  There was some testimony, for both of you to consider, kind of an intimation that were -- or was a prolific amount of clay throughout this region.  And when you look at a map, it doesn't display that, and then you see the photographs or the video -- I mean, for instance, you've got a road coming down and then another road coming down on a continuous piece of property or some property further down the road, and I have no idea what's up the road.

And so one of the problems may be is that Corona Clay may be a contributor, you may be the primary source, but it seemed to me that you were intimating that there could be, minimally, other properties, let alone with just a road cut into the region, which you can see on these properties, that would expose clay on a road and potentially be, at least, a contributing factor.  I wasn't quite certain where you were going with that when you put up those photographs.

And so I don't understand why you are the sole -- or what appears to be the sole point source if later on you're arguing that there are multiple other runoff conditions, whether it's simply a road cut in -- up into the mountain or whether there's a barren spot, and I can't tell from the topography.  I can't tell from these photographs.  What are you going to be arguing in this regard?  That Corona is not the point source?

MR. NEACH:  I think that the argument is "point source" can be Corona Clay's discharge point, right.  I think that in terms of what you're talking about, the questions, I think, that were put to Mr. Moreno -- and I think it also impacts Mr. -- Hiemstra?

MS. SPINUZZI:  Hiemstra.

MR. NEACH:  -- Hiemstra's testimony that "Oh, gee, I" -- you know, "I could tell I was following Corona Clay's water because it's this color, and that's how I know."  And, well, wait a second.  There's clay here, and there's clay here, and it's the same color water --

THE COURT:  That's the point.  Why would I -- and let me turn back to the plaintiffs.

Why would I designate Corona Clay -- if the defense is arguing that there can be other source points, why would I give an instruction that would say Corona Clay "is" the source point?  Why wouldn't I modify to say, you know, "Corona Clay, others" -- I don't know what that testimony is going to come from the defense, but you seem to intimate on cross-examination, "Look.  The hills are full of clay.  We've got continuous pieces of property.  You can see roads going up that are actually cut that may be a contributing factor."  You may be the sole factor.  I just don't know.

So I don't quite know what to do with this instruction yet, and I'm a little concerned that you are the

"sole source point," but certainly you are a source point.
The question is are there multiple source points here?  So I
don't have any concern about this paragraph.  I have a
concern about limiting you to being the "sole" contributor if
in fact you're going to develop evidence during this trial
that there are other -- (indecipherable) -- other potential
contributors.

MR. NEACH:  Yeah.  And I think that's a valid
concern that if you add in this instruction --

THE COURT:  -- add any more before we go back?

MR. NEACH:  Oh.

THE COURT:  Okay.  Now, hold on for a second.

Let's go two more.  The next one --

MS. SPINUZZI:  Your Honor, I'd like to be heard.

THE COURT:  Certainly.

MS. SPINUZZI:  Yeah.  So I've just put up on the
Elmo what is the defendant's SWPPP map that's their overall
site map that's attached to plaintiffs' -- or to defendant's
responses to RFAs for the record.

First of all, Your Honor, up above in the hill that
Mr. Pacheco was pointing to earlier is actually, in fact,
part of Corona Clay -- what Corona Clay has identified and
is, in fact, part of their industrial area.  That's point
number one.  So everything coming down this road is coming
from what Corona Clay itself has designated as Corona Clay's

industrial area.

THE COURT:  But there's no disagreement about that.  That's not my point.

MS. SPINUZZI:  Well, there was disagreement today from Mr. Pacheco.

THE COURT:  No.  No, that's not it.  Let me -- you're missing what I'm saying, and I apologize.  I'm not clear.

It's not that Corona Clay isn't a source point.  It's that they're the "only" source point, and it seemed to me that it's premature on my part to make this decision until I see how the defendant develops their case because cross-examination seemed to infer "The hills are full of clay.  We've got a roadway up here that would be, at least, a contributing factor.  By the way, it's further down the road with this particular culvert.  The runoff seems to be most prolific coming from this area."  I mean, they shouldn't be precluded from that.  I just don't know yet.

MS. SPINUZZI:  Yeah.  The other --

THE COURT:  But to say that they're the sole source point -- the "sole" source point -- that's what I'm struggling with, not that they're not a source point.

MS. SPINUZZI:  Yeah.  Your Honor, I would just like to say that nothing in our instruction indicates that they're the "sole" point source.  However, what I would say is that

anything that runs onto Corona Clay's industrial site -- so, for example, if you look to the top of this map, at the very top-center quadrant, there's actually little an arrow here that says "run on," and where that arrow says that there's "run-on" -- those hills that are far up above Corona Clay's property are not part of the industrial area.  However, Corona Clay is legally responsible for everything that runs onto their industrial site.

THE COURT:  I'm not disagreeing with you.

MS. SPINUZZI:  So --

THE COURT:  Even if they're a contributor --

MS. SPINUZZI:  That's right.

THE COURT:  -- doesn't matter.

MS. SPINUZZI:  But they're responsible under their permit for controlling all of that.  And so anything that crosses -- even the driveway, Your Honor.  Even if it's just something on this road or on the driveway, that's part of their industrial area.  Not only have they designated that as part of their industrial area, but in fact, under the permit, because they have commercial vehicles transporting materials up that road, that is, in fact, part of the industrial area as well.  So everything in Corona Clay's industrial facility -- in what they have designated as their industrial facility is a point source, and that's our argument.  But I understand the Court would like to wait on deciding this jury

instruction.

THE COURT:  Now -- okay.  We'll be back in a moment.  We're just going to take these two.

MS. SPINUZZI:  Thank you.

THE COURT:  The next ones we're going to take would be best management practices" -- so you're prepared -- and we're going to take up the storm water instruction.  So I'll leave these right here for you to look at, but please don't move them.  Okay?  I mean, look at them --

MS. SPINUZZI:  We can look them; right?

THE COURT:  Oh, and by the way, try to keep these in order --

(Pause in proceedings from 6:39 p.m. to 7:40 p.m.)

THE COURT:  Okay.  We're on the record still, because we have running CourtSmart.

We're going to take best management practices, "BMPs," plaintiffs' instruction and defense instruction, and I'd like to hear the argument and the differences between the two of you.  So let's begin with plaintiff.

MS. SPINUZZI:  Yeah.  I think this is going to go real fast.  The difference is, I think, there's a bottom paragraph that explains best available technology.  I'm sorry.  I can't recall it from memory.

THE COURT:  "The Clean Water Act requires NPDES permits to include technology-based effluent limitations and

any more stringent limitations necessary to meet water quality standards."  Is that what you're referring to?

MS. SPINUZZI:  Yeah.

THE COURT:  Otherwise, it -- well, they're not synonymous.  I want the two of you to sort this out because I don't think the disagreement is that great.  I'd like to see what the disagreement is.  So you two look at it before me for a moment.

MS. SPINUZZI:  That's the only difference.

MR. NEACH:  No, it's not, actually.

THE COURT:  -- no it's not.

MR. NEACH:  There's one difference in ours, but I think --

THE COURT:  You two work --

MR. NEACH:  Okay.

THE COURT:  -- you two work on that together.  Tell me what time you'd like me to come back.  How much time? 15 minutes?  20 minutes?  What?

MR. NEACH:  10 minutes?

THE COURT:  10 minutes.

MS. SPINUZZI:  Less.  3.

THE COURT:  10 minutes.

MR. NEACH:  Okay.

(Counsel confer.)

MS. SPINUZZI:  Your Honor, we've discussed the

differences.  Plaintiff is amenable to defendant's middle statement that says -- starting at defendant's --

THE COURT:  No.  I'm sorry.  Just draft it for me, and then read it so I can read it.  Help me.

MS. SPINUZZI:  Say again?

THE COURT:  Because, when you're reading it to me, I'm not absorbing it.  You've got the only copy.  Mark that copy up, and see what you're agreeing to, and see if there's anything left that you're not disagreeing to.  Because I'm at a disadvantage.  You've given me one copy.

(Counsel confer.)

THE COURT:  Okay.  Now, hold on.  Now help me.

MS. SPINUZZI:  I will.

THE COURT:  Are you in agreement or disagreement?

MS. SPINUZZI:  We're in agreement.

THE COURT:  Okay.  Then read into the record what the instruction would look like, and then I'm going to ask you to help me by processing it.

MR. ROBINSON:  Done.

THE COURT:  Thank you so much.  I really appreciate your help.

MS. SPINUZZI:  (Reading) The Permit requires Corona Clay to implement minimum BMPs, as well as any advanced BMPs that are necessary to reduce or prevent discharges of pollutants consistent with technology-based effluent

limitations.  BMPs can be actions (including processes, procedures, schedules of activities, prohibitions on practices, and other management practices), or installed devices to reduce or prevent water pollution.  BMPs can be just about anything that is effective at preventing pollutants from entering the environment and for meeting applicable limits of the Permit.  The Permit requires Corona Clay --

THE COURT:  -- come over and watch for a moment. Because you don't want to be here all night processing. Okay?

MS. SPINUZZI:  (Reading) The Permit requires Corona Clay to implement BMPs "to the extent feasible," which means it is required to select, design, install, and implement BMPs that reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering the technological availability and economic practicability and achievability. The Clean Water Act requires NPDES permits to include technology-based effluent limitations and any more stringent limitations necessary to meet water quality standards necessary for receiving waters to meet applicable water quality standards.

THE COURT:  Now (inaudible).  Thank you.  And isn't this out here too?

MS. SPINUZZI:  Huh?  No.  This is all --

MR. ROBINSON:  So --

MS. SPINUZZI:  These are the same.

MR. ROBINSON:  So I'm adding this paragraph?

MS. SPINUZZI:  Yeah.

MR. ROBINSON:  And adding that and deleting that?

MS. SPINUZZI:  Yeah.

MR. ROBINSON:  Yep.

THE COURT:  What about this?

MS. SPINUZZI:  This -- these are identical.

THE COURT:  In other words, it's redundant, isn't it?

MS. SPINUZZI:  They're identical.  So we're --

THE COURT:  I know.  So just take it out.

MS. SPINUZZI:  Yep.  Well, this is just being transferred to here, and we're adding this.

THE COURT:  No, no.

(Pause.)

THE COURT:  Doesn't it read -- this over to here?  In other words, isn't this just redundant?

MR. ROBINSON:  Oh.  Oh.

MS. SPINUZZI:  Sure.

MR. ROBINSON:  (Inaudible.)

THE COURT:  Okay.

MS. SPINUZZI:  We're saying the same thing.

THE COURT:  That's all I'm doing.

MR. ROBINSON:  Yeah.

THE COURT:  I'm just making certain that there's no confusion downstairs.  Okay?

MR. ROBINSON:  Yep.

MS. SPINUZZI:  Yep.

THE COURT:  Okay?  Okay.

MR. ROBINSON:   All right.

THE COURT:  Excellent.  And --

MS. SPINUZZI:  Thanks, Matt.

THE COURT:  -- thank you on the record.  Okay.

MR. ROBINSON:  Of course.

THE COURT:  Okay.  Now, disputed, next: (Reading)

Wholly past violations.  If you find that plaintiffs' claims are based on violations that are wholly in the past and unlikely to reoccur, then you must find in favor of the Defendant.  "Wholly in the past" means conduct that occurred entirely before February 27, 2018, and if there is not -- and if there is not a reasonable likelihood that the Defendant will violate the Clean Water Act in the future."

Your arguments?

MS. SPINUZZI:  The plaintiff has no objection to the "wholly past" instruction.  However, the plaintiff has cumulative objections if that instruction is given under each cause of action in addition to being a general instruction.

THE COURT:  It should be a generalized instruction. It should not be given under each cause of action because it unduly highlights one instruction.

MS. SPINUZZI:  Under the Court's perfectly stated reasoning, the plaintiff would have no objection.

THE COURT:  I'm joking with you only because I've agreed with you.  For either party.

So, counsel, I'm not going to give this instruction under each cause of action.  It's a generalized instruction that applies across the board.  You can argue it, if I gave that redundantly, it unfairly emphasizes one instruction.

So that's -- now, put this back in the stack over there because it's ruled upon and no longer -- put it in the appropriate place.

MS. SPINUZZI:  (Inaudible.)  Thank you.

THE COURT:  Well, that's a (inaudible).  Just put it where you want it.  Okay.

(Court confers with staff.)

THE COURT:  Oh.  Counsel, do you have -- do you want to state your objections to the Court not giving it as to each, you're more than welcome to.

MR. NEACH:  I think we can live with that, Your Honor, and explain it in argument.  Thank you.

THE COURT:  Okay.  The sixth --

(Pause.)

THE COURT: All right. So now, counsel, I think we're moving to the First Cause of Action.

MR. NEACH: Can I take one look at the "wholly past" just to make sure it has (inaudible).

THE COURT: Sure. Go ahead.

(Pause.)

MS. SPINUZZI: Your Honor --

THE COURT: Let's do this one at a time. He wants to look at the "wholly past."

MR. NEACH: Oh. It's good.

THE COURT: Okay. All right.

MS. SPINUZZI: Yeah. Your Honor, before Your Honor stepped out of the courtroom, plaintiff had an instruction on admissions filed in documents. It was part and parcel -- I thought we were going to argue that when you came back. I -- I'm going to --

THE COURT: We'll get to it eventually, but I was going to take a different order, but if you want to argue admissions, fine.

(Pause.)

THE COURT: All right. Then we're still on the record with a running record. This is "Temescal Creek Receives Corona Clay's Storm Water." And the instruction reads:

"Corona Clay has admitted that Temescal Creek

receives its storm water in multiple Storm Water Pollution Prevention Plans and its Notice of Intent to be, permittee under the General Permit that it submitted to the State Board with a certification under the penalty of law that the information in these submittals was correct and true.

"Corona Clay's admission is binding and you must find Corona Clay's statement to be true."

MS. SPINUZZI:  Yes.  We've requested this instruction, and it has also -- this issue has also been briefed in plaintiffs' *Daubert* motion, Docket 267, on docket page 26 starting with line 15.  But I will restate my arguments here for the Court, which is that the Storm Water Pollution Prevention Plans are certified under penalty of perjury.  They're uploaded to the state's SMARTS system.  The notice of intent is also certified under penalty of perjury.  Both of those documents ask the defendant to identify their receiving waters, not their receiving fields, and multiple documents, including the 2015 SWPPP, the 2016 SWPPP, the 2017 SWPPP, the 2019 SWPPP, and their 2014 notice of intent and their 2015 notice of intent all identify the receiving waters of Corona Clay's storm water discharges to be Temescal Wash.

Now, those are binding admissions.  We have cited a variety of precedent for that including *Sierra Club v. Union Oil*.  That's 813 F.2d 1480 at 1492 that -- and that says that in a citizen suit the defendant may not challenge

the accuracy of information concerning their discharges submitted pursuant to the mandatory reporting requirements. Allowing a defendant discharger to impeach its own reports would, quote, (reading) be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve.

Also in our briefing, which I've already cited to and I will incorporate here by reference, we have a string cite to a variety of precedent, and on that basis we are requesting an instruction that the defendant's multiple certified statements under penalty of perjury be a binding judicial admission for purposes of this litigation as well. This also relates to our instruction that "Temescal Creek" be synonymous with "Temescal Wash."  The Court should be able to take judicial notice of the variety of federally approved, USGS surveys, the variety of maps that identify "Temescal Creek" as in fact "Temescal Wash," which the defendant also argued in the first trial.

That's all.

THE COURT:  Defense?

MR. NEACH:  So this instruction might as well be captioned as "Court Entered Directed Verdict," because that's what effectively they're asking for.  Again, they -- well, let me first start: Was the cite I heard to the *Union Oil* case?

MS. SPINUZZI:  Yeah.  There's a few of them, though.

MR. NEACH:  Okay.  No, but that was the one that you quoted from.

So I would -- there's a case *Environmental Protection Information Center v. Pacific Lumber Company*.  It is 430 F.Supp.2d 996, it's from the Northern District of California, it is 2006, and that court engages in a lengthy discussion, including addressing the *Union Oil* case, about why SWPPPs -- which "SWPPP" is "Storm Water Pollution Prevention Plan."  It's a planning document.  It's not -- as this court said -- the *Environmental Protection* court said, it's a document meant for planning; it's not related to past discharges.  And it said the same thing about NOIs.  They are not conclusive admissions.  Not only that, SWPPPs are updated and amended, and this one was amended, and it changed the language.

So it's not an admission along the lines of saying -- I would again point to that case, the *Environmental Protection Information Center* case, that has a very lengthy discussion that SWPPPs are not what plaintiffs are saying they are and neither are NOIs.

THE COURT:  Okay.  Back to the plaintiff?

MS. SPINUZZI:  Yeah.  Your Honor, I would direct the Court back to our briefing on this issue.  We have so

many string cites for this particular issue.  The notice of intent is specifically submitted under penalty of perjury and can only be submitted by the legally responsible person, which in this case is Mr. Craig Deleo, and these are essentially judicially binding admissions similar to RFAs.

THE COURT:  Okay.  Back to the defense?

MR. NEACH:  That same -- these same string-cited cases she's citing are, again, addressed in the Northern District case.  And I recall testimony from Mr. Hacunda in the previous trial -- and I think we're going to hear similar testimony in our case -- that when you fill -- go -- you know, the notice of intent is not a form that's filled out. It is a form that you kind of go on, electronically submit, and you're kind of -- you have to pick something.  It's, like, a pick list -- drop-down box that you pick from.

It -- really, it's the receiving water that is potentially at issue.  That's all that's there.  And again, this is discussed thoroughly in the *Environmental Protection Information Center* case, and I think, if these were as conclusive as RFAs as they are saying, I would have heard about it in their summary judgment briefing.  This feels like kind of a new argument to get out of proving what they need to prove.

MS. SPINUZZI:  We actually -- Your Honor, if I just may briefly respond.

Mr. Neach's statements that there's a drop-down box are false, and in fact, the 2014 NOI has Mr. Deleo's handwriting on it.  And in addition to that, this was previously briefed.  We have cited cases from the Ninth Circuit, the United -- two cases from the Ninth Circuit, the Eleventh Circuit, the Fourth Circuit, the Central District of California, the Northern District of California, the District of Hawaii, the Northern District of Ohio, the Northern District of New Jersey, and the Eastern District of Texas.

THE COURT:  Back to the defense?

MR. NEACH:  I would have to dig into each one of those cases, but I believe, if you go into the analysis, many, if not all, of those cases are not discussing SWPPPs specifically or NOIs specifically.  They are discussing other documents, such as monitoring reports that are turned in, and basically saying you can't impeach your own monitoring basically.  Again, I could do more extensive briefing after reading the Northern District case I cited, but I feel like I've said everything I need to say.

THE COURT:  Back to the plaintiff?

MS. SPINUZZI:  *Save Our Bays and Beaches v. City and County of Honolulu*, 904 F.Supp 1098, pin cite 1138, say it's that because these reports are submitted under the penalty of perjury -- which NOIs are -- they constitute

admissions of noncompliance which bind the defendant.

I have nothing further on this matter.

THE COURT:  Back to the defense?

MR. NEACH:  One moment.  I'm just checking one thing, Your Honor.

(Pause.)

MR. NEACH:  No.  Nothing further, Your Honor.

THE COURT:  Back to the plaintiff?

MS. SPINUZZI:  I'm good.

THE COURT:  Back to the defense?

MR. NEACH:  Oh, we're just going to keep doing this?  Nothing further, Your Honor.

THE COURT:  Okay.

(Pause.)

THE COURT:  All right.  We're going to move -- I think we've got as far now as the First Cause of Action. Okay?

MS. SPINUZZI:  Was the Court going to rule on --

THE COURT:  Now the First Cause of Action and a disagreement concerning the elements, and I'm a little confused as to what your disagreement really is.  You know, let me give these to you both to look at.  It may be easily resolved concerning the elements -- may not be but take them over -- take a look at them informally with each other.

Counsel, come on over here.

MR. NEACH:  Yeah.  I'm coming.

THE COURT:  All right.  Thank you very much.  You can cooperate and join the plaintiffs' counsel.  Because you've only given me one copy; so we're sharing tonight.

(Counsel confer.)

MS. SPINUZZI:  You mind if I --

THE COURT:  No.  We're going to do one at a time (indecipherable).

MS. SPINUZZI:  Your Honor, this -- with respect to the First Cause of Action, this somewhat relates to -- or actually all of these will relate to the plaintiffs' proposed submitted special verdict form, and, you know, first of all, my problem with the defendant's proposal is, of course, that it says -- that it has that *Gwaltney* instruction on mootness, which the Court has already ruled on.  So we can put that aside.

I don't have any problem necessarily with the language of the defendant's first bullet point.  However, I just don't think it really provides the jury with any instruction, really, as to what "BAT," "BCT" really means, and that's why we have proposed this instruction that also would specifically relate to informing the jury on how their findings would impact how they actually fill out the special verdict form.

MR. NEACH:  I think that --

THE COURT:  Well, I'm going to give a -- I'm going to give a special verdict form -- or at least a partial, and I'm still mulling that over.  It's not going to be a general form because I'm really interested in the *Maui* factors, and I'm really interested in what the jury would check off in those particular factors, if they did.  So minimally I know I'm giving a special verdict form in that regard.

MR. NEACH:  Okay.

THE COURT:  Okay.

MR. NEACH:  In that case, I still don't think it's appropriate to have a paragraph that points the jury to answer a particular question on a verdict form, and I think if we -- depending on how the special verdict form looks, right.  So I won't get -- delve into that too deeply.  I feel like our proposed instruction followed what we did in the previous case.  That's all we did, and we dropped out the water piece, and we've already discussed the second piece, which I'm fine getting rid of that.  I'm not really seeing how -- what they're providing is making any clearer -- and actually their instruction doesn't really kind of point to the First Cause of Action.

THE COURT:  Yeah.  I think the two of you could agree on this, quite frankly, with some draftsmanship.  In other words, there's some important things to argue tonight.  This is not one of them.

MR. NEACH:  I -- we've agreed on this one before.

THE COURT:  You two get together --

MS. SPINUZZI:  Yeah.

THE COURT:  -- and call me in a couple minutes. Okay?

MS. SPINUZZI:  I would -- I don't think that's necessary.  I would agree that we can just use what's in defendant's paragraph 1, although we have not --

THE COURT:  (Inaudible.)  Why don't you two draft it quietly.  Show me the disagreement in a couple minutes. In other words, you're reasoning it out in my presence.  See if you can come to an agreement.

MS. SPINUZZI:  I would need the Court --

THE COURT:  You --

MS. SPINUZZI:  I would need --

THE COURT:  -- time, Counsel.

MS. SPINUZZI:  No.  I would need the Court's direction with respect to what the verdict form is going to look like.

THE COURT:  Well, I don't know yet.

MS. SPINUZZI:  Because we don't have the verdict form drafted -- we've submitted proposed verdict forms.  The defendant has not and --

THE COURT:  Well, the defendant's a little late on it now.

MS. SPINUZZI:  Well.

So I have no idea what the verdict form could possibly look like.  What I can tell you is that the version that we drafted does not refer to causes of action because, frankly, there are multiple violations under each cause of action, and we're all going to want the jury to make specific finding on numbers of days of violations and types of violations and all of those things, and so without guidance on what the verdict form is going to look like, it's difficult for me to agree to instructions.

THE COURT:  Okay.

MR. NEACH:  I think we have a special verdict form to work from that we all agreed on previously that was a pretty good model, and I think that they've moved away from that, and I think the one that they just provided was today -- I think -- the most recent -- maybe yesterday.  I can't remember.  There's stuff flying through.  But I think we've already got a guide, and it can be done pretty quickly.

MS. SPINUZZI:  So the facts have changed substantially since the first trial.  Obviously, we're trying two additional causes of action.  In addition to that, the defendant has uploaded different documents to SMARTS, which kind of entirely changes the course of our litigation, and so I don't actually see the verdict form submitted in the first trial as instructive at all because the entire landscape of

this case has changed.

THE COURT:  Okay.  Let me (inaudible).

All right.  The next -- counsel, let me have this.

The next is "Duty to Comply.  Permit holders must comply with all standard conditions of the permit.  Permit noncompliance constitutes a violation of the Clean Water Act and the California Water Code and is grounds for enforcement action and/or removal from permit coverage."

What's the dispute?

MR. NEACH:  I thought you agreed to get rid of that one.

MS. SPINUZZI:  No.

MR. NEACH:  Oh.  I don't know if there's any dispute.

THE COURT:  Then would you put them back in --

MR. NEACH:  That's -- that was --

THE COURT:  Is there any dispute by the defense?

MR. NEACH:  That's from the previous instructions?

MS. SPINUZZI:  Sorry?

MR. NEACH:  Is that --

MS. SPINUZZI:  It is.

MR. NEACH:  Is that dated 10/25/19?

MS. SPINUZZI:  Yeah.  It's from the previous instructions.

THE COURT:  Is there any dispute from the defense?

MR. NEACH:  No, Your Honor.

THE COURT:  Any dispute from the plaintiffs?

MS. SPINUZZI:  No, Your Honor.

THE COURT:  Okay.  (Inaudible.)  I need a cause of action number.  Is this five or --

UNIDENTIFIED SPEAKER:  No.  This is the sampling analysis.

THE COURT:  Okay.  Thanks.

"Sampling and Analysis: Qualifying Storm Events."  Just a moment.

(Pause.)

THE COURT:  I think that the only disagreement between you is the wording -- in what I'm going to call the last paragraph or two paragraphs.  In other words, read the first paragraph.  It's just formatted differently --

MR. NEACH:  Yours is fine.

THE COURT:  -- and then it's the last paragraph in one and two paragraphs in the other.  I think you're saying the same thing but --

MR. NEACH:  Your Honor, I -- they're adding a paragraph.  It's fine.  I'm -- I -- I'll accept that.

MS. SPINUZZI:  Obviously, no objection to that.

THE COURT:  Well, that's good news.  Submitted it, and thank you for (indecipherable) your cooperation.  I'm joking with you.  Okay.

Now, time out.  Let's get rid of the one we're not using so I don't make a mistake.  Good.  And let's put this one back on the table.

Where's my word processor?

MS. SPINUZZI:  Probably processing.

THE COURT:  Processing.

MS. SPINUZZI:  He's actually working on exhibits. I have another associate coming over here.

THE COURT:  Oh, okay.

MR. NEACH:  I mean, to be clear, I was working from the principle that I thought we did a really good job at the first trial so why change the stuff that we did, but that's fine.

THE COURT:  Well, because a lot of your theories have changed.  There are two more causes of action that weren't in the first trial --

MR. NEACH:  Yeah.

THE COURT:  -- and --

UNIDENTIFIED SPEAKER:  The only ones that are left are the causes of action --

THE COURT:  Let's take them.  And let's go from one to, I think, five.

UNIDENTIFIED SPEAKER: Yeah.  I --

THE COURT:  Let's keep them in order, though. Let's -- are we on five?

UNIDENTIFIED SPEAKER:  This is three.

THE COURT:  Five.

All right.  Waterkeeper's Fifth Cause of Action.

(Pause.)

THE COURT:  Okay.  Who submitted this instruction?

UNIDENTIFIED SPEAKER:  Plaintiff.

THE COURT:  Okay.  Just put "Plaintiff" at the top. Thank you so much.  Appreciate it.

(Pause.)

THE COURT:  All right.  Let me begin with plaintiff, and then defendant, and I'll hand you back your respective instructions so you can both argue.

And by the way, I really do need that processed.  I know you're working on exhibits, but I would just suggest to you that, if you can get that processing done, you won't be here as long as --

MS. SPINUZZI:  Which one needs to be processed?

THE COURT:  Well, there was one document the gentleman was processing.  I don't know if he returned it or not.

(Pause.)

MR. NEACH:  Well, for starters, the one that's "Permit Condition XIB. Sampling and Analysis."  I don't think we had an alternative instruction.  I don't think we objected to this one.  So this is fine.

THE COURT: All right. So just a moment. Let me make the record clear what we're referring to, and that is there's no objection to the Permit Condition Sampling and Analysis; is that correct?

MR. NEACH: Correct.

THE COURT: Now -- but now we're into the Fifth Cause of Action, and there was a substantial difference, including the last paragraph in defendant's proposal.

MR. NEACH: Well, paragraph 2 about the wholly past -- the dates -- I'm sorry -- yeah, paragraph 2 -- we've already come -- we've already decided that one is gone but --

THE COURT: Then cross it out.

MR. NEACH: Yeah. That's fine.

THE COURT: (Inaudible.)

In other words, I want to see what your proposal is.

MR. NEACH: That's --

THE COURT: That's it?

MR. NEACH: That's it.

THE COURT: Okay. Let's hear from the plaintiff.

MS. SPINUZZI: Yes. With respect to the Fifth Cause of Action -- which plaintiffs' submitted instruction is Docket 281, page 47 and 48. Again, plaintiff has proposed what we believe is something that can actually

instruct the jury as to what a SWPPP violation is without asking the jury to read the permit, which I think is unreasonable.  And so that has a list of different SWPPP violations that come directly from the permit.

THE COURT:  Are we (inaudible)?

MS. SPINUZZI:  I mean, the SWPPP section is 20 pages.

THE COURT:  (Inaudible.)

MS. SPINUZZI:  And so what we've done is we have limited this to what we intend to prove --

(Pause.)

MS. SPINUZZI:  What we have submitted is the SWPPP requirements that we think are actually relevant in this case and that we intend to prove that we would submit to the jury.

THE COURT:  What happens if I miss one?  In other words, it's -- I agree with you.  It's a lengthy document. What I'm concerned about is that you can argue from the SWPPP document.  I'm really concerned, if I miss one, on appeal -- so you're -- I'm not disagreeing with you.

MS. SPINUZZI:  Yeah.

THE COURT:  Those may be the relevant documents. My fear factor is what happens, though, if we look at that document and we discover on appeal?  We're starting all over again.

MS. SPINUZZI:  Well, I --

THE COURT:  That's why -- you're free to argue from the SWPPP document.  You're free to refer to it.  I'm just a little concerned, I think, terrified that I see you two a third time.  I'm joking with you.

MS. SPINUZZI:  That scares nobody more than me, Your Honor.

THE COURT:  I'm joking with you.

MS. SPINUZZI:  Of course I'll see you again on other cases, but.

I understand the Court's concern, and I think I can assuage and address the Court's concern and --

THE COURT:  Well, you two talk --

MS. SPINUZZI:  If I just may finish.

I doubt that the defendant would appeal that they missed a SWPPP violation in the instruction, that the jury could have found additional violations, and so the only party that would be making that objection would be the plaintiff, and the plaintiff has submitted these instructions and has approved these instructions, and because we're not objecting to these instructions and in fact they are our instructions, I don't think we would have a very successful appeal.

THE COURT:  But does this take away -- first of all, let me say tentatively I think you're right, but does this take away from the jury actually looking at the documents?  They should be looking at the evidence.  You

should be able to argue and point to that portion of the document, regardless of how lengthy it is, and say, you know, "This is what it literally reads."

And this is a pinpoint instruction again, and that's my fear is that -- at least in state court, you know, 24 1/2 years ago, pinpoint instructions were not something I would give, and I've come to federal court with that same concern. And I agree with you. Who would appeal? But not knowing the unknown and with new appellate counsel, potentially -- so let me hear from the defendant.

I think the plaintiffs' points are well taken, but these are the salient point. The problem is they highlight those points.

MR. NEACH: I agree, Your Honor. I think the instruction is --

THE COURT: They specifically point -- but I don't know what you're going to argue, and by the time you're arguing, counsel may be absolutely right.

MR. NEACH: Your Honor, the basic problem with pinpoint instructions like this -- and that's -- when I looked at this, that was kind of just obvious. The problem with a pinpoint instruction like this -- it is coming from the judge, and the judge is pointing the jury to a very specific thing, and that's different than them arguing it, and they've got the permit, and there's other sections of the

permit that are counter to that and that lay out the law a little bit differently, right.  The permit says, you know, "Update as necessary," and that's the -- and that's language we point to and --

(Pause.)

MR. NEACH:  And that's where I'd leave it, Your Honor.  I -- this is so pinpoint, I think it's really inappropriate what they're doing.

MS. SPINUZZI:  I've proposed some red-lines that take out --

THE COURT:  Counsel, have a seat.

MR. NEACH:  Sorry.

THE COURT:  Take a look --

MS. SPINUZZI:  That take out the --

THE COURT:  Counsel --

MS. SPINUZZI:  -- requirement to revise and re-upload a SWPPP.  I don't think we need it.  And so I'm essentially limiting it.  There is a page in the permit which I'm happy to pull to limit it to what is left here, which stops at plaintiffs' proposed instruction, Docket 281, page 47, line 18.  But then again, as with all the causes of action, we would still request that the Court instruct the jury as to how to fill out the verdict form.  So of course we'll have to wait on what that looks like.

MR. NEACH:  Counsel, x'ed out the last lengthy

paragraph but left in the paragraph that direct the jury to go to a particular question on the verdict form.  We'd object to that.  Plaintiffs are still leaving in that --

THE COURT:  First of all, in the instructions I will never direct the jury to go a specific special verdict -- or portion of a special verdict.  I will give them a special verdict form.  But all of the instructions should be contained in instructions, and the problem that I've seen in the past is that oftentimes court starts instructing in a special verdict form.  All my instructions should be in the instructions section.  That's it.  A special verdict form doesn't give instructions.  It gives guidance.  But I have never historically said in an instruction, "Now, with this instruction you should look at special verdict form" -- whatever.  I won't do that.

MR. NEACH:  Okay.  So that's fine.  That's -- but still -- even with taking that paragraph out, there's still -- plaintiffs are still proposing an instruction that's pointing to -- pinpointing to specific aspects of the permit. Again, it's the same problem that I already talked about that, when it comes from the judge, it's not appropriate, and I think that's why we have language in this cause of action that very much track the way we did our causes of action in the last case for the sixth and seventh causes of action, and I think that the way we've done it is appropriate, again,

taking out the second paragraph that refers to the February 27, 2018.

(Pause.)

THE COURT:  Okay.  The Sixth Cause of Action.  Now we're into causes of action, though, that we presided over before.

MR. NEACH:  Correct.

THE COURT:  And I don't have a good memory of the original instructions.  So let me just re-read and see --

(Pause.)

THE COURT:  Well, first of all -- yeah.  Just for -- I would never direct them "You must answer Question 5 of the verdict form as 'yes,'" but that's just -- not substance.

(Pause.)

THE COURT:  Okay.  All right.  Here's plaintiffs' Sixth Cause of Action, I think, that we gave in the first.  Here's defendant's, and then plaintiffs' back on -- so let me give those to you.  Why don't you two look at them for just --

(Pause.  Court conferring regarding organizing and formatting of instructions.)

MS. SPINUZZI:  Your Honor, we have --

THE COURT:  Hold on.  I'm coming back for more argument in just a moment.

MS. SPINUZZI:  We're in agreement.

THE COURT:  Well, you might be on that, but I'm not in agreement with you yet in terms of getting this done because we're staying here until it's done tonight.

(Pause.  Court conferring regarding organizing and formatting of instructions.)

THE COURT:  Okay.  We're at your disposal, and once again, thank you on the record.

All right, counsel.  Let me come back now to -- I believe we were on claim seven.

MS. SPINUZZI:  Claim six.

THE COURT:  My apologies.  Six.

MS. SPINUZZI:  That's okay.

The plaintiff is willing to accept the defendant's proposal, of course with the exception of its second bullet point, which has the *Gwaltney* instruction.  So we're in agreement.

THE COURT:  Agreed by the defense?

MR. NEACH:  Yes.

THE COURT:  Okay.  Do you want to give that to your processor?

UNIDENTIFIED SPEAKER:  I think, Judge, that's later.

THE COURT:  Yeah.  Let's do it later.  We'll do it by the numbers; so they're all out on the table tonight.  Okay?

All right.  What's the next one, (indecipherable)?  Is it seven?

UNIDENTIFIED SPEAKER:  Seven.

THE COURT:  All right.  Jury instruction concerning Seventh Cause of Action, defendant's failure to report as required by the Storm Water Permit in violation of Storm Water Permit and Clean Water Act.  Now, hold on.

(Pause.)

THE COURT:  All right.  Let me turn these back to each of you for just a moment to look at.  Okay?

(Pause.)

THE COURT:  Counsel, we'll be back in about 15 minutes or so.

(Pause in proceedings from 8:32 p.m. to 9:22 p.m.)

THE COURT:  Okay.  Let me just walk through these quickly with you.  Let me just see what we have tonight and then say go home because I know we have some dispute that we want to talk about after (inaudible).

(Pause.)

MS. SPINUZZI:  Your Honor, before I forget, can I (inaudible) trial counsel asked me to ask you if our expert can be present while their expert --

THE COURT:  Oh, absolutely.  Experts for both parties are allowed to listen to another expert.  Absolutely.  That's --

MS. SPINUZZI:  Thank you.

(Pause in proceedings from 9:24 p.m. to 10:08 p.m.)

THE COURT:  Okay.  Let's let you go tonight.  We've got some work to do.  Okay?

MR. NEACH:  I guess we're not going to set the --

THE COURT:  There's no reason for you to watch this.

MR. NEACH:  -- record.

THE COURT:  Well, we'll get to it tonight.  Okay?

MS. SPINUZZI:  Thank you, Your Honor.

THE COURT:  Okay.  Good night.  Thank you very much.

MULTIPLE SPEAKERS:  Thank you, Your Honor.

THE COURT:  Yeah.  Take everything that you don't need off the table.  Okay.  Now, I'll leave these in this so you can trade them around, you can add them at the last moment, we can shuffle them and -- thank you.

MS. SPINUZZI:  Thank you, Your Honor.

THE COURT:  Do you want anything else on the record?

MS. SPINUZZI:  Actually, can I just get some clarification while we're on the record?

THE COURT:  (Inaudible.)

MS. SPINUZZI:  Sorry.

THE COURT:  No.  That's fine.

MS. SPINUZZI:  just to lay out the plan for tomorrow, because I think the plaintiff is pretty much ready to close, but I want to get some clarification.

So tomorrow morning we will read into the record the RFA response; is that correct?

THE COURT:  Now, I'm going to get -- yeah.  I'm going to get my notes.  You have three issues.

MS. SPINUZZI:  Sure.

(Pause.)

THE COURT:  Let me tell you what my summary shows, and then correct me.  Okay?

First, issue one was the issue concerning the qualifying storm event.

MS. SPINUZZI:  Yes.

THE COURT:  Okay.

MS. SPINUZZI:  We've requested an instruction on that.

THE COURT:  And you already agreed.

MS. SPINUZZI:  No.  Well, wait.  Hold on.  Let me clarify.

THE COURT:  (Indecipherable.)

MS. SPINUZZI:  Let me clarify.

THE COURT:  (Indecipherable) you read that into the record.

MS. SPINUZZI:  We did agree on the instruction of

what a "qualifying storm event" is.  There's a different instruction that I emailed that is in dispute on -- that pertains -- remember earlier we had talked about maybe having somebody from the State Water Resources Control Board come down because the response to comments is that there is no design storm standard for best management practices, and that's the instruction that's still in dispute, but that's kind of a separate topic.

THE COURT:  Okay.

MS. SPINUZZI:  Yeah.  So just for the plan for tomorrow would be to read the RFA 68 into the record.

THE COURT:  Right.  And that's under penalty of perjury.

MS. SPINUZZI:  Yes.

THE COURT:  The entire RFA No. 68 is being read.

MS. SPINUZZI:  That's correct.

THE COURT:  Now, that was issue number two.

MS. SPINUZZI:  Okay.

THE COURT:  There was the first issue that we had taken up concerning the -- what was the stipulation?

MS. SPINUZZI:  The photo stipulation?

THE COURT:  Yeah.  It was the qualifying storm event, and that was stipulated to on the record and agreed to.

MR. NEACH:  No, no, no.  No.  There was stipulation

that we did in writing related to the properties, what the -- the parcel maps.  And then there was a stipulation regarding the dates for the photographs.

THE COURT:  Right.  That's number three.  The date for the photograph you've stipulated to -- concerning the photographs.  That's coming through you.  We had the RFP No. 68, which was our second issue.  We had, I thought, the qualifying storm event, which was our first issue.

MR. NEACH:  I can't remember the rankings of the issues.

THE COURT:  That was our first issue.

MS. SPINUZZI:  There is no stipulation with respect to the -- I think what you're referring to as the "qualifying storm event issue" is not about the instruction defining what a "qualifying" --

THE COURT:  Right.

MS. SPINUZZI:  -- "storm event" is.  The issue with relation to the qualifying storm event is that defense counsel has been arguing that the permit only regulates up to a certain size of storm.  Now, we have what we think is the law, which is the permit does not actually put out a design storm standard, i.e., there's no such thing as a -- a size of a storm that the permit covers.  And what we have is the State Water Resources Control Board's response to comments, when they were adopting the permit, that explicitly says:

There is no best management practices design storm standard that equates to compliance with the permit.  In other words, the permit regulates all sizes of storms.

And that's the instruction that I emailed that is still in dispute, and whether it's an instruction or whether we just get the evidence into the record, that's the issue, and there's no stipulation on that.

(Pause.)

THE COURT:  Yeah.  And, counsel, my confusion is I'm wrong.  That was about the title.  That was the first stipulation.  I have that as your first issue.

MS. SPINUZZI:  Yes.

THE COURT:  And that was going to be read by you concerning title.

You were going to read at the beginning of your case what I call "issue number three," which was the stipulation concerning the photographs.

MR. NEACH:  Yes.

THE COURT:  Okay.  And issue number two was the RFP 68.

MR. NEACH:  Right.  RFA.

THE COURT:  Okay.

MR. NEACH:  And I think -- actually what you suggested was the reading of the first stipulation regarding the property would be --

THE COURT:  Right.

MR. NEACH:  -- me and counsel up there together.

THE COURT:  And you would read the third stipulation at the beginning of your case.

MR. NEACH:  Yeah.

THE COURT:  Because it's your evidence you're trying to get in.

MR. NEACH:  Right.

THE COURT:  And the RFP is going to be read by the plaintiffs.

MS. SPINUZZI:  RFA.  Yes.

THE COURT:  Okay.  And so what remains -- what's our issue for tomorrow?

MS. SPINUZZI:  Yeah.  So the outstanding issue is with respect to essentially an instruction on -- I don't know if it's an instruction or if we need to put it into evidence -- that's what I'm seeking the Court's guidance on -- but basically the State Water Board's response to comments indicating that there is no design storm standard in the permit.

THE COURT:  Well, you'd left me in a quandary about that because, when your lead counsel left, the only thing I heard was that you were trying to get somebody down here.

MS. SPINUZZI:  Yeah.  I --

THE COURT:  That's where it was left.

MS. SPINUZZI:  Realistically, that's not going to happen by 8:00 a.m., and so I guess I'm wondering if -- our perspective is that this is the law, that this is not evidence.  So -- but if the Court's opinion is that it's evidence and not the law, then we don't want to close our case until we get this purported evidence, which we argue is the law, in front of the jury.  So that's the clarification that I'm seeking before we close our evidence.

THE COURT:  But is your concern that your witness -- this expert misstated the law?  That's really the concern, isn't it?

MS. SPINUZZI:  Partially.  But the concern is, also, that Mr. Pacheco has repeatedly misstated the law in saying that there -- you know, that the size of the storm somehow excuses noncompliance.  So we're either looking for an instruction or for the Court to take judicial notice and to have that read to the jury of the State Water Board's response to comments.

THE COURT:  Okay.  We'll be back with you in just a moment.

MS. SPINUZZI:  Okay.  Your Honor, I just have one more matter.

THE COURT:  Uh-huh.

MS. SPINUZZI:  This was not brought up earlier, and so I apologize for the late notice in bringing this up to the

Court, but this relates to the issue of timing of the whole case and our -- my clients' ability to collect data and evidence.  We would like the Court to take judicial notice of its prior ruling, which was our summary judgment motion.  The Court's order is Docket No. 55.  We would like the Court to take judicial notice of page 15, where the Court states that the plaintiff need not show -- this would be lines 17 to 21 -- or 22, really, that says, "...under the CWA, a discharging" -- wait.  Sorry.  "To the contrary, Plaintiffs need not show that discharges have reached the body of water in question; under the CWA, a discharging facility's violation of BMPs can be determinative of whether that facility has violated its state permit and the" Clean Water Act.

The reason we would like the Court to take judicial notice of this is because defense counsel has very repeatedly argued that the plaintiff was somehow negligent in our ability to collect evidence, but the Court had a prior ruling that specifically said that we didn't need to prove that factor.

THE COURT:  Okay.

Counsel?  Normally I don't --

MR. NEACH:  I'm not understanding --

THE COURT:  -- I don't instruct on the summary judgment motion.  That's not a -- this only an issue

concerning materiality -- material issues of fact --

MR. NEACH:  It's the --

THE COURT:  -- that go to the jury but --

MR. NEACH:  It's a prior statement of law is what it sounds like to me.  I don't think it's appropriate for judicial notice, and I'm not sure, after the appeal and everything else, it's particularly pertinent, especially given that the summary judgment ruling was incorporated into a judgment which was then vacated by the Ninth Circuit.  So I'm not sure it's appropriate there.

I'm also not seeing the connection.  I mean, look, they had a cause of action -- the Second Cause of Action that had -- that was in place for the first trial that had to do with impact on the receiving water.  So the issue of water being impacted by discharges from Corona Clay was always there, always there in the first trial.  So we came back to this one, and it clearly was there because the Ninth Circuit said, "You need the jurisdictional discharge."  So I'm not seeing the need for this, and I'm not seeing, even, the connection between the two.

MS. SPINUZZI:  May I respond?

THE COURT:  Please.

MS. SPINUZZI:  The plaintiff is being prejudiced here by defense counsel's arguments that are entirely and exclusively related to the discovery process, which the jury

may or may not know anything about, and essentially it has been argued by defense counsel that plaintiff is at fault for following, essentially, the Court's prior ruling, which I understand has been overruled -- we acknowledge that -- but it's substantially prejudicing us in front of the jury.

In addition to that, the discovery process, which allows us inspections under Rule 34, and only allows us one, and it has to be during the discovery window, which both in 2019 and 2022 has been mostly during the summer, it's obviously very, very difficult for us to collect evidence during the discovery period with the cooperation of counsel, which you can imagine has been very difficult for us, and now we're substantially prejudiced by this argument that we haven't done enough, and I'm just seeking to correct that or ameliorate that by pointing out to the jury the Court's prior ruling that the plaintiffs need not prove a discharge.  Of course, we understand the Ninth Circuit's ruling, and, you know, the jury will be instructed on the requirement to show a discharge now so that's clearly not in dispute.

THE COURT:  Okay.

MS. SPINUZZI:  Thank you.

THE COURT:  Uh-huh.

MR. NEACH:  I got the sense that there was some suggestion of lack of cooperation.  So they did do a property inspection request.  They did a formal one, and set it for a

date, I believe, of April 15th, and in their inspection request, they always put in a request that says, "Hey, by the way, we want to do this sort of wet weather inspection so" -- and obviously, you know, they don't know it's going to rain three weeks ahead.  So they kind of say, "Hey, so we want to" -- you know, "24 hours, and we'll come get you," and we -- you know, we objected to it and said, you know, "I'm not a fireman.  I'm not going to go jumping out" -- you know, "jumping out of my house because you think it's going to rain tomorrow, but, Hey, you know, we'll talk about it."

So that's exactly what happened.  That was March 24th.  We got notice from them, and they said, "Hey, we want to come to the property on April 15th, but it's supposed to rain on Monday.  We'd like to come."  We let them come. We -- that's when -- actually when Mr. Moreno came.  And they actually said, "Well, we want to come up to the driveway." So there's been no lack of cooperation on our part allowing them to do this.  So I'm not quite sure I'm following that argument and that suggestion.

Also, in terms of how their ability to get discovery was impacted by the Court's summary judgment ruling, the Court's summary judgment ruling came out in June of '19.  I think discovery was either closed or practically closed.  They had a -- you know, what did we say? I think we said April of '18 through about May of '19 to do

whatever they wanted to do in terms of inspections.  They did one on a sunny day; never heard from them again.

So I'm not quite sure -- I'm, again, not -- I'm just not getting the reason for this particular passage of the Court's ruling when they've always been -- by their own pleading -- by their own pleading the first time around, they knew they had to prove -- one of their causes of action -- that discharges reached the receiving water.  That's their Second Cause of Action.  And of course they knew it around this time too.  So I'm -- just -- I think it's inappropriate.

THE COURT:  Counsel?

MS. SPINUZZI:  I mean, frankly, we were not aware that it was actually a disputed fact until the last trial because they had admitted it so many times in so many documents and were so close to the creek that we, frankly, didn't see it as an issue.  Obviously, we understand that obligation very well at this point in time.

I do want to acknowledge that we did try to do a rain inspection.  Mr. Neach was compliant in his obligations under Rule 34 for that single inspection, and it was raining in Orange County, and by the time we got out to Corona, there was no rain, and it didn't rain again until -- I think the day we started trial, last Tuesday, was our last really significant event.  We've had some drizzles in between now and then.  So it's been difficult.

THE COURT:  Counsel?

MR. NEACH:  I don't have anything further, Your Honor.

THE COURT:  Counsel?

MS. SPINUZZI:  I'm good.  Thanks.

THE COURT:  Okay.  We'll be back with you in a few moments.

(Pause in proceedings from 10:24 p.m. to 10:29 p.m.)

THE COURT:  Okay.  Well, we'll go back on the record, and I'll simply say that we have -- it's about 10:30. We have some more work to do tonight, and I'll address your arguments at 7:30 tomorrow.  You're ordered in at that time.

MS. SPINUZZI:  Thank you.

THE COURT:  Okay.  Good night.

MR. NEACH:  7:30?  Oh, I thought there was a 7:00 o'clock exhibit thing?

THE COURT:  7:30.

MR. NEACH:  Okay.

THE COURT:  Thank you.  Good night.

(Proceedings adjourned at 10:29 p.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Julie Messa                    November 5, 2024
Julie Messa, CET\*\*D-403            Date
Transcriber