**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

INLAND EMPIRE WATERKEEPER, a project of Orange County Coastkeeper; ORANGE COUNTY COASTKEEPER, a California non-profit corporation,

*Plaintiffs - Appellees*,

v.

CORONA CLAY COMPANY, a California corporation,

*Defendant - Appellant*.

No. 24-6090

D.C. No. 8:18-cv-00333-DOC-DFM

ORDER AND AMENDED OPINION

INLAND EMPIRE WATERKEEPER; ORANGE COUNTY COASTKEEPER,

*Plaintiffs - Appellants*,

v.

CORONA CLAY COMPANY,

*Defendant - Appellee*.

No. 24-6199

D.C. No. 8:18-cv-00333-DOC-DFM

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted August 11, 2025
Pasadena, California

Filed August 5, 2026
Amended September 3, 2026

Before: Jacqueline H. Nguyen, Danielle J. Forrest, and
Lawrence VanDyke, Circuit Judges.

Order;
Opinion by Judge Forrest


**SUMMARY***

**Environmental Law**

The panel reversed the district court's order denying defendant's motion for a new trial in a citizen suit under the Clean Water Act and remanded for further proceedings on the question of whether Temescal Creek in California is a "water of the United States" subject to regulation under the Act.

Plaintiffs sued defendant Corona Clay Co. for violating certain stormwater-permit requirements related to its clay-


* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

recycling activities conducted near Temescal Creek. Corona defended by arguing that it had not discharged any pollutants into the creek. The case went to trial, with a verdict in favor of Corona. On appeal, this court reversed for a new trial in part because in an intervening decision the Supreme Court had held that indirect discharges are covered by the Clean Water Act if they are the "functional equivalent" of a direct discharge. On remand, the district court conducted a second trial, at which plaintiffs prevailed. Not long after, the Supreme Court decided *Sackett v. EPA*, 598 U.S. 651 (2023), which narrowed what constitutes "water of the United States" under the Act. The district court denied Corona's alternative motions to dismiss for lack of subject-matter jurisdiction or for relief under Federal Rule of Civil Procedure 59.

The panel concluded that whether a case brought under the Clean Water Act involves a water of the United States is a merits question, not a question of jurisdiction. The panel therefore affirmed the district court's denial of Corona's post-judgment motion to dismiss for lack of subject-matter jurisdiction.

Given the change announced in *Sackett* concerning the scope of the Clean Water Act, however, the panel concluded that a new trial was required under Rule 59 even though Corona did not dispute in either previous trial that Temescal Creek is a water of the United States. The panel held that when there is an intervening change in law that renders a previously foreclosed and bypassed issue viable, a new trial may be warranted where the court retains jurisdiction over the case and the issue is raised at the earliest opportunity. Those circumstances were present here. And on the present record, the panel could not determine in the first instance whether Temescal Creek satisfies the new

standard set forth in *Sackett*. Accordingly, the panel remanded for further proceedings for Corona to litigate whether, under *Sackett*, the Clean Water Act applies to Temescal Creek.

---

## COUNSEL

Christopher Sproul (argued), Environmental Advocates, San Francisco, California; Sarah Spinuzzi, Orange County Coastkeeper, Costa Mesa, California; Jennifer F. Novak and Megan S. Meadows, Law Office of Jennifer F. Novak, Rancho Palos Verdes, California; for Plaintiffs-Appellees.

Nadia A. Sarkis (argued) and Kelly S. Delvac, Miller Barondess LLP, Los Angeles, California; Brian Neach, Law Offices of Brian Neach, Fountain Valley, California; for Defendant-Appellant.

---

## ORDER

The mandate is recalled. *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir. 1988). Recall is warranted to clarify a legal standard. *Contrast Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 65 (1987), *with Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 89–91 (1998). The opinion filed on August 5, 2026, Dkt. 49, is hereby amended. The amended opinion will be filed concurrently with this order. No petitions for rehearing or rehearing en banc shall be permitted. This order shall constitute the mandate of this Court.

On page 18 of the previously issued slip opinion, lines 8–11 are amended to delete the following language: "And in interpreting § 1365(a), the Supreme Court has held that 'a good-faith allegation' of the elements of a citizen-suit claim is sufficient to confer subject-matter jurisdiction over the action. *Gwaltney*, 484 U.S. at 65." Line 14 of the same page is amended to delete "*Id.* at 64" and add "*Gwaltney*, 484 U.S. at 64."

## OPINION

FORREST, Circuit Judge:

The law governing this case has undergone significant change in recent years. This appeal is the latest installment of what must now feel to the parties—and the district court—like an endless chain novel. Reluctantly, we conclude that the saga requires another chapter.

Inland Empire Waterkeeper and Orange County Coastkeeper (Plaintiffs) sued Defendant Corona Clay Company for violating certain stormwater-permit requirements related to its clay-recycling activities conducted near Temescal Creek[1] in California. Corona defended against Plaintiffs' claims primarily by arguing that it had not discharged any pollutants into the creek. The case went to trial, with a verdict in favor of Corona. On appeal, we reversed for a new trial in part because in an intervening

[1] Throughout the record, the parties, district court, and public maps and documents use "Temescal Creek" and "Temescal Wash" interchangeably to refer to the geological feature at issue in this case. By utilizing the title "Temescal Creek," we do not take any position on the feature's classification as a water of the United States.

decision the Supreme Court had held that indirect discharges are covered by the Clean Water Act if they are the "functional equivalent" of a direct discharge, which was a departure from the prior rule that discharges need only be "fairly traceable from the point source." *See Inland Empire Waterkeeper v. Corona Clay Co.* (*Inland Empire I*), 17 F.4th 825, 836 (9th Cir. 2021) (discussing *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165 (2020)).

Following our direction, the district court conducted a second trial. This time, Plaintiffs prevailed. Not long after, the law shifted again. The Supreme Court decided *Sackett v. EPA*, 598 U.S. 651 (2023), which narrowed what constitutes a "water of the United States" subject to regulation under the Clean Water Act. After *Sackett* was announced, Corona moved to dismiss for lack of subject-matter jurisdiction, arguing for the first time that Temescal Creek is not a water of the United States. Alternatively, Corona moved for a new trial so that the issue of whether the creek is covered by the Clean Water Act could be litigated.

Because we conclude that whether a case brought under the Clean Water Act involves a water of the United States is a merits question, not a question of jurisdiction, we affirm the district court's denial of Corona's motion to dismiss. But given the change announced in *Sackett* concerning the scope of the Clean Water Act, we once again conclude that a new trial is required. Though Plaintiffs and the district court are correct that issues not litigated before judgment is entered in the district court generally cannot be raised thereafter, we do not expect parties to raise issues that are foreclosed under governing law. And when there is an intervening change in law that renders a previously foreclosed and bypassed issue viable, a new trial may be warranted where the court retains jurisdiction over the case and the issue is raised at the earliest

opportunity. Those circumstances are present here. So, we conclude that we must yet again remand for further proceedings so Corona may litigate whether the Clean Water Act applies to Temescal Creek.

## BACKGROUND

### A. Clean Water Act

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act primarily prohibits the discharge of any pollutant from a point source to navigable waters, defined as "waters of the United States," except as authorized by a permit. *See* 33 U.S.C. §§ 1311(a), 1362(7), (12).

#### 1. "Waters of the United States"

Interpreting "waters of the United States" as coextensive with "navigable waters" has troubled the executive branch and courts for decades. The concept of navigable waters has been long tied to Congress's Interstate Commerce Power and was understood to refer only to waters that were "navigable in fact," or which could reasonably be made so, such that they were or could be used for interstate trade or travel. *E.g.*, *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563 (1870). But in the Clean Water Act, Congress "uses the phrase 'navigable waters' as a *defined* term." *Rapanos v. United States*, 547 U.S. 715, 730 (2006) (plurality) (citing 33 U.S.C. § 1362(7)). And because the Act regulates more waters than those useful for interstate commerce, courts generally have agreed that waters of the United States, as used in the Clean Water Act, encompasses more than traditionally navigable waters. *Id.* at 731. Discerning which waters come within the

scope of the Act, beyond those that were traditionally navigable, has generated significant disagreement.

In *Rapanos*, the Supreme Court fractured over whether wetlands noncontiguous to traditionally navigable waterways were covered by the Act. A four-justice plurality held that "waters of the United States" means "only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes. The phrase does not include channels through which water flows intermittently or ephemerally . . . ." *Id.* at 739 (plurality) (citation modified). The plurality carefully distinguished between ephemeral channels, which it concluded were not covered, and seasonal streams, which it concluded were covered. *Id.* at 732 n.5 ("Common sense and common usage distinguish between a wash and seasonal river."). Thus, under the plurality's test, wetlands were protected only if they had "a continuous surface connection to bodies that are 'waters of the United States' in their own right." *Id.* at 742.

Justice Kennedy concurred in the judgment. *Id.* at 758. He reasoned that "[w]hen the [government] seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction," but it "must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." *Id.* at 782.

We held that Justice Kennedy's opinion controlled because it was the narrowest ground of decision. *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). In *United States v. Moses*, we further

recognized that "a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States." 496 F.3d 984, 989 (9th Cir. 2007). In reaching this decision, we relied both on our prior precedent and on every opinion in *Rapanos*—the plurality, Justice Kennedy's concurrence, and Justice Stevens's dissent. *See id.* at 989–91 (holding that "the Supreme Court unanimously agreed that intermittent streams (at least those that are seasonal) can be waters of the United States").

The agencies responsible for administering the Clean Water Act—the Environmental Protection Agency (EPA) and the Army Corps of Engineers (Corps)—promulgated several interpretive rules after *Rapanos*. In 2015, the agencies adopted Justice Kennedy's "significant nexus" test. *See* 80 Fed. Reg. 37054, 37060–61, 37104–05 (2015). But five years later, in 2020, the agencies redefined waters of the United States consistent with the plurality's test. *See* 85 Fed. Reg. 22250, 22340 (2020). The 2020 regulations were short-lived. The agencies withdrew them in 2023 and re-adopted the "significant nexus" test. 88 Fed. Reg. 3004, 3142–44 (2023). Notably, however, under each version of the regulations, tributaries of traditionally navigable waters were expressly covered, although with slight definitional variations. *See* 80 Fed. Reg. at 37104, 37105–06; 85 Fed. Reg. at 22340, 22341; 88 Fed. Reg. at 3142.

In 2023, the Supreme Court stepped in again and conclusively resolved the question. In *Sackett*, the Court adopted the *Rapanos* plurality's test and rejected Justice Kennedy's approach. 598 U.S. at 671. The Court held that "waters of the United States" includes "only those relatively permanent, standing or continuously flowing bodies of water forming geographical features that are described in ordinary

parlance as streams, oceans, rivers, and lakes." *Id.* (citation modified).

**2. Permitting and Enforcement**

There are two primary types of permits issued under the Clean Water Act: National Pollutant Discharge Elimination System (NPDES) permits, which are issued by the EPA, *see* 33 U.S.C. § 1342, and dredge-and-fill permits, which are issued by the Corps, *id.* § 1344. Only NPDES permits are relevant here.

A NPDES permit is required for stormwater discharges "associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B); *see also* 40 C.F.R. § 122.26(b)(14) ("Storm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant."). The EPA may delegate NPDES-permitting authority to states, 33 U.S.C. § 1342(b), and it has delegated such authority to California, *see Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1198–99 (9th Cir. 2013). General NPDES permits may issue to govern a variety of discharges by area and type of discharge. 40 C.F.R. § 122.28(a). NPDES permits use a combination of technology-based and water-quality-based effluent limitations. 33 U.S.C. § 1311(b)(1)(A)–(C); *see City & County of San Francisco v. EPA*, 604 U.S. 334, 340–41 (2025). Technology-based discharge limitations take several forms, including "the best conventional pollutant control technology (BCT)" for conventional pollutants and "the best available technology economically achievable (BAT)" for toxic pollutants. 40 C.F.R. § 125.3(a)(2).

Beyond discharge limitations, NPDES permits impose a variety of other conditions. *See* 33 U.S.C. § 1342(a)(1) ("[T]he [EPA] may . . . issue a permit for the discharge of any pollutant . . . upon condition that such discharge will meet either (A) all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the [EPA] determines are necessary to carry out the provisions of this chapter."); *see also id.* § 1342(a)(3) (applying the same conditions to permits issued by states). For example, permittees must maintain records, file reports, monitor for discharges, and conduct sampling, among other things. *See* 33 U.S.C. §§ 1318(a)(4)(A), 1342(a)(2); 40 C.F.R. § 122.41(j), (l). And stormwater permits require "[t]he discharger to conduct an annual inspection of the facility site to identify areas contributing to a storm water discharge associated with industrial activity and evaluate whether measures to reduce pollutant loadings identified in a storm water pollution prevention plan [(SWPPP)] are adequate and properly implemented." 40 C.F.R. § 122.44(i)(4)(i).

States and the federal government have primary enforcement authority for unlawful discharges and permit violations. *See* 33 U.S.C. § 1319(a)–(c) (authorizing administrative, civil, and criminal enforcement). But Congress also provided for private enforcement: "any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter." *Id.* § 1365(a)(1) (citation modified). Before filing a citizen suit, a plaintiff must provide the EPA, the relevant state, and the alleged violator with 60-day notice of its intent to sue. *Id.* at § 1365(b)(1)(A). The Act mandates civil penalties for

specific violations, subject to a per-day cap depending on the application of enumerated factors. *See id.* § 1319(d); 40 C.F.R. § 19.4, tbl. 1 (2023) (adjusting for inflation); *see also* Pub. L. No. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461, Statutory Note).

### B. This Lawsuit

#### 1. Corona's NPDES Permit Violations

Corona annually recycles approximately 20,000 tons of clay products at a facility in Corona, California. Corona's facility is near Temescal Creek—a 22-mile stream connecting Lake Elsinore and the Santa Ana River. When it rains, Corona's facility discharges stormwater that reaches Temescal Creek.

The California Water Resources Control Board has issued an Industrial General Permit (General Permit) for stormwater discharges from all covered facilities throughout the state. To receive coverage under this General Permit, a discharger must submit a Notice of Intent. The General Permit requires dischargers to implement best management practices to comply with both BAT and BCT requirements "to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." Dischargers must also develop "a site-specific SWPPP," which must include a list of industrial materials, a description and assessment of potential pollutant sources, a description of best management practices, a monitoring-implementation plan, and an annual evaluation. Each of these components is described in detail in the General Permit. The General Permit also requires sampling, continual reporting if a discharge occurs, and annual reporting.

In 2014, Corona submitted a Notice of Intent and obtained coverage under the General Permit for stormwater discharges. Between 2015 and 2017, California regulators issued Corona several permit-violation notices, but they did not bring an enforcement action against Corona. Inland Empire Waterkeeper issued notice of its intent to bring a citizen suit, and along with Orange County Coastkeeper filed this lawsuit in 2018.

### 2. First Trial

Plaintiffs' operative complaint alleged seven claims, ranging from unlawful discharges to violation of the procedural monitoring and reporting requirements imposed by the General Permit. Relevant here, Claim One alleged that Corona failed to implement best management practices that achieve BAT or BCT. *See Inland Empire I*, 17 F.4th at 830. Claim Two alleged permit violations arising from discharge of polluted stormwater. *Id.* Claim Five alleged that Corona failed to implement a SWPPP. *Id.* Claim Six alleged that Corona failed to adequately monitor its facility. *Id.* And Claim Seven alleged that Corona failed to submit accurate reporting. *Id.*[2]

The district court granted in part Plaintiffs' motion for summary judgment on Claims One and Five but denied their motion on Claims Two, Six, and Seven. *Id.* The case proceeded to trial on the latter set of claims, and the district court instructed the jury that to prevail on its claimed discharge, monitoring, and reporting violations, "[Plaintiffs] must prove either a forbidden discharge after the complaint was filed, or a reasonable likelihood that discharge

---

[2] Plaintiffs voluntarily dismissed Claims Three and Four. *Inland Empire I*, 17 F.4th at 830.

violations would thereafter recur." *Id.* The jury found in favor of Corona on each claim, and Plaintiffs appealed. *Id.* at 831.

In the first appeal, we held that Plaintiffs had standing to pursue the claims that went to trial. *Id.* at 832–35. We also held that the district court erred by instructing the jury that "an ongoing *discharge* violation [w]as a prerequisite to a [Clean Water Act] citizen suit asserting ongoing monitoring and reporting violations." *Id.* at 835. We reasoned that while *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49 (1987), interpreted § 1365(a) of the Clean Water Act as requiring an ongoing violation, neither it nor the statutory text required that claims "alleging reporting or monitoring violations . . . be premised on ongoing or reasonably likely *discharge* violations." *Inland Empire I*, 17 F.4th at 835. *Gwaltney* concerned only discharge violations, not procedural violations. *See* 484 U.S. at 52–56. Accordingly, we vacated the jury's verdict and remanded Plaintiffs' monitoring and reporting claims. *Inland Empire I*, 17 F.4th at 836–38.

We also observed that after trial the Supreme Court decided *County of Maui*, in which it held that even indirect discharges are covered by the Clean Water Act if they are the "functional equivalent" of a direct discharge. *Inland Empire I*, 17 F.4th at 836. We concluded that *County of Maui* was an intervening change in law that "affected not only the jury instructions, but also the partial summary judgment." *Id.* Accordingly, we also remanded for the district court to apply *County of Maui* to the remaining discharge claims. *Id.* at 836–37.

### 3. Second Trial

On remand, Plaintiffs sought summary judgment on their First, Fifth, Sixth, and Seventh claims. The district court denied summary judgment, reasoning that whether the discharges were functionally equivalent to a direct discharge was best left for the jury to decide because the parties had presented competing evidence concerning whether stormwater runoff from Corona's facility reached Temescal Creek. Notably, Corona conceded the following facts: (1) the Santa Ana River is traditionally navigable water and therefore a water of the United States, (2) Temescal Creek is a tributary of the Santa Ana River, and (3) Temescal Creek is a water of the United States. It did not concede that Temescal Creek is a relatively permanent water feature, but it also did not directly dispute that fact.

Plaintiffs voluntarily dismissed Claim Two, the last remaining claim alleging an actual discharge of stormwater, leaving only their asserted procedural permit violations for retrial. At the second trial, consistent with Corona's stipulation, the district court instructed the jury that "Temescal Creek is a water of the United States." The jury found that Corona committed a direct discharge or the functional equivalent thereof "into waters of the United States." It also found that Corona failed to implement best management practices by not using BCT or BAT to control stormwater discharges, failed to develop or implement a SWPPP that complied with the General Permit, and failed to comply with its monitoring and reporting obligations under the General Permit. In total, the jury found 12,541 violations of the Clean Water Act.

#### 4. Post-Trial Proceedings

Roughly six months after the jury's verdict, the Supreme Court decided *Sackett*. As explained, it held that "waters of the United States" refers only to relatively permanent waterbodies—like streams, oceans, rivers, and lakes—and it rejected Justice Kennedy's significant-nexus test from *Rapanos*. *Sackett,* 598 U.S. at 671, 679–80. Relying on *Sackett*, Corona moved to dismiss for lack of subject-matter jurisdiction, arguing for the first time that Temescal Creek is not a water of the United States. The district court denied Corona's motion, holding that "the term 'jurisdiction' in the [Clean Water Act] context refers to statutory jurisdiction, or the bodies of water where the [Act] can be enforced, not subject-matter jurisdiction." The district court then assessed over $1.8 million in penalties against Corona for the violations found by the jury.

After final judgment was entered, Corona once again moved for a new trial, arguing that Temescal Creek is not a water of the United States under *Sackett*. The district court also denied this motion. It first concluded that Federal Rule of Civil Procedure 59(a) does permit a new trial based on intervening law, but not as to an unlitigated issue, and "whether Temescal Creek is a [water of the United States] was never presented to the jury at the [second] trial." Second, the district court concluded that relief was not warranted under Rule 59(e) because Plaintiffs had argued throughout the proceedings and presented evidence that Temescal Creek was a water of the United States under the *Rapanos* plurality's test that *Sackett* adopted and Corona had conceded that Temescal Creek was a tributary of the Santa

Ana River and did not dispute legal arguments relevant to this question. Corona timely appealed.[3]

## DISCUSSION

The district court was correct that Corona did not dispute in either previous trial that Temescal Creek is a water of the United States. Ordinarily, we treat issues not raised before verdict is entered as forfeited. *See Doi v. Halekulani Corp.*, 276 F.3d 1131, 1140 (9th Cir. 2002). To escape that result, Corona presses two exceptions. First, that the district court lacked subject-matter jurisdiction because the Clean Water Act violations asserted against Corona did not involve any waters of the United States. And second, that even if this requirement is not jurisdictional, *Sackett* was an intervening change in law that warrants post-trial relief under Federal Rule of Civil Procedure 59. We address both contentions.

### A. Subject-Matter Jurisdiction

Subject-matter jurisdiction "involves a court's power to hear a case," so it "can never be forfeited or waived." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). The party asserting federal jurisdiction must establish that it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Parties cannot consent to subject-matter jurisdiction and "principles of estoppel do not apply." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

---

[3] Corona's arguments on appeal focus on two main issues. First, whether Temescal Creek is a water of the United States. And second, whether the penalties the district court imposed on it were excessive. Because we conclude that further proceedings are required based on the changed definition of "waters of the United States," we do not reach whether the remedies that the district court issued were proper.

According to Corona, subject-matter jurisdiction exists here only if Temescal Creek is a water of the United States. We reject Corona's premise. The Supreme Court has repeatedly observed that "[j]urisdiction . . . is a word of many, too many, meanings." *Arbaugh*, 546 U.S. at 510 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). "Because jurisdictional rules have a unique capacity to disrupt the orderly adjudication of disputes," the Court has cautioned that a statutory requirement should be treated as truly jurisdictional only when "Congress has clearly signaled that the rule is meant to have that status." *Riley v. Bondi*, 606 U.S. 259, 274 (2025). This signal must be "exceedingly strong." *Id.* Such a signal may exist where the statute references jurisdiction or includes language "demarcat[ing] a court's power." *Id.* (alteration in original) (quoting *Harrow v. Dep't of Def.*, 601 U.S. 480, 484 (2024)).

The Clean Water Act does not strongly signal that involvement of waters of the United States is necessary for a court to have *power* to hear a citizen suit bought under this statute. Unlike the parties—who hardly mention the Act itself—we start with the statutory text. Section 1365 creates a private right of action to enforce the Act. It provides that "any citizen" can sue "any person . . . who is alleged to be in violation of [] an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1)(A). District courts are vested with jurisdiction "to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties . . . ." *Id.* § 1365(a); *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under [federal law]."). For purposes of the citizen-suit provision, "effluent standard or limitation" means "an unlawful act" under § 1311(a)—i.e. the discharge of a pollutant from a point source to waters of the United

States without a permit—and "a [NPDES] permit or condition of a [NPDES] permit," among other things. *Id.* § 1365(f)(1), (f)(7).

Nothing in the text suggests that Congress intended the necessary elements of a citizen-suit claim to be jurisdictional. It is not the case that "citizen-plaintiffs must prove their allegations" under § 1365(a) "before jurisdiction attaches." *Gwaltney*, 484 U.S. at 64. Nor does anything in the statute dictate that citizen-plaintiffs must prove their allegations for jurisdiction to continue. In this case, the claims presented at the second trial alleged, per § 1365(a)(1) and (f)(7), that Corona violated the General Permit in various ways. The district court had subject-matter jurisdiction over this dispute, regardless of whether Temescal Creek is proven to be a water of the United States.

Indeed, we have previously rejected the same argument that Corona now advances. In *San Francisco Baykeeper v. Cargill Salt Division*, we observed that "[s]ome confusion has been caused by the fact that we and the parties have from time to time referred to the issue in this case as whether the Pond is within the 'jurisdiction' of the [Clean Water Act]." 481 F.3d 700, 709 n.9 (9th Cir. 2007). "A better statement of the issue would be whether the Pond is within the coverage of the [Act]." *Id.* We made clear that "the 'jurisdiction' of the [Clean Water Act] has nothing to do with the jurisdiction of this court;" rather, the plaintiff's "complaint alleged that [the defendant] had violated the [Act] by discharging pollutants into the waters of the United States," and "that colorable allegation clearly gave the district court jurisdiction over the case . . . ." *Id.* (citing 33 U.S.C. § 1365(a); 28 U.S.C. § 1331); *see id.* ("[The plaintiff's] failure to establish that [the defendant's] Pond was a water of the United States is a failure to make out a

case, not a failure to establish the jurisdiction of the court.”). We are bound by *Cargill Salt*.

Corona’s counterarguments are unpersuasive. First, it asserts that the Supreme Court has repeatedly held that “waters of the United States” is a requirement for subject-matter jurisdiction. Not so. Every major Supreme Court case interpreting “waters of the United States” has used the word “jurisdiction” to refer only to federal and state regulatory authority or the waters covered by the Clean Water Act. *E.g.*, *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135 (1985) (referring to “bodies of water over which the Corps has jurisdiction”); *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng’rs*, 531 U.S. 159, 168 (2001) (rejecting the Corps’ claim of “jurisdiction” over “ponds that are not adjacent to open water” (emphasis removed)); *Rapanos*, 547 U.S. at 731 (plurality) (“[T]he [Clean Water Act] authorizes federal jurisdiction only over ‘waters.’”); *Sackett*, 598 U.S. at 664–69 (discussing the EPA’s and the Corps’ historical understanding of their “jurisdiction”). These cases do not so much as hint that the involvement or non-involvement of waters of the United States dictates subject-matter jurisdiction.

Second, Corona suggests that we previously held in this case that the involvement of waters of the United States is a subject-matter jurisdiction requirement, and accordingly, we are bound by the law-of-the-case doctrine to reach the same result. “The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.” *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (citation modified). That is, “courts generally . . . refuse to reopen what has been decided.” *Id.* at 245 (citation modified). But this doctrine “applies only where

'the issue in question' was 'decided explicitly or by necessary implication in the previous disposition.'" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 47 (9th Cir. 2025) (quoting *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007)).

In the first appeal in this case, we rejected the district court's holding that a citizen-suit "alleging monitoring and reporting violations can only lie if there are also current forbidden discharges." *Inland Empire I*, 17 F.4th at 836. While we also stated that the Act "vests district courts with jurisdiction over a citizen suit only upon proof of discharge into the navigable waters of the United States," we did not explain in what capacity we used the term "jurisdiction." *See id.* And as noted, it is well-recognized that this term has multiple meanings. *Arbaugh*, 546 U.S. at 510. Where our opinion can just as easily be read as establishing that "proof of discharge into the navigable waters of the United States" is necessary to trigger liability under the Clean Water Act, Corona is incorrect that the law-of-the-case doctrine binds us to its preferred reading of a statement made only in passing in our prior opinion. *See Trent v. Valley Elec. Ass'n*, 195 F.3d 534, 537 (9th Cir. 1999) (observing that the law-of-the-case doctrine extends only to those aspects of the prior decision that were part of "a decision on the merits"). Accordingly, we conclude that the district court had subject matter jurisdiction over this case.

### B. Post-Trial Relief

Corona also argues that it is entitled to a new trial under Rule 59(a) or an amended judgment under Rule 59(e) because *Sackett*'s adoption of the *Rapanos* plurality's standard for determining what is a water of the United States was an intervening change in the law. A new trial may be

granted under Rule 59(a) "on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). One such ground is where "the trial was not fair" to the moving party due to "substantial errors in . . . instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also* 11 *Wright & Miller's Federal Prac.& Proc.* § 2805 (3d ed. 2025) ("The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice."). Under Rule 59(e), a district court may alter or amend its orders and judgments when "interests of finality and conservation of judicial resources" justify such an "extraordinary remedy." *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (quoting *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (per curiam)). Both a motion for a new trial and a motion to alter or amend a judgment must be filed within 28 days of entry of judgment. Fed. R. Civ. P. 59(b), (e); *see also* Fed. R. Civ. P. 6(b)(2) (prohibiting extension of the deadline).[4]

We review the denial of a Rule 59 motion for abuse of discretion. *See Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 886 (9th Cir. 2002); *Wood*, 759 F.3d at 1121. The district court "abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (citation modified). We reverse only if the asserted error affects the party's substantial rights. Fed. R.

[4] Plaintiffs assert that Corona failed to file its motion within 28 days of entry of judgment because the district court concluded that Temescal Creek was a "water of the United States" in its second summary-judgment order. We disagree. Rule 59's time limits are based off entry of "judgment," which was not entered until after the second trial.

Civ. P. 61. Though the typical corrective for "an intervening change in controlling law is . . . amendment of the judgment, rather than a new trial," *LiButti v. United States*, 178 F.3d 114, 119 (2d Cir. 1999), a new trial may be warranted when the change in law relates to a question of fact, *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 758 (11th Cir. 1984).

We begin by addressing whether Corona's failure to challenge Temescal Creek's status as a water of the United States earlier may be excused based on *Sackett*. A party generally cannot complain about "errors below for which [it] is responsible." *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002) (citation modified); *cf. Perez v. Discover Bank*, 74 F.4th 1003, 1008 (9th Cir. 2023) (recognizing that a party may waive a legal argument through inconsistent conduct). The theory here is that Corona invited any error that occurred by admitting during the summary judgment proceedings that Temescal Creek was a water of the United States. But the rationale for the invited-error doctrine is undermined where a change in law revives a previously foreclosed issue. For example, we have recognized that the invited-error doctrine does not apply where a party fails to challenge a jury instruction in the face of "a 'solid wall of Circuit authority' [that] would have rendered an objection futile." *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1438 (9th Cir. 1996) (quoting *Robinson v. Heilman*, 563 F.2d 1304, 1307 (9th Cir. 1977) (per curiam)).

Of course, not every change in law triggers this exception. The intervening authority must "announce a substantial departure from [the] previous rule of law; intervening decisions that merely clarify the law as it existed at trial will not excuse a failure to object." 9 Moore's Federal Practice – Civil § 51.33 (2026) (citing *Castrignano v. E.R. Squibb & Sons, Inc.*, 900 F.2d 455, 460 (1st Cir. 1990)). And

the party seeking to rely on an intervening change in law needs to raise it as a basis for relief at the earliest procedural opportunity. *See Knapp*, 90 F.3d at 1438 (noting that the change in law was raised before the district court in a motion for a new trial).

Where these circumstances are present, and the court retains jurisdiction over the case, allowing consideration of a newly available issue does not permit parties to escape the consequences of invited errors or to obtain an unfair "second bite at the apple." *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001) (citation modified). Rather, it avoids "the unhappy result" that would flow from the contrary practice of "encourag[ing] . . . counsel to burden district courts with repeated assaults on the then settled principles out of hope that those principles will be later overturned." *Robinson*, 563 F.2d at 1307 (citation modified).

Up through the second trial, our decision in *Moses* governed whether a tributary like Temescal Creek constitutes a water of the United States. In that case, we understood the question to be "whether a seasonally intermittent stream which ultimately empties into a river that is a water of the United States can, itself, be a water of the United States." 496 F.3d at 989. Relying primarily on Justice Kennedy's opinion in *Rapanos*, we reasoned that even a tributary that was "dry during much of the year," so long as it flowed continuously on occasion, was sufficient to trigger regulation under the Clean Water Act. *Id.* at 991. District courts understood *Moses* to instruct that *every* seasonally intermittent stream that flowed into a water of the United States was itself a water of the United States. *E.g.*, *S.F. Baykeeper v. W. Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 763–69 (N.D. Cal. 2011); *United States v. Vierstra*, 803 F. Supp. 2d 1166, 1170 (D. Idaho 2011).

*Moses* did not part a sea of hostile precedent for Corona. It created one. It is undisputed that Santa Ana River is a water of the United States and that when Temescal Creek flows, it empties into the Santa Ana River. Given these undisputed facts, it would have been futile for Corona to dispute that Temescal Creek is a water of the United States before *Sackett* adopted the *Rapanos* plurality's narrower interpretation.

*Sackett* contravened the law upon which this case was litigated by repudiating Justice Kennedy's view in *Rapanos* and rejecting the notion that impermanent waterbodies can constitute waters of the United States. 598 U.S. at 678. In *Moses*, we assumed that seasonality did not impede regulating a tributary under the Clean Water Act. 496 F.3d at 990. *Sackett*'s emphasis on relative permanence and a continuous surface connection to navigable water suggests otherwise. And by opening up the possibility that Temescal Creek is *not* a water of the United States even though it is a tributary of the Santa Ana River, the Supreme Court's decision justifies allowing Corona to litigate this question before being held liable for significant monetary penalties under the Clean Water Act.[5]

We recognize that Corona admitted that Temescal Creek is a water of the United States. But this admission is different than Corona's admissions regarding Temescal Creek's connection to the Santa Ana River. The latter are facts

[5] Plaintiffs assert that *Sackett* merely adopted the standard articulated by the *Rapanos* plurality and could not have unsettled *Moses*, which viewed the *Rapanos* plurality's approach as consonant with its holding. While we do not decide the extent to which *Moses* remains good law after *Sackett*, we observe that its interpretation of the *Rapanos* plurality is difficult to square with *Sackett*.

related to the natural world; the former is a legal construct. Facts of the natural world are certainly relevant to the inquiry, but whether a geographic feature is a "water of the United States" is at least a mixed question of law and fact. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) (defining a mixed question as one "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard"). The outcome may have been different had Corona admitted the underlying *facts* necessary to establish that Temescal Creek is a water of the United States under *Sackett*'s legal test. But it did not. As discussed above, Corona disputed Plaintiffs' assertion that "Temescal Creek is a permanent, long-standing water feature." Thus, we do not hold Corona to its admission that Temescal Creek is a water of the United States because this admission was contingent on the law that existed at the time the admission was made. *Knapp*, 90 F.3d at 1438.

## CONCLUSION

For the reasons explained, proof that Temescal Creek is a water of the United States is not required to confer federal subject-matter jurisdiction over this case. Therefore, we affirm the district court's denial of Corona's post-judgment motion to dismiss. But we reverse the denial of Corona's motion for relief under Federal Rule of Civil Procedure 59 and remand for further proceedings.

After *Sackett*, there was no longer a solid wall of authority barring Corona from viably challenging whether Temescal Creek is a water of the United States. And because Corona raised this newly available challenge at the first opportunity when the district court still retained jurisdiction, it is entitled to relief under Rule 59.

We conclude that remand for further proceedings, rather than amendment of the judgment, is the appropriate remedy because *Sackett* broadened the scope of factual findings relevant to determining what constitutes a water of the United States, and on the present record, we cannot determine in the first instance whether Temescal Creek satisfies the new standard. Of course, any relief under Rule 59 is unwarranted if the district court's instruction to the jury that Temescal Creek is a water of the United States did not prejudice Corona. *Frost v. BNSF Ry.*, 914 F.3d 1189, 1194 (9th Cir. 2019). But Plaintiffs do not assert that the relevant jury instruction was harmless even though it was their burden to establish harmlessness. *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009).

On remand, the district court may consider whether it is appropriate to limit the scope of further proceedings to whether Temescal Creek is a water of the United States. *See* 11 *Wright & Miller's Federal Prac. & Proc.* § 2814 (3d ed. 2025) (noting that a partial new trial may be appropriate under circumstances analogous to the ones here).

**REVERSED AND REMANDED.**[6]

[6] Corona's motion to partially strike the fourth brief on cross-appeal (Dkt. No. 38) is DENIED.