BRIAN NEACH, No. 242801
brianneachlaw@gmail.com
Law Offices of Brian Neach
10171 Peregrine Circle
Fountain Valley, California 92708
(714) 475-4550

DAMIEN M. SCHIFF, No. 235101
dschiff@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
(916) 419-7111

SEAN J. RADOMSKI*, Pa. Bar No. 319732
sradomski@pacificlegal.org
FRANK D. GARRISON*, Ind. Bar No. 34024-49
fgarrison@pacificlegal.org
MATTHEW B. GILLIAM*, W. Va. Bar No. 12255
mgilliam@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
(202) 888-6881

**Pro hac vice*

*Attorneys for Defendant Corona Clay Co.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION – SANTA ANA**

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER; ORANGE COUNTY COASTKEEPER,<br><br>Plaintiffs,<br><br>v.<br><br>CORONA CLAY CO.,<br><br>Defendant. | No. 8:18-cv-00333-DOC-DFM<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: December 7, 2026<br>Time: 1:30 p.m.<br>Place: 10A, 10th Floor<br>Judge: Hon. David O. Carter<br>Action filed: 2/27/2018 |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ 3

INTRODUCTION ........ 8

STATEMENT OF FACTS & PROCEDURAL HISTORY ........ 9

LEGAL STANDARD ........ 10

33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS ........ 10

I. Plaintiffs Are Exercising the Executive Power ........ 10

II. Plaintiffs' Exercise of Executive Power Violates the Private Nondelegation Doctrine ........ 13

III. CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion ........ 19

IV. Congress Violated the Appointments Clause ........ 23

V. CWA Citizen Suits Have No Basis in History or Tradition ........ 25

CONCLUSION ........ 27

CERTIFICATE OF COMPLIANCE ........ 29

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) .......... 14

*Alpine Secs. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) .......... 16, 19

*Buckley v. Valeo*,
424 U.S. 1 (1976) .......... 11, 20, 26

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936) .......... 14, 18

*Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*,
652 F. Supp. 620 (D. Md. 1987) .......... 22

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 21

*Confiscation Cases*,
74 U.S. 454 (1868) .......... 26

*de Fontbrune v. Wofsy*,
838 F.3d 992 (9th Cir. 2016) .......... 11-12

*Dep't of Transp. v. Ass'n of Am. R.R.s*,
575 U.S. 43 (2015) .......... 13, 19, 22

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 11

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) .......... 12

*FCC v. AT&T, Inc.*,
608 U.S. 531 (2026) .......... 14

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 13-15, 17, 19

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 13, 26

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) .......... 10

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .......... 25

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 10, 21, 24

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 20, 22

*Huntington v. Attrill*,
146 U.S. 657 (1892) .......... 11-12

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .......... 19-20, 22

*In re Grand Jury Investigation*,
916 F.3d 1047 (D.C. Cir. 2019) .......... 24

*In re Sealed Case*,
829 F.2d 50 (D.C. Cir. 1987) .......... 24

*Inland Empire Waterkeeper v. Corona Clay Co.*,
189 F.4th 804 (9th Cir. 2026) .......... 9-10, 12

*Inland Empire Waterkeeper v. Corona Clay Co.*,
17 F.4th 825 (9th Cir. 2021) .......... 10

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 26

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) .......... 24

*Lucia v. SEC*,
585 U.S. 237 (2018) .......... 23-24

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 21

*Martin v. Hunter's Lessee*,
14 U.S. (1 Wheat.) 304 (1816) .......... 26

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
501 U.S. 252 (1991) .......... 27

*Mississippi v. Johnson*,
71 U.S. 475 (1866) .......... 22

*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 24

*NAACP v. X.AI Corp.*,
--- F. Supp. 3d ----, 2026 WL 3124447 (N.D. Miss. Oct. 19, 2026) .......... 15-16

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*,
200 F. Supp. 2d 551 (E.D.N.C. 2001) .......... 22

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
178 F.4th 224 (5th Cir. 2026) .......... 16, 23

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) .......... 13-14, 19

*Nat'l Rep. Sen. Comm. v. FEC*,
146 S. Ct. 2404 (2026) .......... 27

*Oklahoma v. United States*,
163 F.4th 294 (6th Cir. 2025) .......... 13, 16-19

*Patterson v. Barden & Robeson Corp.*,
No. 04-cv-803, 2007 WL 542016 (W.D.N.Y. Feb. 16, 2007) .......... 22

*Printz v. United States*,
521 U.S. 898 (1997) .......... 26

*Robertson v. U.S. ex rel. Watson*,
560 U.S. 272 (2010) .......... 18

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 10, 19, 22, 25-26

*Sierra Club v. Chevron U.S.A., Inc.*,
834 F.2d 1517 (9th Cir. 1987) .......... 12

*Sierra v. City of Hallandale Beach*,
996 F.3d 1110 (11th Cir. 2021) .......... 11

*Student Pub. Interest Rsch. Grp. of N.J., Inc. v. Monsanto Co.*,
600 F. Supp. 1474 (D.N.J. 1985) .......... 23

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 20, 25

*Trump v. California*,
--- S. Ct. ----, 2026 WL 2473573 (Aug. 24, 2026) .......... 19

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 21-22

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... 10-11, 19, 21, 26

*Trump v. United States*,
603 U.S. 593 (2024) .......... 21

*U.S. ex rel. Kelly v. Boeing Co.*,
9 F.3d 743 (9th Cir. 1993) .......... 23-24

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 15

*United States v. Arthrex*,
594 U.S. 1 (2021) .......... 26

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) .......... 24

*United States v. Germaine*,
99 U.S. (9 Otto) 508 (1878) .......... 24

*United States v. Maurice*,
26 F. Cas. 1211 (C.C.D. Va. 1823) .......... 25

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 10

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 11

*United States v. Texas*,
599 U.S. 670 (2023) .......... 19, 22, 26-27

**U.S. Constitution**

U.S. Const. art. II, § 2, cl. 2 .......... 23

**Statutes**

31 U.S.C. § 3730(b)(2) .......... 15

31 U.S.C. § 3730(c)(2)(A) ........ 15

31 U.S.C. § 3730(c)(3) ........ 15

33 U.S.C. § 1365 ........ 8, 10, 14

33 U.S.C. § 1365(a) ........ 21, 24

33 U.S.C. § 1365(b)(1)(A) ........ 16, 20, 24

33 U.S.C. § 1365(b)(1)(B) ........ 16, 20, 24

33 U.S.C. § 1365(c)(2) ........ 15

33 U.S.C. § 1365(c)(3) ........ 15


**Rule**


Fed. R. Civ. P. 12(c) ........ 10


**Other Authorities**


4 Blackstone, William, *Commentaries on the Laws of England* ........ 11-13, 18

de Montesquieu, Baron, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ........ 11

Greve, Michael S., *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339 (1990) ........ 19

Lawson, Gary, *Delegation and Original Meaning*, 88 Va. L. Rev. 327 (2002) ........ 13

Locke, John, *Second Treatise of Civil Government* (J. Gough ed. 1947) ........ 22

Locke, John, *Second Treatise on Government* (East India Publishing Co. ed. 2023) ........ 11-12, 18, 20

Memorandum in Support of the United States' Amended Motion for Intervention and Dismissal, *NAACP v. X.AI Corp.*, No. 3:26-cv-74, ECF 86 (N.D. Miss. July 7, 2026) ........ 26

Prakash, Saikrishna, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701 ........ 13, 20, 22

Woolhandler, Ann & Nelson, Caleb, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004) ........ 12-13

## INTRODUCTION

Congress's enactment of 33 U.S.C. § 1365—the statute under which Plaintiffs pursue this case—upsets the balance struck by the U.S. Constitution's Framers. In 1787, they vested the executive power in a President and established Executive Branch unity by giving the President the power to appoint, oversee, and remove subordinates. The Framers feared that a plural executive would lead to second-guessing of the President's decisions. Although the Framers chose this arrangement, Congress in 1972 shattered Executive Branch unity with Clean Water Act ("CWA") citizen suits, which allow private actors to exercise executive power. And that is what happened here: despite being notified by Plaintiffs of the alleged violations in 2017, the President's subordinates did not bring an enforcement action. That should have been the end of the story. But because Congress undermined the President's prerogatives, Plaintiffs—who think they know better than the President, Department of Justice ("DOJ"), and U.S. Environmental Protection Agency ("EPA")—were allowed to bring the very claims the Executive declined to pursue. This is not an isolated incident, as this is the 97th CWA citizen suit Plaintiffs have filed since 2006.

This vitiating of the President's enforcement decisions threatens the liberty and accountability our Framers sought to ensure. The vesting of all executive power in an accountable government official was just as much a part of Article II's design as the vesting of that power in one individual. Under this structure, private, unaccountable plaintiffs may not seek public remedies, which is exactly what Plaintiffs attempt here by suing for civil penalties payable to the U.S. Treasury to the tune of up to $51,570 per day, per violation.

Because Plaintiffs wield executive power, their lawsuit triggers the private nondelegation doctrine, which prevents private individuals from wielding government power and limits their role to giving advice, assistance, and recommendations to an agency with authority and surveillance over them. Plaintiffs cannot meet this test, and their citizen suit violates this doctrine. And because

Congress has allowed Plaintiffs to wield executive power to bring a lawsuit that the Executive declined to pursue, Congress has interfered with the President's ability to employ prosecutorial discretion and thereby violated the Executive Vesting and Take Care Clauses. Finally, this lawsuit violates the Appointments Clause. For these reasons, the Court should enter judgment in Defendant's favor.

## STATEMENT OF FACTS & PROCEDURAL HISTORY

Corona Clay Co. ("Corona" or "Defendant") owns and operates a clay manufacturing facility in Corona, California. *See* First Amended Complaint (ECF 12) ("FAC") ¶¶ 1, 8, 10, 116.[1] The facility operates under California's General Permit for Discharges of Storm Water Associated with Industrial Activities ("General Permit"). *Id.* ¶¶ 1, 32, 104, 106. On December 13, 2017, Plaintiffs sent a Notice of Intent to Sue Letter to Corona, the EPA Administrator, and California state regulators threatening to sue and alleging Corona was violating the CWA by violating the General Permit through its discharges to Temescal Creek and certain procedural violations. *See* FAC ¶ 3; ECF 12-1. EPA did not initiate a CWA lawsuit against Corona prior to February 27, 2018. *See* FAC ¶ 4. Although, "California regulators issued Corona several permit-violation notices," they too "did not bring an enforcement action against Corona." *Inland Empire Waterkeeper v. Corona Clay Co.*, 189 F.4th 804, 811 (9th Cir. 2026) ("*Corona II*"); FAC ¶ 4.

On February 27, 2018, Plaintiffs filed their Complaint, *see* ECF 2, and on April 20, 2018, filed their seven-count FAC, alleging Defendant violated the General Permit. Plaintiffs allege their "members use and enjoy the Santa Ana River watershed and its tributaries for" various recreational activities, "engaging in scientific study, . . . and/or for aesthetic enjoyment." *Id.* ¶ 4*. Plaintiffs claim Defendant's alleged

[1] The FAC starts with a paragraph bearing both the numbers 1 & 2. From there, it continues to ¶ 7 and then restarts at ¶ 1. This Motion cites to the initial enumerated paragraph as ¶ 1. Because there are duplicates of ¶¶ 1-7, this Motion cites to the first ¶¶ 1-7 without an asterisk. It cites to the second ¶¶ 1-7 with an asterisk.

violations "impair [their] members' use and enjoyment of those waters." *Id.* ¶ 5*. Plaintiffs pray for declaratory and injunctive relief, request that this Court assess penalties of up to $51,570 "per day per violation" against Defendant, and seek attorney's and expert witness fees. *Id.* at p. 44 (Part VII - Relief Requested).

After a jury ruled for Defendant, the Ninth Circuit vacated and remanded. *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825 (9th Cir. 2021). After another jury ruled for Plaintiffs, the Ninth Circuit reversed and remanded. *Corona II*, 189 F.4th 804. Plaintiffs have voluntarily dismissed Counts II-IV—the only "claim[s] alleging an actual discharge of stormwater, leaving only their asserted procedural permit violations." *Id.* at 812 & n.2.

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings," Fed. R. Civ. P. 12(c), which "is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). An argument challenging the constitutionality of a statute may be made through a Rule 12 motion. *See United States v. Morrison*, 529 U.S. 598, 604 (2000).

## 33 U.S.C. § 1365 VIOLATES THE SEPARATION OF POWERS

### I. Plaintiffs Are Exercising the Executive Power

Through § 1365, Congress has unconstitutionally vested executive power in private citizens by allowing them to seek civil penalties payable to the U.S. Treasury for alleged violations of the statute. The Framers vested "the 'executive Power'—all of it—. . . 'in a President,'" and the pursuit of "daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 219 (2020) (citation omitted); *see also Trump v. Slaughter*, 146 S. Ct. 2283, 2305 & n.4 (2026); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring). Because Plaintiffs seek civil penalties payable to the U.S.

Treasury of up to $51,570 per day, per violation, they exercise executive power. *See* FAC ¶ 26; *see also* Baron de Montesquieu, *The Spirit of the Laws* Pt. 2, Bk. 11, Ch. 6, p. 157 (Anne M. Cohler, Basia C. Miller & Harold S. Stone eds. 1989) (1748) ("the executive power" includes the power by which the magistrate "punishes"); John Locke, *Second Treatise on Government* §§ 7, 13, pp. 9, 12 (East India Publishing Co. ed. 2023) (1689) ("the executive power" includes the "right to punish the transgressors").[2]

Further, Plaintiffs exercise executive power by "conducting civil litigation in the courts of the United States for vindicating public rights[.]" *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam); *see also Slaughter*, 146 S. Ct. at 2305 ("[T]he 'discretionary power to seek judicial relief' lies at the very core of executive authority." (quoting *id.* at 138)). There is a distinction between injured parties seeking reparation for private wrongs and suits that seek to redress "a wrong to the public," not just "a wrong to the individual." *Huntington v. Attrill*, 146 U.S. 657, 668 (1892). This distinction is rooted in "the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: private wrongs and public wrongs,'" *id.* (quoting 3 William Blackstone, *Commentaries on the Laws of England* *2), and rights are divided into private rights and public rights. *Ellingburg v. United States*, 607 U.S. 163, 179-80 (2026) (Thomas, J., concurring) (discussing Blackstone).

"[P]ublic rights" are those that involve duties owed "to the whole community, considered as a community, in its social aggregate capacity." 4 Blackstone, *supra*, at *5; *see Huntington*, 146 U.S. at 668 (citation omitted); *de Fontbrune v. Wofsy*, 838

---

[2] Because *Seila Law* settled this issue, based on precedent alone, this Court can hold that Plaintiffs' pursuit of civil penalties is an exercise of executive power. Besides precedential argument, this Court can conduct an originalist analysis. *See United States v. Rahimi*, 602 U.S. 680, 708-10 (2024) (Gorsuch, J., concurring); *id.* at 715, 722 n.3, 723 (Kavanaugh, J., concurring); *id.* at 737-39 (Barrett, J., concurring). Such an analysis of "the executive power" would yield the same conclusion. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1134 (11th Cir. 2021) (Newsom, J., concurring).

F.3d 992, 1001 (9th Cir. 2016) (citation omitted). Public rights "include interests generally shared, such as . . . general compliance with regulatory law." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004) (footnote and citation omitted). A public wrong could be pursued only "at the suit of the king" for public remedies such as "fine and imprisonment." 4 Blackstone, *supra*, at *6.[3] In contrast, private rights are those "'belonging to individuals, considered as individuals.'" *Huntington*, 146 U.S. at 668 (quoting 3 Blackstone, *supra*, at *2); *Wofsy*, 838 F.3d at 1001 (same). Such rights an individual can redress only by pursuing private remedies, which would "either restor[e] to him his right, if possible; or by giving him an equivalent" of "private compensation" through "civil satisfaction in damages." 4 Blackstone, *supra*, at *6-7; *see* Locke, *supra*, § 10, p. 10 ("a particular right to seek reparation from him that has done it").

Citizen suit plaintiffs sue to vindicate public rights by initiating enforcement actions, as "citizen plaintiffs effectively stand in the shoes of the EPA." *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987); *see Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004) (Citizen plaintiffs "seek relief not on their own behalf but on behalf of society as a whole[.]" (citation omitted)). Plaintiffs are suing to redress alleged wrongs to public rights because they allege harms to the "waters of the United States." FAC ¶ 7. Indeed, they admit that the only time the CWA applies is when the "waters of the United States" are implicated. *Id.* ¶ 14. There are alleged harms to three "waters," *id.* ¶¶ 180-81, none of which Plaintiffs allege an ownership interest in, as the only alleged recreational, scientific, and aesthetic interests are those the whole community shares. *Id.* ¶ 4*. Further, the four remaining counts are for "asserted procedural permit violations," *Corona II*, 189 F.4th at 812,

[3] Because the Montesquieu, Locke, and Blackstone sources are not readily available on a legal search engine, Defendant has provided them as exhibits to this Motion for the Court's convenience.

and such "general compliance with regulatory law" constitutes public rights. Woolhandler & Nelson, *supra*, at 693. Thus, Plaintiffs seek to "[v]indicat[e] 'the *public* interest'" which "is the function of Congress and the Chief Executive.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation omitted); *see* 4 Blackstone, *supra*, at *2 (The sovereign was "the person injured by every infraction of the public rights belonging to that community, and is therefore in all cases the proper prosecutor for every public offence."); Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 789 (The Framers understood the President to be the "avenger of public wrongs."). Vindicating the public interest is not the function of private individuals, but Plaintiffs attempt to do so here.

## II. Plaintiffs' Exercise of Executive Power Violates the Private Nondelegation Doctrine

Congress's vesting of executive power in private plaintiffs, and Plaintiffs' attempt to wield it here, run afoul of the private nondelegation doctrine. This doctrine teaches that the Constitution's separation of powers forbids Congress from enacting a law that "allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025).[4] In contrast, laws are permissible under which "private actors" provide only "advice and assistance" to "[g]overnment agencies" and "give [them] recommendations." *Id.* at 692. A government agency must "retain[] decision-making power" so that "the private party's recommendations . . . cannot go into effect

[4] *See also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring) ("There is not even a fig leaf of constitutional justification" for allowing "[p]rivate entities" to exercise "'executive Power,'" as "it raises '[d]ifficult and fundamental questions' about 'the delegation of Executive power' when Congress authorizes citizen suits." (alteration in original) (citation omitted)); *Oklahoma v. United States*, 163 F.4th 294, 305 (6th Cir. 2025) ("[T]he Vesting Clauses . . . bar unchecked reassignments of power to a non-federal entity."); *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022) ("*Black I*") (The "Constitution permits only the federal government to exercise federal power."); Gary Lawson, *Delegation and Original Meaning*, 88 Va. L. Rev. 327, 352 (2002).

without an agency's say-so[.]" *Id.* at 692, 695 (citation omitted). Further, private actors must "'function[] subordinately to' the agency" and be "subject to [the agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted).[5] Section 1365 violates this doctrine by allowing Plaintiffs to govern.

Section 1365 lets citizen plaintiffs govern by allowing them to exercise executive power. *See supra* pp. 10-13. Here, Plaintiffs exercised that power by filing their Complaint and FAC without the Government's "say-so." *Consumers' Rsch.*, 606 U.S. at 695. This violates the private nondelegation doctrine. Plaintiffs did not advise the Government that the Government should file these complaints. Plaintiffs did not give the Government assistance in filing these complaints. And Plaintiffs did not recommend that the Government file these complaints. *Id.* at 692. Instead, Plaintiffs governed by making these filings without the Government's "say-so." *Id.* at 695. Thus, one cannot say that the Government "alone has decision-making authority." *Id.* at 693.

Further, Plaintiffs do not "'function[] subordinately to' [any] agency" because they are not "subject to [any agency's] 'authority and surveillance.'" *Id.* at 692 (citation omitted). To determine what authority the Executive Branch has over Plaintiffs, the proper place to look is the pertinent statute, as an "agency 'literally has no power to act unless and until authorized by statute.'" *FCC v. AT&T, Inc.*, 608 U.S. 531, 541 (2026) (citation omitted) (cleaned up). The CWA gives the Executive

---

[5] "This commonsense principle" "is reflected in the Supreme Court's non-delegation cases," in which the Court "has set its face against giving public power to private bodies." *Black I*, 53 F.4th at 880. For example, in "the leading case" on the private nondelegation doctrine, *Carter Coal* held the Bituminous Coal Conservation Act of 1935 authorizing local coal district boards to adopt codes setting minimum coal prices to be unconstitutional. *Consumers' Rsch.*, 606 U.S. at 692. This was because the Act was "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935).

Branch essentially no authority over Plaintiffs. The only post-suit rights any officials have is that "the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator," and, if the private plaintiff wants to settle with the defendant, the Attorney General and Administrator are entitled to only a 45-day review period. 33 U.S.C. § 1365(c)(3). The officials lack final decision-making authority over the proposed consent judgment. This scheme inverts the way the public and private entities are supposed to interact. To survive private nondelegation doctrine scrutiny, "the private party's recommendations . . . cannot go into effect without an agency's say-so[.]" *Consumers' Rsch.*, 606 U.S. at 695 (citation omitted). If the private plaintiff wants to settle, however, the Government can only make recommendations, with the private plaintiff retaining the final say.

Although the Administrator "may intervene as a matter of right," 33 U.S.C. § 1365(c)(2), this limited intervention right does not "allow the Administrator to unilaterally dismiss a citizen suit once he has intervened." *NAACP v. X.AI Corp.*, --- F. Supp. 3d ----, 2026 WL 3124447, at *6 (N.D. Miss. Oct. 19, 2026). Thus, it can be contrasted with the right Congress gave in the False Claims Act ("FCA") *qui tam* statute, another law that allows private plaintiffs (known as relators) to exercise executive power. 31 U.S.C. § 3730(b)(2), (c)(2)(A), (c)(3). That statute expressly gives the Government the ability to intervene and dismiss a *qui tam* action at any time over the relator's objection.[6] *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023). But with CWA citizen suits, the Executive Branch "is given no statutory authority to approve, review, or countermand any of [Plaintiffs' litigation] decisions. All of that enforcement, according to [CWA]'s 'plain terms,' 'can be done by the private entities without the [Executive Branch]'s

---

[6] In this way, § 1365's constitutionality is even more suspect than the FCA *qui tam* statute. *Polansky*, 599 U.S. at 442 (Kavanaugh, J., joined by Barrett, J., concurring) (stating "'[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II'" (citation omitted)); *id.* at 449 (Thomas, J., dissenting) (same).

involvement.'" *Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, 178 F.4th 224, 247 (5th Cir. 2026) ("*Black III*") (citations omitted).

The CWA's "diligent prosecution bar" does not remedy the statute's constitutional defects. That bar prevents a citizen plaintiff from suing "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State." 33 U.S.C. § 1365(b)(1)(B). But critically, the EPA Administrator has only "sixty days" to exercise this authority "after the plaintiff has given [the Administrator] notice." *Id.* § 1365(b)(1)(A). If the Government does not sue within sixty days (as happened here), then the citizen plaintiff may file its complaint without the Government's say-so. And even when the Government sues within sixty days, "any citizen may intervene as a matter of right." *Id.* § 1365(b)(1)(B). Thus, the diligent prosecution bar does not actually "bar" citizens from wielding executive power. It is wholly illusory.

Therefore, the argument against the constitutionality of the CWA's citizen suit provision is even stronger here than the analogous argument successfully advanced against the private Financial Industry Regulatory Authority ("FINRA"). The D.C. Circuit preliminarily enjoined FINRA from expelling a member prior to review by the Securities and Exchange Commission ("SEC") because "SEC review can come only after, not before, the expulsion [from FINRA] takes effect," which would be "too little too late." *Alpine Secs. Corp. v. FINRA*, 121 F.4th 1314, 1326 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2751 (2025); *see also Black III*, 178 F.4th at 247 ("some back-end review over [Plaintiffs'] enforcement actions" is not enough to survive private nondelegation doctrine scrutiny). But with the CWA, there is no supervisory role for any federal actor once the citizen suit has been filed. *X.AI*, 2026 WL 3124447, at *5 ("EPA[] . . . does not . . . retain[] complete control over *all* Clean Air Act litigation."). Thus, Plaintiffs do not "*remain*[] 'subject to [the agency's] pervasive surveillance and authority' when it matters." *Oklahoma*, 163 F.4th at 314 (alteration in original) (emphasis added) (citation omitted).

Even opinions finding no private nondelegation doctrine violation serve to underscore how far citizen suits are from satisfying this doctrine. The *Consumers' Research* Court upheld a delegation from the Federal Communications Commission ("FCC") to the private Universal Service Administrative Company, which serves as Administrator for the Universal Service Fund. Whereas "the Administrator is broadly subordinate to the" FCC because the "FCC appoints the Administrator's Board of Directors and approves its budget," here, Plaintiffs self-appoint and approve their own case budget. *Consumers' Rsch.*, 606 U.S. at 692-93 (citation omitted). Further, the "Administrator makes the initial projections" and "estimates the programs' cost," which the FCC reviews "and either revises or approves." *Id.* at 693-94. Thus, the FCC was the entity making the final decision. In contrast, citizen plaintiffs do not recommend how CWA suits should proceed and instead litigate cases independent of EPA's surveillance. "In every way that matters to the constitutional inquiry, [Plaintiffs], not the [EPA], [are] in control." *Id.* at 695.

And although the Sixth Circuit split with the Fifth and rejected a facial nondelegation challenge to the Horseracing Integrity and Safety Act ("HISA"), it did so because HISA gives the Federal Trade Commission ("FTC") "'pervasive' oversight and control of the [Horseracing Integrity and Safety] Authority's enforcement activities[.]" *Oklahoma*, 163 F.4th at 312. For example, whenever the Authority proposes a sanction, an "aggrieved entity may obtain review from an Administrative Law Judge," and "[a]fter that, the FTC has full authority to review . . . [and] reverse any sanction by the Authority." *Id.* at 311 (citations omitted). Further, the "Authority's adjudication decisions do not become final until the FTC has the opportunity to review them," and if "the Authority tries to implement a sanction before the FTC finally reviews it, the FTC or the ALJ may stay the sanction." *Id.* (citations omitted). Also, HISA empowers the FTC to promulgate "rules constraining the Authority's investigations and increasing the procedural rights" and "to determine *who* the Authority investigates." *Id.* at 312. Indeed, at the

time *Oklahoma* was decided, there was a proposed "rule that would require the FTC's approval before the Authority may issue a subpoena or bring a civil enforcement action." *Id.* (citation omitted). There is nothing remotely similar here. Thus, even if this Court finds that *Oklahoma* is more persuasive than *Black III* (or if the Supreme Court resolves the split in the Sixth Circuit's favor), this Court should still enter judgment in Defendant's favor.

Enforcing the private nondelegation doctrine to dismiss Plaintiffs' FAC also would further the rationale behind vesting the executive power in the sovereign alone. The Framers took the "sword out of private hands and turn[ed] it over to an organized government, acting on behalf of all the people." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 282-83 (2010) (Roberts, C.J., dissenting from the dismissal of a writ of certiorari); *see also* 4 Blackstone, *supra*, at *7-8 ("In a state of society this right is transferred from individuals to the sovereign power[.]"); Locke, *supra*, §§ 88-89, pp. 55-56 ("every man who has entered into civil society . . . has thereby quitted his power to punish offences" and has "quit . . . his executive power"). This was done to prevent self-interested, private individuals from using "the *power* of human punishment" for their own ends. 4 Blackstone, *supra*, at *7–8; *see Carter Coal*, 298 U.S. at 311 (delegation to "private persons" was unconstitutional because they were not "disinterested"); Locke, *supra*, § 90, p. 56 ("[C]ivil society [sought] to avoid, and remedy those inconveniences of the state of nature, which necessarily follow from every man's being judge in his own case, by setting up a known authority, to which every one of that society may appeal upon any injury received, or controversy that may arise[.]"). With § 1365, Congress undid the Framers' design and placed the sword in private hands.

Further, this diffusion of executive power, and the vesting of it in citizen plaintiffs who are not accountable to the President, impairs the liberty and accountability the separation of powers was meant to secure. *Oklahoma*, 163 F.4th at 305 ("Transferring unchecked federal power to a private entity that is not elected,

nominated, removable, or impeachable undercuts representative government at every turn."); *see also Ass'n of Am. R.R.s*, 575 U.S. at 57 (Alito, J., concurring); *Black I*, 53 F.4th at 880; Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tul. L. Rev. 339, 391 (1990). Plaintiffs do not merely give advice, assistance, and recommendations to EPA, they do not function subordinately to EPA, and they are not subject to EPA's authority and surveillance such that EPA retains decision-making power. *Consumers' Rsch.*, 606 U.S. at 692; *Alpine*, 121 F.4th at 1325; *Black I*, 53 F.4th at 889-90. For these reasons,[7] and because "'quintessentially executive' power may not be cleaved off from the Executive Branch," *Slaughter*, 146 S. Ct. at 2305, the citizen suit provision and Plaintiffs' lawsuit violate the private nondelegation doctrine.

## III. CWA Citizen Suits Violate the Executive Vesting and Take Care Clauses by Preventing the Executive Branch from Employing Prosecutorial Discretion

Congress's vesting of executive power in private plaintiffs impairs the President's ability to "[s]et[] prosecutorial priorities," which "lies within the President's Article II power." *Trump v. California*, --- S. Ct. ----, 2026 WL 2473573, at *3 (Aug. 24, 2026); *see also United States v. Texas*, 599 U.S. 670, 684 (2023); *id.* at 689 (Gorsuch, J., concurring in judgment). "The Presidential power of prosecutorial discretion is rooted in Article II," and "the President possesses a significant degree of prosecutorial discretion not to take enforcement actions against

[7] Congress exacerbated the private delegation violation because § 1365 "also forecloses certain indirect methods of Presidential control" by allowing Plaintiffs "receipt of funds outside the appropriations process." *Seila Law*, 591 U.S. at 225-26. "The President normally has the opportunity to recommend or veto spending bills that affect the operation of administrative agencies." *Id.* at 226 (citations omitted). Although "Presidents frequently use these budgetary tools 'to influence the policies of independent agencies,'" "no similar opportunity exists for the President to influence" plaintiffs' pursuit of citizen suits. *Id.* (citation omitted). For example, if EPA or DOJ exercises discretion contrary to his wishes, the President can limit their funding through a budget bill veto. Plaintiffs, however, are immune from this pressure, as they self-fund.

violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The Framers imbedded this concept in Article II because they took to heart "Montesquieu's maxim" that, "[i]f the executive and legislative powers were united, the wielder of both powers would enact tyrannical laws and execute them tyrannically." Prakash, *supra*, at 798 (footnotes omitted). With "the executive power" separated, however, "the executive could temper the effects of tyrannical laws with mild execution." *Id.* at 781 (footnote omitted); *see* Locke, *supra*, § 11, p. 10-11 ("the magistrate . . . can often, where the public good demands not the execution of the law, remit the punishment of criminal offences by his own authority").

The power of prosecutorial discretion extends to "an agency's decision not to prosecute or enforce, whether through civil or criminal process, [and] is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). This is because "an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832 (citation omitted); *see also Buckley*, 424 U.S. at 139. Indeed, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants . . . falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Through CWA citizen suits, however, private plaintiffs (and their attorneys) vitiate prosecutorial discretion by choosing how to prioritize and how aggressively to pursue CWA actions against defendants. Indeed, the only time citizen suit plaintiffs can sue is when, after a 60-day waiting period, the Executive Branch does not prosecute the alleged CWA violation. *See* 33 U.S.C. § 1365(b)(l)(A). To be sure, the President may head off the citizen suit by having the Administrator commence a lawsuit, *see id.* § 1365(b)(1)(B), but this impinges on the President's power of

prosecutorial discretion by forcing him to do the very thing he does not want done. *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting).

*Trump v. United States* confirms that Congress may not second-guess the Executive Branch's enforcement decisions. The Court there reiterated that "'the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" and this authority finds its source in the Take Care Clause. 603 U.S. 593, 620 (2024) (citations omitted). It also held that, "once it is determined that the President acted within the scope of his exclusive authority, his discretion in exercising such authority cannot be subject to further judicial examination." *Id.* at 608. All nine Justices agreed that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609; *see id.* at 678 (Sotomayor, J., dissenting); *see also Slaughter*, 146 S. Ct. at 2307. The CWA's citizen suit provision, however, allows Congress to avoid this prohibition by empowering private citizens to bring the very claims that the President decided not to pursue. Thus, "'by concentrating power in a unilateral actor insulated from Presidential control,'" Congress breaks the executive chain of command by allowing unaccountable private parties to bring lawsuits that the Executive Branch has chosen not to pursue. *Collins v. Yellen*, 594 U.S. 220, 251 (2021) (citation omitted).

Moreover, by requiring this Court "to enforce" the very "effluent standard or limitation" that the President has declined to enforce, *see* 33 U.S.C. § 1365(a), Congress exacerbates the Take Care violation by "transfer[ring] from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). The Supreme Court has "always rejected" such a "vision of [its] role" that "would enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *Id.* (citations omitted); *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("But federal courts do not

exercise general oversight of the Executive Branch . . . ."). It has also recognized a distinction between "a mere ministerial duty, the performance of which might be judicially enforced," and a duty that is "purely executive and political." *Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866) (A ministerial duty "is one in respect to which nothing is left to discretion."). There are "general principles which forbid judicial interference with the exercise of Executive discretion," as any attempt by the Judiciary to control discretionary duties "might be justly characterized . . . as 'an absurd and excessive extravagance.'" *Id.* at 499. This is exactly what Congress forces the Judiciary to do through § 1365.

This subjects citizen suit defendants to a loss of "liberty as described by Locke"; liberty understood as "to be free from 'the inconstant, uncertain, unknown, arbitrary will of another man.'" *Ass'n of Am. R.R.s*, 575 U.S. at 75-76 (Thomas, J., concurring in judgment) (quoting John Locke, *Second Treatise of Civil Government* § 22, p. 13 (J. Gough ed. 1947)); *see also Seila Law*, 591 U.S. at 223-24. Prosecutorial discretion "protect[s] individual liberty by essentially under-enforcing federal statutes regulating private behavior." *Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J., concurring). But because CWA citizen suits prevent the proper operation of Article II, any private plaintiff who disagrees with EPA's decision not to sue can bring suit and deprive a defendant of the liberty Article II sought to secure. As originally understood, the Executive Vesting Clause gave the President "the power to execute the laws," Prakash, *supra*, at 701, and the Supreme Court has repeatedly affirmed that this includes the President and his Executive Branch subordinates' power to decline to bring lawsuits. *Texas*, 599 U.S. at 678; *Heckler*, 470 U.S. at 831-32. Congress undermined that prerogative with CWA citizen suits.[8]

[8] Multiple district courts have rejected constitutional arguments against CWA citizen suits. *See, e.g.*, *Patterson v. Barden & Robeson Corp.*, No. 04-cv-803, 2007 WL 542016, at *8 (W.D.N.Y. Feb. 16, 2007); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555-56 (E.D.N.C. 2001); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623-26 (D. Md. 1987);

## IV. Congress Violated the Appointments Clause

The Appointments Clause by default requires the President to nominate and the Senate to confirm all "Officers of the United States," while allowing an exception for "inferior Officers" whose appointment Congress has "by Law vest[ed] . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. One is an "officer" requiring appointment under the Clause when he (1) "'exercise[es] significant authority pursuant to the laws of the United States'"; and (2) "occup[ies] a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citations omitted).[9] The first prong's requirements are established by the prior sections on the Executive Vesting and Take Care Clauses, and this argument need not be repeated here in full. *See supra* pp. 10-13, 19-22 (discussing lawsuits seeking civil penalties and vindicating public rights). Courts also consider "significant authority" to exist when an actor "'exercise[s] significant discretion,'" *Lucia*, 585 U.S. at 245, 247-48 (citation omitted), which occurs here because Plaintiffs "possess[] authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678 (citations omitted).

Although the Ninth Circuit has upheld the FCA's *qui tam* provision against an Appointments Clause challenge, it did so based on its findings that (1) "relators [do not] exercise 'significant authority'" because "the Executive Branch retains 'sufficient control' of relators"; and (2) "under the terms of the [FCA] statute [the

---

*Student Pub. Interest Rsch. Grp. of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478-79 (D.N.J. 1985). None of these non-binding opinions involved a private nondelegation doctrine argument or Defendant's history and text-based arguments. Moreover, they lacked the benefit of the Supreme Court's recent opinions.

[9] There is debate over whether the Appointments Clause applies to those who are not part of the government and whether challenges to non-governmental individuals/entities should be through the private nondelegation doctrine. *Black III*, 178 F.4th at 249-53. Defendant makes this argument in the alternative, and the Court need not address it if it grants this Motion on other grounds.

relator] must yield to the government's assumption of 'primary responsibility' when it elects to intervene in a qui tam action." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (9th Cir. 1993) (citation omitted). The CWA's citizen suit provision is distinguishable because the Executive Branch does not retain sufficient control of citizen suit plaintiffs, as the CWA does not allow for Government control or dismissal of CWA citizen suits when it intervenes. *See supra* pp. 15-16. And, unlike non-officers, Plaintiff does not operate in an "advisory" role and make "only non-binding recommendations." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025).

The second prong also is met because Plaintiffs "occupy a 'continuing' position established by law." *Lucia*, 585 U.S. at 245 (citation omitted). This prong "[s]tress[es] 'ideas of tenure [and] duration'" and asks whether the putative officer's statutory duties are "'occasional or temporary' rather than 'continuing and permanent.'" *Id.* (citation omitted). This inquiry "embraces the ideas of tenure, duration, emolument, and duties" as set out in the relevant statute. *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511 (1878),[10] and the statute identifies the office's duties. *See* 33 U.S.C. § 1365(a) (ability to "commence a civil action"); *id.* § 1365(b)(1)(A) (duty to give sixty days' notice); *id.* § 1365(b)(1)(B) (ability to "intervene as a matter of right"). Also, the notion that the position is "continuing" is bolstered by the fact that, since 2006, Plaintiffs have filed 97 CWA citizen suits. *See* Exhibit D, attached hereto. Essentially, they "act[] as a self-appointed mini-EPA." *See Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting). If multiple courts have held that an individual who temporarily pursues a single case can be an officer,[11] then litigants

---

[10] This Court can hold that Plaintiffs occupy a continuing position even if not all "continuing position" factors are met. *Braidwood*, 606 U.S. at 755 (holding that members of the Preventative Services Task Force are officers even though "[t]hey serve on a volunteer basis" and "are not paid by the Federal Government").

[11] *Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988); *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022); *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019); *In re Sealed Case*, 829 F.2d 50, 56-57 (D.C. Cir. 1987).

like Plaintiffs which regularly file enforcement actions over a twenty-year period qualify as officers. Further, the position is not personal to Plaintiffs, which is underscored here by the fact that there are two Plaintiffs; if one withdrew, the other could still pursue the suit. Further, Plaintiffs are non-profit corporations; if they were to withdraw, the suit still could be prosecuted by one or more of their members. *See* FAC ¶¶ 1-3*. Thus, the office's "duties continue, though the person" occupying it "be changed." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.).

Thus, Plaintiffs occupy a continuing position, but Plaintiffs have not been appointed to their office consistent with the Appointments Clause, nor does the CWA require that they be so appointed. Therefore, § 1365 violates this Clause.

## V. CWA Citizen Suits Have No Basis in History or Tradition

Besides examining Article II's clauses to determine whether Congress violated the separation of powers, the Supreme Court considers whether a statute lacks a historical precedent. According to this criterion, courts should view congressional enactments with skepticism when they are "an innovation with no foothold in history or tradition." *Seila Law*, 591 U.S. at 222. "'Perhaps the most telling indication of the severe constitutional problem with [a statute] is the lack of historical precedent for'" it. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 505 (2010) (citation omitted). Citizen suits have no foothold in history or tradition because, "until the 20th century, Congress rarely created 'citizen suit'-style causes of action for suits against private parties by private plaintiffs . . . . The situation has changed markedly, especially over the last 50 years or so." *TransUnion*, 594 U.S. at 428 n.1. Their status as "a historical anomaly" provides additional evidence as to why there are constitutional violations here. *Seila Law*, 591 U.S. at 220, 222 ("CFPB's single-Director structure" was

unconstitutional because it was "almost wholly unprecedented"); *see United States v. Arthrex*, 594 U.S. 1, 21 (2021).[12]

Far from there being a tradition of private citizens exercising executive power, there has been since the Founding a tradition of the Executive pursuing public remedies to vindicate public rights and having discretion over such suits. *See supra* pp. 10-13, 19-22. This tradition was confirmed by the Supreme Court in the nineteenth century. *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 329-30 (1816) ("The second article declares that 'the executive power *shall be vested* in a president of the United States of America.' Could congress vest it in any other person . . . ? It is apparent that such a construction . . . would be utterly inadmissible."); *Confiscation Cases*, 74 U.S. 454, 457 (1868) (noting the "[s]ettled rule" that "civil or criminal" suits cannot proceed "for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business, in his absence, as may appertain to the duties of his office"). And it continued into the twentieth century, *Buckley*, 424 U.S. at 139; *Printz v. United States*, 521 U.S. 898, 922-24 (1997), and remains the law today. *All. for Hippocratic Med.*, 602 U.S. at 382; *Texas*, 599 U.S. at 684; *id.* at 689 (Gorsuch, J., concurring in judgment).

Any contention that citizen suits are constitutional because, as *TransUnion* acknowledged, they have been included in federal statutes over the last fifty-six years, must be rejected. A court's "inquiry is sharpened rather than blunted by the fact that Congressional [enactments] are appearing with increasing frequency in statutes which delegate authority to" private plaintiffs to wield executive power. *INS v. Chadha*, 462 U.S. 919, 944 (1983); *see also Slaughter*, 146 S. Ct. at 2309; *Seila Law*, 591 U.S. at 231-32. Indeed, due to the nature of Congress's constitutional

---

[12] The United States agrees "citizen suits lack the historic pedigree" needed for them to be upheld. *NAACP v. X.AI Corp.*, No. 3:26-cv-74, ECF 86 at 28 n.5 (N.D. Miss. July 7, 2026).

powers, it shouldn't be surprising that it can take more than a half-century for novel congressional enactments to be found unconstitutional. Because Congress's powers are "'at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments.'" *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 273-74 (1991) (citation omitted). Congress has encroached on the Executive Branch by creating CWA citizen suits, which have no "foothold in history or tradition," a consideration that points to a separation of powers violation.

**CONCLUSION**

Although the Constitution envisions checks against the excessive application of executive power, CWA citizen suits eviscerate these checks by violating numerous constitutional provisions. Any role private plaintiffs may have in the enforcement of federal environmental law is constitutionally limited to seeking private remedies for alleged private wrongs. If Congress believes under-enforcement of the CWA to be a problem, "other forums remain open for examining the Executive Branch's" purported lack of diligence. *Texas*, 599 U.S. at 685. "For example, Congress possesses an array of tools to analyze and influence those policies—oversight, appropriations, the legislative process, and Senate confirmations, to name a few. And through elections, American voters can both influence Executive Branch policies and hold elected officials to account for enforcement decisions." *Id.* (citation omitted); *cf. NRSC v. FEC*, 146 S. Ct. 2404, 2422 (2026) ("But a purported lack of Government (Executive) enforcement of campaign finance restrictions is not an excuse for the Government (Congress and the Executive) to turn around and enact legislation that would broadly suppress speech and sweep aside the First Amendment."). Because CWA citizen suits are unconstitutional, the Court should enter judgment in Defendant's favor.

DATED: October 26, 2026.

Respectfully submitted,

BRIAN NEACH
DAMIEN M. SCHIFF
SEAN J. RADOMSKI*
FRANK D. GARRISON*
MATTHEW B. GILLIAM*

By /s/ Damien M Schiff
DAMIEN M. SCHIFF

*Attorneys for Defendant Corona Clay Co.*

**Pro hac vice*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Corona Clay Co. certifies that this memorandum contains 7,000 words, which, complies with the word limit of L.R. 11-6.1.

DATED: October 26, 2026.

/s/ Damien M Schiff
DAMIEN M. SCHIFF
*Attorney for Defendant Corona Clay Co.*